UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES *ex rel*., | ) | |
| HARRY BARKO | ) | |
| 11305 Hawthorne | ) | |
| Southgate, MI  48195, | ) | |
| | ) | |
| Plaintiff-Relator, | ) | C. A. No. 05-01276(EGS) |
| | ) | |
| BRINGING THIS ACTION ON BEHALF | ) | Amended Complaint filed |
| OF THE UNITED STATES OF AMERICA | ) | **Under Seal** pursuant to 31 |
| | ) | U.S.C. §3730(b)(2) |
| UNITED STATES ATTORNEY | ) | |
| Judiciary Center Building, | ) | |
| 555 Fourth Street, NW, | ) | |
| Washington, 20530 c/o John Greene | ) | |
| | ) | |
| and | ) | |
| | ) | |
| c/o | ) | |
| ALBERTO GONZALES | ) | |
| Attorney General of the United States | ) | |
| U.S. Department of Justice | ) | |
| 10th and Constitution Avenues, N.W. | ) | |
| Washington, DC 20530 | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| HALLIBURTON COMPANY | ) | |
| 5 Houston Center, 1401 McKinney, | ) | |
| Houston TX 77010 and | ) | |
| 1150 18th Street NW, Suite 200 | ) | |
| Washington, DC 20036. | ) | |
| | ) | |
| KELLOGG BROWN AND ROOT, INC. | ) | |
| 5 Houston Center, 1401 McKinney, | ) | |
| Houston TX 77010 and | ) | |
| 1150 18th Street NW, Suite 200 | ) | |
| Washington, DC 20036: | ) | |
| | ) | |
| KELLOGG BROWN & ROOT SERVICES, INC. | ) | |
| 5 Houston Center, 1401 McKinney, | ) | |
| Houston TX 77010 and | ) | |
| 1150 18th Street NW, Suite 200 | ) | |
| Washington, DC 20036) | ) | |

1

KBR  TECHNNICAL SERVICES,INC. )
    5 Houston Center, 1401 McKinney, )
    Houston TX 77010 and )
    1150 18th Street NW, Suite 200 )
    Washington, DC 20036 )
  )
KELLOGG BROWN & ROOT ENGINNERING )
COPRORATION )
    5 Houston Center, 1401 McKinney, )
    Houston TX 77010 and )
    1150 18th Street NW, Suite 200 )
    Washington, DC 20036 )
  )
KELLLOGG BROWN & ROOT )
INTERNATIONAL, INC. )
    (A Delaware Corporation) )
    5 Houston Center, 1401 McKinney, )
    Houston TX 77010 and )
    1150 18th Street NW, Suite 200 )
    Washington, DC 20036 )
  )
KELLLOGG BROWN & ROOT )
INTERNATIONAL, INC. )
    (A Panamanian Corporation) )
    5 Houston Center, 1401 McKinney, )
    Houston TX 77010 and )
    1150 18th Street NW, Suite 200 )
    Washington, DC 20036 )
  )
And any other entities doing business under the )
Name KELLLOGG BROWN & ROOT )
5 Houston Center, 1401 McKinney, )
    Houston TX 77010 and )
    1150 18th Street NW, Suite 200 )
    Washington, DC 20036 )
  )
DAOUD & PARNTERS Inc. P.O Box 6518 )
Aman, 11118 Jordan )
  )
EAMAR COMBINDED FOR TRADING )
AND CONTRACTING COMPANY )
P.O Box 196 )
Dasman, 15452, Kuwait )
  )
                    Defendants. )

## FIRST AMENDED COMPLAINT

This is a *qui tam* action under 31 U.S.C. Sec. 3729, *et al.* of the False Claims Act filed by Relator/Plaintiff Harry "Hap" Barko, in the name of the United States Government and himself to recover penalties and damages arising from Defendants' (KBR *et. al.*) violations of federal requirements concerning contracts with agencies of the United States Defense Department.

## I. THE PARTIES INVOLVED

1.      Plaintiff, Harry Arthur ("Hap") Barko, Jr. of 11305 Hawthorne, Southgate, MI  48195, 51, was a subcontract administrator for Kellogg, Brown and Root, stationed in Iraq. He was hired as of July 1, 2004  and served in Iraq beginning on or about July 8, 2004 in Al Asad, Iraq. He left the country on or about June 20, 2005.

2.      Defendant, Halliburton Company ("Halliburton") of 5 Houston Center, 1401 McKinney, Houston TX 77010, is a publicly traded company, which wholly owned of all business entities known as KBR or Kellogg, Brown and Root, before during and after reorganization under Chapter 11 at the time this action was commenced.  The Halliburton 2005 Annual Report listed the following entities as being wholly owned subsidiaries, before, during and after reorganization under Chapter 11 proceedings:

> Kellogg Brown & Root, Inc.
>
> KBR Technical Services Inc.
>
> Kellogg Brown & Root Engineering Corporation;
>
> Kellogg Brown & Root International, Inc.

(A Delaware Corporation)

Kellogg Brown & Root International, Inc.

(A Panamanian Corporation)

BPM Minerals, LLC

3.      Defendant, Kellogg, Brown and Root, also known as KBR (and entities doing business under these names), of 5 Houston Center, 1401 McKinney, Houston TX 77010, is the prime contractor for all LOGCAP III Contracts referred to below.  Collectively referred to as "KBR".

4.      Defendant, Daoud & Partners Inc. of P.O. Box 6518 Amman 1118, Jordan, served as the subcontractor to KBR for building and staffing laundry facilities.

5.      Defendant, EAMAR combined for General Trading and Contracting Company of P.O Box 196 Dasman, 15452, Kuwait (Hereinafter "EAMAR"), a shell company which KBR hired to dig wells for Water in Iraq.

## II. JURISDICTION AND VENUE

6.      The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

7.      The Plaintiff, Harry Barko, hereby alleges causes of action under 31 U.S.C. sections 3729 *et al*. of the False Claims Act, arising from Defendants' contracts with agencies of the United States Government Defense Department.

8.      Plaintiff, Harry Barko, is the original source of all of the allegations contained in this Complaint.

9.      There has been no public disclosure of the allegations contained in this complaint.

10.     Pursuant to the requirements of the False Claims Act 31 U.S.C. § 3729 et seq., Relator's statements have been filed with the Department of Justice and the United States Attorney's office with exhibits including evidence that documents substantially all of the allegations presented in this complaint.

11.     Jurisdiction over all stated causes of action is conferred upon this Court by 31 U.S.C. Section 3732 and 28 U.S.C. Section 1331 in that this action arises under the laws of the United States.

12.     The Defendants are in the business of providing services and material to the U.S. Government through its Defense Agencies and conduct business in Washington, DC.

13.     Halliburton/KBR maintains offices at 1150 18th Street NW, Suite 200, Washington, DC 20036.

14.     Presentment to the United States has been made under KBR's LOGCAP III contract with the United States Government.

15.     Venue and jurisdiction are proper in the United States District Court, Washington, D.C. pursuant to 28 U.S.C. Section 1391(c) and 31 U.S.C. Section 3732 as the Defendants are a group of organizations and persons subject to personal jurisdiction in Washington, DC.

16.     Plaintiff, Harry Arthur ("Hap") Barko, Jr., 51, of 11305 Hawthorne, Southgate, MI  48195, was a subcontract administrator for Kellogg, Brown and Root (hereinafter "KBR") serving in Iraq.

17.     Mr. Barko worked for the contractor and is not a member of the armed forces. Defendant, Kellogg, Brown and Root (Services, Inc.), including any entities

using the name "Kellogg, Brown and Root" to do business, of 1150 18th Street, NW Suite 200, Washington, DC. 20036 and 5 Houston Center, 1401 McKinney, Houston TX 77010 (hereinafter "KBR"), is the prime contractor for all LOGCAP III contracts with the United States Military.

18.     This includes the contract #DAAA09-02-0007 which is referred to in all subcontract documents listed below.

19.     All entities doing business under the name Kellogg, Brown and Root, before, during and after reorganization under bankruptcy proceedings, were wholly owned subsidiaries of Halliburton Company according to Halliburton's Annual Report.

20.     Halliburton Company has offices at 1150 18th Street, NW Suite 200, Washington, DC 20036 and 5 Houston Center, 1401 McKinney, Houston TX 77010.

21.     Daoud and Partners ("Daoud") of P.O. Box 6518 Amman 11118 Jordan is a subcontractor engaged by KBR to provide laundry facilities and services.

22.     EAMAR Company of P.O Box 196 Dasman, 15452, Kuwait (Hereinafter "EAMAR") was a subcontractor engaged by KBR to dig wells for water in Iraq.

### III. STATEMENT OF FACTS

**A. Introduction.**

23.     The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

24.     The Relator, Harry ("Hap") Barko, was hired by KBR to administer contracts pursuant to the Logistics Civil Augmentation Program (LOGCAP III).

25.     Under this program, KBR is to provide support to military operations.

26.     Mr. Barko was stationed at the B1 Camp, Al Asad, in Iraq, which served as the administrative headquarters for KBR operations in all the B sector camps.

27.     While performing his duties for KBR, Mr. Barko discovered that the company used a subcontract procedure which vastly inflated the costs of constructing laundry facilities and providing laundry services on at least three military bases.

28.     KBR could pass these costs along to the United States Government and receive additional awards under the LOGCAP III cost plus program.

29.     First, KBR entertained bids in a marginally competitive manner and issued a "Notice To Proceed" to the subcontractor, Daoud.

30.     Next, KBR issued back-dated contracts for Daoud to provide facilities and equipment, as well as for Daoud to process the laundry.

31.     In order to increase the value of the contracts, KBR issued Change Orders without any competitive bidding process.

32.     After paying to have the facilities built and paying for Daoud to use the facilities to process laundry, KBR's inspectors often found the facilities to be in unsatisfactory condition.

33.     On Behalf of the U.S. Government, KBR awarded contracts to Daoud for three sites at a total of $9,792,000.

34.     The Change Orders for the three sites increased the value of the contracts by at least $4,869,023.00.

35.     Of that amount, $3,817,249.00 was specifically designated for equipment and Real Property which had previously been included in the terms of the original contracts.

36.     The initial contracts all list "The United States Government" as the owner.

37.     They all required Daoud to provide all materials and equipment necessary to build laundry facilities and provide laundry services on the military bases.

38.     All equipment purchased by Change Order was provided under the terms of the initial contracts.

39.     Therefore, KBR purchased equipment and material on behalf of the U.S. Government at least twice.

40.     Any "purchase" of Real Property is fraudulent on its face.

41.     The Real Property "sold" was situated on U.S. military bases in Iraq. Neither Daoud nor KBR could hold title such property.

42.     Each Change Order included a line item for a "negotiated" 25% buyout premium included within the costs for equipment and Real Property.

43.     That premium alone totaled $1,015,834.00 for the three sites.

44.     Even accepting that these individual charges were legitimate (which the Relator, Mr. Barko, does not), the Change Orders fraudulently inflate the value of KBR's Contracts to Daoud on their face by billing again for property already purchased under the initial contracts.

45.     The initial contracts explicitly state that Daoud is to provide all material, equipment and all other things necessary to provide laundry services and that everything Daoud furnishes for its work shall become the property of the General Contractor.

46.     In each Change Order, KBR used the amount of total construction value that was already allocated by the initial contracts as its starting point for determining the "Net Cost of Obtaining Title" to be added to the amount of the initial contracts.

47.     The entire amount of the total construction value that is used in each Change Order to determine the "Net Cost of Obtaining Title" was already included under the terms of the initial contracts.

48.     Therefore, each Change Order effectively charged a second time for materials, equipment and other things necessary to construct laundry facilities that were covered under the terms of the initial contracts.

49.     The amounts double-billed are as follows:

|  |  |
|---|---|
| For Camp B1 | $ 1,093,920 |
| For Camp B3 | $ 758,909 |
| For Camp B2 | $ 727,186 |
| **Total** | **$ 2,580,015** |

50.     This amount was effectively counted twice when increasing the value of the Contract through Change Orders, even assuming all the individual charges were legitimate, which of course the Plaintiff/Relator disputes.

51.     The Plaintiff's information is that fraudulent contracting with regard to building laundry facilities at these three sites also occurred at other sites in the

B sector of Iraq, and is most likely occurring throughout the LOGCAP III contract program.

52.     Documents obtained by the Plaintiff show that contracts issued by KBR for Laundry Facilities and services under the LOGCAP III program totaled a sum of $77,424,509.04.

53.     KBR officials engaged in other activity which inflated costs to the U.S. Military in the B sector of Iraq. KBR also contracted with "shell companies" to create an extra layer of cost and profit for all those involved.

54.     The EAMAR master agreement highlights this practice.

55.     According to the testimony of General Paul J. Kern before the U.S. House on March 11, 2004, the LOGCAP III contract, which KBR administers for the Government, has at least one incentive to increase the price.

56.     KBR is given an extra award of 3% of any costs in addition to its expenses related to this contract program.

57.     Therefore, the higher the subcontracting costs the more reward for KBR.

58.     Harry "Hap" Barko was deployed by KBR to work as a contract administrator in Iraq for the B sites.

59.     Mr. Barko generally worked out of the Camp Al Asad (B-1) where the administrative offices for the B site camps are located by KBR.

60.     Barko has documented extensive abuse of the contracting process by KBR and its subcontractors which increased costs to the United States Government.

**B. KBR received only two bids for Laundry Facilities and Services.**

61.     The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

62.     KBR received bids from only two contractors to provide laundry facilities and services at three sites.

63.     The two contractors bidding on the projects were Daoud and Partners and Rezayat Projects. The bids varied vastly in the price quoted to KBR.

64.     The Bid from Daoud was to provide "…Turn-Key Supply and Operations of laundry Facilities at Sites B-1, Al Asad AB, to service 4,800 personnel; B-2 Rifles Base-Air Ramadi, to service 2500 personnel; and B-3 to service 4,200 personnel."

65.     The initial Daoud Bid stated the price to provide all three camps with Laundry facilities and services as follows:

> B1 for $4,015,764
> B2 for $3,398,876 and
> B3 for $4,256,714
> (Total amount of $11,671,354)

66.     The Bid from Rezayat Projects, according to the KBR review sheet, was as follows:

> B1 for $14,347,515
> B2 for $8,197,258
> B3 for $11,573,642
> (Total amount of $21,205,695)

67.     KBR began processing requisitions according to the Daoud Bid.

**C. Daoud Lowers Bid after a lone KBR official requests a "Sanity Check."**

68.     The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

69.     Robert Gerlach of KBR negotiated the Bid with Daoud and Partners.

70.     Daoud's Bid and the KBR Requisitions generated as a result were for more money than another KBR official wanted to pay.

71.     Mr. Gerlach received instruction from Donald Bailey of KBR on November 13, 2003, in response to Gerlach's attempts to obtain KBR approval for the Daoud Bid.

72.     Mr. Bailey suggested that KBR should pay significantly less than the Daoud Bid.

73.     He suggested that KBR should pay Daoud to provide the services at the three camps as follows:

        B1 for $4,608,000
        B2 for $2,304,000 and
        B3 for $2,880,000
        (for a total of $9,792,000)

74.     Mr. Bailey states "$12M is a little high, we want to make sure and put a good **sanity check** and justification on this before we commit." [emphasis added]

75.     He also stated "The one year contract is okay per the CA of V Corp"

76.     As a result, Mr. Gerlach was later obliged to defend the bidding procedure used to award the work to Daoud.

77.     A bid tabulation sheet signed by Mr. Gerlach confirms that the only other official bidder for the Camp B1 job besides Daoud was Rezayat Projects.

78.     Reyzayat Projects bid over $14 million for the Camp B-1 Laundry Services Contract won by Daoud.

79.     For that one site at Camp B-1, Daoud's Bid was more than $10 million less than Reyzayat Projects' Bid.

80.     Gerlach's actions ensured that Rezayat Projects' Bid was the only other bid on the record and that Daoud would eventually win the contracts.

81.     To obtain approval of the contracts, Daoud lowered its price temporarily.

82.     On November 19, 2003, Mr. Gerlach wrote to Lazlo Tibold of KBR that the final cost of the laundries was reduced to $9,486,891.

83.     Apparently, Mr. Gerlach was able to renegotiate the Bids from Daoud and lower the price for the three contracts by approximately 2.5 million dollars.

84.     Daoud's bid was reduced when there was no competitive bidder in the space of six days.

85.     The new, lower bid raised concerns within KBR.

86.     David Haddock of KBR asked for an explanation as to why approval occurred after the award of the subcontract and start of work.

87.     Mr. Haddock also wanted an explanation of how it was determined that the low bidder's offer was "technically and commercially acceptable."

88.     Given that Daoud's Bid was for millions of dollars lower than the bid from Reyzayat Projects, the only other contractor on record, Mr. Haddock wanted to be convinced that Daoud could perform the contract at the stated price.

89.     In response, Gerlach placed a note regarding the absence of solicitation from other bidders for these services in the contract file on December 9, 2004, long after award, subsequent to an internal investigation of this subcontract and shortly before Gerlach's early departure from KBR employment.

90.     Gerlach stated that he arrived "as the Subcontract Administrator for the B sites on October 1, 2003."

91.     Gerlach stated that he was given a packet of proposals for laundry services which were solicited prior to that time and that "The original solicitations were accomplished by unknown persons. Therefore, I was unable to include them in the file."

92.     The end result was that no other bidder besides Daoud had any chance of obtaining the contracts for the work.

**D. KBR Issues Daoud Notice to Proceed at all sites.**

93.     The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

94.     KBR provided Daoud and Partners with a Notice to Proceed on November 18, 2003 for each site.

95.     The Notice to Proceed referenced as yet unexecuted subcontracts numbered:

> **GU84-VC-SB10005 (Sublet Work at Site B1 Al Asad)**
> **GU84-VC-SB20008 (Sublet Work at Site B2 Rifles Base-Air Ramadi)**
> **GU84-VC-SB30005 (Sublet Work at Site B3- MEK)**

96.     The Notice to Proceed included a "Scope of Work," but no terms with regard to price.

97.     The Notice to Proceed "Scope of Work" Section 2.0 states that Daoud is to:

> Provide all bonds, labor, material equipment, transportation, insurance, supervision, permits, supplies, documentation, inspection and all other things necessary…

98.     The Notice to Proceed required permanent placement of items for each of the contracts.

99.     For example, at Site B1, the subcontractor was required to "Provide emplace and maintain a laundry facility approx. 135' x 40' to service 4,800 personnel. Include all buildings, materials and equipment necessary for installation, operation and maintenance of all utilities."

100.    The agreement was referred to as a "sublet" between KBR and Daoud.

101.    The document states that all equipment is to be provided by Daoud.

102.    There is no reference to any title or deed in Real Property held by either Daoud or KBR.

103.    The Notice to Proceed, explicitly states the requirements for each site.

104.    The requirements vary according to the needs of each military base, but in each case all material, including construction of the facilities, was to be provided by Daoud.

105.    The Notice to Proceed was executed on November 18, 2003.

106.    However, none of the applicable contracts had been executed at that time.

**E. Contracts Awarded For All Sites and Camp B1 Contract Terms.**

107.    The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

108.    In spite of the concerns raised by Mr. Haddock, the contracts were signed for all three sites on December 30, 2003 at the lower price structure.

109.    The Subcontract KBR awarded to Daoud to build the laundry facilities at Camp B1 is numbered GU84-VC-SB10005.

110.    It is priced the same as the bid by Daoud for Camp B1 at $4,015,764 pursuant to KBR's Contract with the United States DAA09-02-0007.

111.    The contract includes a two-page signature document, which in section 3

incorporates by reference all other contract forms including the *Subcontract*

*Terms*.

112.    The Contract for Camp B1 backdates the effective date to November 18, 2003

matching the Notice to Proceed.

113.    It was signed by Rani Oweis for Daoud & Partners and Robert Gerlach for

KBR on December 30, 2003.

114.    The *Subcontract Terms Section 2.0 S*cope of Work states Daoud is to:

> Provide all labor material equipment, transportation, insurance,
> supervision, permits, supplies, documentation, inspection and all other
> things necessary to provide laundry services to Al Asad AB, Iraq as
> specified in 2.1 below.

115.    Section 4.1 of the Subcontract Terms states laundry services are to be

operational on or before December 24, 2003 and through December 23, 2004.

116.    Section 1.2 of the Subcontract Terms defines The Owner as "The United

States Government."

117.    Section 4.2 of the Subcontract Terms states that "SUBCONTRACTOR shall

make whatever adjustments in working hours, manpower, equipment, etc.,

deemed necessary by CONTRACTOR. All costs associated with such

adjustments shall be to the SUBCONTRACTOR'S account."

118.    The Subcontract *General Conditions* are also incorporated by reference in the

signature document.

119.    Section 3.3 of the *General Conditions* titled "Liens," makes reference to title

in equipment and real property and states:

> 3.3.1 To the extent permitted by law, Subcontractor hereby waives and

agrees not to claim any lien against the Sublet Work or the Property on which it is performed.  Subcontractor agrees to obligate is subcontractors and vendors not to claim such a lien.  Subcontractor and its subcontractors and vendors shall pay or cause to be paid when due, all bills for labor, materials, equipment or services connected with the Sublet Work, and shall not assert any lien or permit any lien to be asserted or maintained against the Project or any funds or land involved in the Project.

3.3.2 Subcontractor warrants that title to all materials, supplies and equipment installed or delivered by Subcontractor, together with all improvements and appurtenances constructed or placed by Subcontractor is free from any claims, liens, security interests or charges.

3.3.3 If any lien or encumbrance is asserted or maintained in violation of this Article 3.3, Subcontractor shall promptly proceed to have it removed. If Subcontractor fails to remove any such lien or encumbrance, then General Contractor may, but without obligation to do so, do everything necessary to have the lien or encumbrance removed and Subcontractor shall pay any and all costs including attorney's fees incurred by the General Contractor in connection therewith.

Section 6.1.1 States:

The Sublet work in progress and all of the Owner-and General Contractor-furnished items and all of the subcontractor furnished labor, materials plant equipment, supplies and other things intended for the Sublet work shall be the property of General Contractor from the earliest moment of identification to the Sublet work, subject to General Contractor's Obligation to compensate Subcontractor therefore in accordance with the Subcontract Terms.

120.  This contract makes clear that all material, real property and labor for Laundry facilities at camp B-1 and the processing of the laundry through December 23, 2004 were to be provided by Daoud to KBR on behalf of the U.S. Government in exchange for a Not to Exceed Amount of $4,015,764.

121.  However, KBR and Daoud soon acted to increase the amount of money paid for the materials and services.

17

**F. Camp B1 Change Order Contract Increases Costs.**

122.     The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

123.     KBR provided Daoud with Change Orders to increase the value of the laundry contracts in June of 2004, only six months after issuing the initial contracts.

124.     KBR approved an additional $2,737,707 on its Purchase Recommendation Approval/Commitment authorization for Camp B1.

125.     Two KBR Officials signed the authorization, Robert Gerlach on June 20, 2004, and Tom Quigley on June 23, 2004.

126.     Mr. Quigley made it explicit that "in this case we are acquiring a building and infrastructure, (ostensible durable goods)," and the authorization stated that "ACO approval is not required."

127.     KBR issued a change order adding $2,737,707 to the contract for camp B1 to Daoud, bringing the total value to $6,753,471 for Subcontract Number GU84-VC-SB-10005. The Change order stated:

> The purpose of the Change Order is to change the subcontract type from a firm fix-price to a unit rate with not-to-exceed amount; to obtain a fee simple absolute to the real property and  contents therein; an to extend the date of this subcontract from December 24, 2004 to June, 2005.

128.     Section 3.0 "Pricing" of the Change Order states that $1,605,615.00 of the Change Order amount was for "obtaining title to real property contents, tanks, vehicle and power generation equipment," while $1,132,092 was for performance under unit rates to process laundry and to extend the performance period.

129.     Even interpreting all of the charges individually as valid, KBR increased the

         value of the contract by more than one million dollars in a fraudulent manner.

130.     KBR did this by equating two items, which should not be the same.

131.     In Section 3.2 KBR presents what it calls "Net Cost of Obtaining Title", and

         the construction value of the initial contract is used as the starting point for

         determining the amount to increase the contract.

132.     KBR's chart for "Net Cost of Obtaining Title" is as follows in section 3.2 of

         the Change Order:

```
ORIGINAL FIRM FIXED PRICE CONTRACT, TOTAL CONSTRUCTION VALUE    $1,677,780.
PLUS VALUE OF Truck (FROM SERVICES PART OF ORIGINAL BID TAB      $    73,800
                                        SUBTOTAL                 $1,751,580
PLUS 25% OF Subtotal (negotiated premium required for buyout)   `$   437,895
                                        SUBTOTAL                 $2,189,475
MINUS PAYMENTS MADE (CONSTRUCTION PORTION ONLY
TO 31 MAY 2004 ON FIRM FIXED PRICE ORIGINAL CONTRACT)           $  (583, 860)
                        NET COST OF OBTAINING TITLE             $1,605,615
```

133.     This is the same amount KBR puts in Section 3.0 as "for obtaining title to real

         property, contents tanks, vehicle, and power generation equipment."

134.     Even if we accept that every single charge as represented in the chart is

         allowable (and the plaintiff emphatically does not accept that KBR should be

         paying for a used truck under these circumstances, much less paying for Real

         Property and Equipment) there is more than a million dollars added in excess

         of these costs to the value of the contract.

135.     The first line item claims to be the amount in the original contract for these

         construction purposes.

136.     KBR claims to have made payments for construction.

137.     Furthermore, the original contract claimed to provide all necessary equipment and material to build a laundry service. Therefore, adding charges to the change order necessarily creates a double charge to the government if those bills are to obtain title for the property or finish construction as the contract says they are.

138.     The amount to increase the contract to purchase anything should figure into it how much money is actually left in the contract for those purposes.

139.     According to KBR's figures, to determine the amount left in the contract and available to apply to the amount needed to obtain title the following equation should apply:

ORIGINAL FIRM FIXED PRICE CONTRACT, TOTAL CONSTRUCTION VALUE    $1,677,780.
        MINUS PAYMENTS MADE (CONSTRUCTION PORTION ONLY
            TO 31 MAY 2004 ON FIRM FIXED PRICE ORIGINAL CONTRACT)    $  (583, 860)
AMOUNT REMAINING IN CONTRACT FOR CONSTRUCTION          **$1,093,920**

140.     By simply using the amount KBR and Daoud determine as the "Net Cost of Obtaining Title" as the same amount to increase the value of the contract, KBR and Daoud increased the value of the contract WITHOUT DEDUCTING THE AMOUNT REMAINING IN THE CONTRACT.

141.     KBR is essentially paying a second time for property already purchased under the terms of the initial contract.

142.     Therefore, KBR fraudulently increased the value of the contract by $1,093,920 even assuming all of the individual charges were legitimate.

143.     KBR would be able to pay Daoud an extra $1,093,920 and pass those costs along to the United States Government.

144.     Of course, the Relator disputes the validity of each of the charge items listed.

145.    For example the "negotiated 25% premium" of $437,895 to "buyout" a contract is figured on the full amount of the construction cost.

146.    It was "Negotiated" without any competitive bidding.

147.    Laundry services are extended and changed to a Unit Cost also without a competitive bid.

148.    Even the $73,800 for a used truck is debatable at best.

149.    With the Contract and Change Orders in place, Daoud continued to issue invoices to process laundry.

150.    Daoud invoiced KBR $1,605,615 for the Camp B1 Laundry Services *Assets* in 2004.

151.    These assets were the same laundry facilities for which Daoud had already contracted to build.

152.    These were the assets Daoud used to process the laundry and charge KBR on a unit basis.

153.    KBR therefore agreed to significantly increase the cost of creating and using these facilities to the United States.

154.    Even after paying to build and then re-purchase the laundry facilities, KBR's inspection of the B1 site indicates there were significant quality control problems.

155.    The very assets that KBR bought (twice) for the U.S Government were often in unsatisfactory condition.

156.    The Camp B1 contract change order procedure was not an isolated event.

## G. Full Extent of Change Order Costs Planned out by KBR.

157.     The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

158.     Documents included in the contract package for Camp B1's laundry facilities and services show KBR planned to execute similar change orders for all three sites discussed herein. KBR in fact did issue such change orders (see below sections).

159.     Included in the document package supporting the Camp B1 Change Order was a May 23, 2004 breakout showing the total amount of Subcontracts for **each** of the three subcontracts as well as the amount KBR contemplated to pay in addition for the Real Property and fixed assets.

160.     The document shows KBR was well aware of the costs being applied to increase each of the three Laundry Facility and Services contracts. It lists costs as follows:

|  | Subcontract Number GU84-VC-SB-10005 | Subcontract Number GU84-VC-SB-20008 | Subcontract Number GU84-VC-SB-30005 |
|---|---|---|---|
| Contract Value | $4,015,764 | $2,573,039 | $2,898,084 |
| Total Construction | $1,751,580 | $1,110,278 | $1,201,478 |
| Plus 25% | $ 437,895 | $ 277,569.50 | $ 300,369.50 |
| Monthly invoice for Construction | $ 145,965 | $ 92,523 | $ 100,123 |
| Total Construction paid | $ 583,860 | $ 277,569 | $ 400,492 |
| Total Real Prop and Fixed Assets Buyout | $1,605,615 | $1,110,278.50 | $1,101,355.50 |
| Subtotal Laundry Services | $ 2,337,984 | $1,536,561 | $1,770,410 |
| Less $73,800 for Trucks | $2,264,184 | $1,462,761 | $1,696,610 |
| Monthly Invoices for Laundry Less Trucks | $ 188,682 | $ 121,897 | $141,384 |
| 6 Month POP Extension | $1,132,092 | $731,382 | $848,304 |

| | | | |
|---|---|---|---|
| Total Change Order | $2,737,707 | $1,841,660.50 | $1,949,859.50 |
| Total Contract | $6,753,471 | $4,414,699.50 | $4,847,743.50 |

161.   KBR was well aware, based on this chart alone, that its officials were working to increase costs to the United States Government.

**H. Camp B2 Bid, Contract and Change Order Increase.**

162.   The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

163.   Repurchasing facilities for which KBR had already contracted and paid Daoud for followed the same pattern at Camp B2.

164.   Bids by Daoud and Rezayat Projects were processed.

165.   While Daoud originally bid $3,398,876 on the Camp B2 site, the price was negotiated down to $2,573,039 according to the Revised Scope of Works.

166.    KBR's original Subcontract to Daoud for Camp B2 (Subcontract GU84-VC-SB20008) for $2,573,039 was executed on December 30, 2003.

167.   The two-page Signature Document incorporates by reference a six-page document entitled "Subcontract Terms" which states what is to be provided by the parties and defines terms.

168.   The contract's effective date is again backdated to November 18, 2003.

169.   Again, Daoud is to "Provide and maintain a Laundry facility to service 2,500 personnel. Include all buildings, materials and equipment necessary for installation operation and maintenance of all utilities," according to section 2.1 of the Subcontract Terms.

170.     The "Subcontract Terms" states: "owner shall mean the United States Government."

171.     In spite of the fact that the United States is listed as the owner in the original contract, KBR issued a Change Order to purchase assets and Real Property from Daoud six months later.

172.     In June of 2004, KBR issued a Subcontract Change Order and Material Requisition for a total of 2,573,039 to:

> …Change the subcontract type from a firm fix-price to a unit rate with not-to-exceed-amount; to obtain a fee simple absolute to the real property and contents therein; and to extend the contract the end date of this subcontract from December 24, 2004 to June 1, 2005.

173.     The change order once again increases the amount of the contract by the full amount KBR pays Daoud to obtain title in Real Property in equipment.

174.     It again fails to deduct even the amount KBR's own figures would indicate remain unspent in the original contract for construction.

175.     The chart KBR uses to determine its figure for Obtaining Title is as follows

| | |
|---|---|
| Original Firm Fixed Price Contract, Total Construction Value | $1,036,476 |
| Plus Value of Truck (From Services Part of Original Bid Tab) | $   73,800 |
| Subtotal: | $1,110,278 |
| Plus 25% of Subtotal (negotiated premium required for buyout) | $  277,569.50 |
| Subtotal: | $1,387,847.50 |
| Minus Payments Made (Construction Portion Only) | |
| To 31 May 2004 On Firm Fixed Price Original Contract | ($277,569.00) |
| **Net Cost of Obtaining Title:** | **$1,110,278.50** |

176.     This is the same amount KBR places in Section 3.0 as the amount "for obtaining title to real property, contents tanks, vehicle, and power generation equipment."

177.    Even if we accept that every single charge as represented in the chart is allowable (and the Plaintiff does not accept that KBR should be paying for a used truck under these circumstances, much less paying for Real Property and Equipment) there is more than a three quarters of a million dollars added to the value of the contract..

178.    The first line item claims to be the amount in the original contract for these construction purposes.

179.    KBR claims to have made payments for construction.

180.    The amount to increase the contract to purchase anything should reflect the amount of money left in the contract.

181.    KBR ignored this amount.

182.    According to KBR's figures from the chart above, the following equation should have been used to determine the amount left in the contract:

Original Firm Fixed Price Contract, Total Construction Value           $1,036,478
Minus Payments Made (Construction Portion Only)
        To 31 May 2004 On Firm Fixed Price Original Contract           ($277,569.00)
                                                                       _____
**Amount remaining in Contract for Construction**                     **$758,909**

183.    KBR and Daoud did not deduct this amount from the amount needed to buy out the contract.

184.    Therefore, this amount was duplicated, and the contract value was increased.

185.    Daoud invoiced KBR $1,110,278.5 for the assets at Camp B2.

186.    Daoud was also paid for laundry services at Camp B2 and filed invoices accordingly.

187.     Of course, determining the proper amount left in the contract in order for KBR
         to have paid Daoud for material, equipment and Real Property accepts the
         notion that these charges were appropriate.

188.     The Plaintiff does not accept these charges as legitimate.

189.     The company uses these contracts to justify purchasing Real Property on a
         U.S. Military Base. KBR also re-purchased laundry equipment after that
         equipment was supposed to be operational.

190.     It bought a used truck.

191.     It "negotiated" a 25% buyout premium.

192.     All of these charges were added to the contract with no competition.

193.     KBR was of course able to pass these costs to the United States under the
         LOGCAP III program.

194.     After the change orders went through for Camp B2 selling KBR a Fee Simple
         interest in the facilities that Daoud built, KBR inspections found that the site
         was "Unsatisfactory" in numerous respects.

195.     For example, the February 15, 2005 Quality Audit/Inspection report states 16
         different line items as "Unsatisfactory" including:

> Generators need to be grounded: **Unsatisfactory**
> Fuel tanks need to be grounded: **Unsatisfactory**
> Both generators need containment: **Unsatisfactory**

196.     Daoud continued to be paid for using the facilities.

197.     KBR's purchase of unsatisfactory real property or equipment for the United
         States Government is,  a violation of its obligations under the LOGCAP III

program, unless KBR repaired and replaced such equipment at its own expense.

198.	Clifton Taylor of KBR felt the contractors apparently did not properly document the file up to the usual standards for Camp B2.

199.	On February 20, 2005, he created a "Note to File" with a Green Sheet reflecting a total of $11,671,354 for the total costs of the three laundry facilities.

200.	However, the Change Order was executed in spite of any such concerns about documentation, indicating the change order was executed with KBR's full knowledge and consent to such terms.

## I. Camp B3 Contract and Change Order Increase.

201.	The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

202.	The Camp B3 (Fallujah) contracting process for laundry facilities and services followed a similar procedure as Camp B1 and Camp B2.

203.	The initial Subcontract was executed on December 30, 2003 for $2,898,088.

204.	The two-page signature document incorporates by reference Subcontract Terms.

205.	The Subcontract Terms state that "Project shall mean providing of a turn key supply and operation of a laundry facility at Site B3., St. Mere, Iraq as defined in 2.0 scope of work."

206.	The Subcontract Terms also define "Owner", stating: "Owner shall mean the United States Government."

207.     A Change Order was signed on June 24, 2004. That Change Order states it is:

> "to change the subcontract type from a firm fix-price to a unit rate with not-to-exceed amount; to obtain a fee simple absolute to the real property and contents therein; and to extend the date of this subcontract from December 24, 2004 to June 1, 2005"

208.     The Change Order requires that KBR provide a lump sum payment of $1,110,278 to Daoud "for obtaining title to real property, contents, tanks vehicle and power generation equipment."

209.     It was also increased by up to an additional $848,304.00 value for performance under "unit rates" during the additional performance period.

210.     Once again, the amount to figure the increase in the contract for obtaining title to real property was the same as figured for the net cost to obtain property. The Chart in section 3.2 of the contract change order states:

| | |
|---|---|
| Original Firm Fixed Price Contract, Total Construction Value | $1,127,678 |
| Plus Value of Truck (From Services Part of Original Bid Tab) | $    73,800 |
| Subtotal: | $1,201,478 |
| Plus 25% of Subtotal (negotiated premium required for buyout) | $   300,369.50 |
| Subtotal: | $1,501,847.50 |
| Minus Payments Made (Construction Portion Only) | |
| To 31 May 2004 On Firm Fixed Price Original Contract | ($400,492.00) |
| **Net Cost of Obtaining Title:** | **$1,101,355.50** |

211.     Once again, KBR double-counts the amount of the original contract for construction purposes.

212.     According to KBR's own figures, the amount left in the contract is as follows:

| | |
|---|---|
| Original Firm Fixed Price Contract, Total Construction Value | $1,127,678 |
| Minus Payments Made (Construction Portion Only) | |
| To 31 May 2004 On Firm Fixed Price Original Contract | $400,492.00 |
| **Amount remaining in Contract for Construction** | **$727,186** |

213.     Therefore, there should be $727,186 left in the original contract value for construction.

214.    That amount is effectively counted twice when KBR increases the value of the contract by $1,110,278.

215.    Daoud provided KBR with an invoice, which was marked "Paid 27 November 2004" for the $1,101,355.50 for assets, real property and equipment.

216.    Of course, the above examination of KBR's Change Order accepts the notion that the charges related to these contracts were appropriate.

217.    The Plaintiff does not accept that premise.

218.    The company attempted to justify purchasing Real Property on a U.S. Military Base.

219.    KBR re-purchased laundry equipment after that equipment was operational and was to be supplied by the subcontractor.

220.    KBR bought a used truck.

221.    KBR "negotiated" a 25% buyout premium and extended Daoud's period of service and allowed Daoud to charge unit rates.

222.    All these items were included in a change order with no competition.

223.    The earlier contract documents contradict the possibility that KBR could sell equipment and material to Daoud at this point.

224.    KBR had issued Daoud a Notice to Proceed dated November 18, 2003, which required Daoud provide virtually all the equipment and facilities.

225.    KBR also issued a contract on December 30, 2003.

226.    The contract included virtually every detail needed for a laundry service, down to the smallest detail, including, for example, power generation, washers and dryers, plumbing, tables and more.

227.    KBR's Change Order re-purchased this equipment from Daoud, as well as the land on the Military Base.

228.    Of course, KBR could pass these costs on to the United States Government under the LOGCAP III program.

229.    Even after re-purchasing these laundry facilities, some were not found to be satisfactory.

230.    Although most of the Quality Audit Inspection Reports for Camp B3 showed satisfactory results, the report of July 27, 2004 shows the facility to be "Unsatisfactory" in at least six respects.

231.    KBR therefore not only purchased these facilities on behalf of the United States more than once, the company also appears to have allowed them to deteriorate subsequently.

232.    KBR lists failures at Camp B3 showing that as late as September 14, 2004, machines were out of service and that in July of 2004, significant problems requiring corrective action were noted regarding generators at the facility. Of course, this assessment occurred after KBR purchased the facilities for the second time by Change Order from Daoud on behalf of the United States.

**J. Total Value of Laundry Facilities Under LOCGAP III.**

233.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

234.    The contracting abuse by KBR officials in Iraq extended beyond re-purchasing equipment and purchasing real property which could not have been owned by those who were paid for them.  KBR also entered into master

subcontract agreements with other contractors who operated as "shell companies."

235.    These companies could take profits on the subcontracted work even if they, themselves had not performed any of the work.

236.    The subcontract between KBR and EAMAR of P.O Box 196, Dasman, 15452, Kuwait was such an agreement.

237.    The contract was signed by Lazlo Tibold for KBR.

238.    There was no competition for the contract.

239.    It was later terminated by default.

240.    The basis of the contract was that EAMAR would work on a monthly retainer arrangement to drill wells for water as needed throughout Iraq.

241.    The Plaintiff obtained a letter showing Laundry Facilities and Services contracts issued by KBR to subcontractors under the LOGCAP III program.

242.    The spreadsheet lists relevant subcontract numbers and not to exceed dollar amounts.

243.    Vendors involved in addition to Daoud & Partners include the following:

> MJC, Meer Company, Ecolog, Tailor, Modern Development, Firstt Kuwaiti Trading and Construction, A&M laundry Services. Al OGieil Dry Clean, PPF, Rbben Al- Safna, Al Rasheed Hotel, Hanna Kaka, Alwan Laundry, Al Tahseer, Naglas, Khalifa, La Nouvelle, PPI, Eastern Solutions General Trading and National Contracting.

244.    As of December 22, 2004, not to exceed initial work releases exceeded 26 million dollars. Total liability to the subcontractor exceeded 14 million dollars

245.    KBR had already made payments of more than 5 million dollars.

246.    Work Releases would be authorized for each month and the company was supposed to mobilize and drill approximately 2 wells a month at any given site.  The Master Agreement was set in Kuwaiti Dinars.

247.    The Kuwaiti Dinar was fixed to be worth 3.39616 USD in a later change order.

248.    "Mobilization" costs were set at 10,334.890 Kuwati Dinars to move rigging from country of origin to Kuwait and the lease rate was set at 74,676 Kuwaiti Dinars per month for a 12 hour day.

249.    This soon added up to a tremendous amount of billing for EAMAR.

250.    An internal note to file as of December 22, 2004 showed with total liability from the subcontractor listed as $14,551,417 and a not to exceed amount for the contract set at $26,240,178 and payments made of $5,817,932.

251.    KBR was just beginning to determine the amount that it had spent through EAMAR in December of 2004.

252.    EAMAR's contract was terminated for default yet this amount of payments and liabilities had already been approved.

**K. Daoud built a Substandard and hazardous Dormitory KBR paid for it.**

250.    The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

251.    The B-6 Main Camp subcontract, GU84-VC-SW00061 required construction of a dormitory for 375 KBR personnel Al Taqaddum, Iraq, for $4,800,000.

252.    According to the Scope of Work portion of this subcontract the dorm was to be composed as follows:

> "A 375 man bed down consisting of 40 foot two man wet units with shower latrine. Provide 220v power with ground fault circuits, electric control units, lighting"

253. Inspection reports conducted by KBR on Daoud's work make clear the work could fail any standard.

254. A quality audit was composed by Buck Burgett of the KBR engineering department, with approval from Victor Turner of KBR. This audit detailed necessary corrections to be implemented on the B-6 Man Camp Dormitory for it to comply with the terms of the original agreement.

255. These corrections were not completed.

256. Ernie Applewhite, a KBR representative and Construction Manager for the B-sites, visited the B-6 site on February 27, 2005. Mr. Applewhite submitted a report via e-mail to Ed Cetnarski, Procurement Supply Manager for KBR's B-sites. Mr. Applewhite's report refers to pictures submitted as part of the inspection report filed by Buck Burgett and was as follows.

257. There had been improper welding of the dormitory's support channels.

258. Beam connections on the second floor are of improper length and thickness.

259. Bolts that were used were too short.

260. Bolts were not properly tightened and lacked washers.

261. Channel stringers on each side of the bottom floor were attached to exterior columns with single bolt connections instead of the proper two-bolt connections.

262. Some of the bolts are welded instead of being fastened with the proper nuts and washers.

263.   Furthermore, the channels themselves are not continuously formed requiring splices, which are not properly welded.

264.   Tubing was used as joist for the floor decking.

265.   The tack welds attaching the tubing are improper and some of the tubing had already come loose.

266.   J-bolts were epoxy grouted into existing slab. These anchor bolts were marked as totally unacceptable, as the bolts would never achieve the hold down requirements needed in an excessive wind load condition.

267.   The second floor beams were fabricated too long, and to correct the length problem, a section of the beam was removed and the bolted connection to the column piece was butt-welded back on.

268.   This was noted as a serious deficiency that minimized the structural integrity of the second floor.

269.   Intermediate floor supports were not supported.

270.   On March 6th 2005, Joey Reid, a certified welding inspector for KBR, visited the B-6 Man Camp Dormitory with a KBR Quality Assistance Supervisor, Victor Turner, to inspect the welds.

271.   Mr. Reid's report states, "Upon inspection all the welds at this dormitory are defects." The inspector noted that the welds "… are a hazard to the well being of personnel living that would occupy this building."

272.   Reid submitted photographs of the welds and noted the following specific violations of the Welding Procedure Specifications "WPS".

Welding Process: The contractors (WPS) states (GMAW) Gas Metal Arc Welding. The process being used on the Dormitory is (SMAW) Shielded Metal Arc Welding.

Filler Metal Specifications (SFA):  The contractor's (WPS) states (AWS) Class: ER 70 S-6.  This filler metal is considered a bare wire material needing a backing gas.

The (WPS) the subcontractor provided stated the backing gas which is an essential variable was non-applicable.

Welding Position:  The contractors (WPS) states that the 1-G position was used for the certification of the welder.  1-G position is flat position only.  This certifies a welder for flat position only per (AWS) D1.1.  The procedure being used on the dormitory is all positions.

Automatic Voltage Control: The contractors (WPS) states that the automatic voltage control performed in this (WPS) was (GTAW) Gas Tungsten Arc Welding.  This is a completely different process from the stated welded process at the top of (WPS).

273.   Mahavir Rana from the engineering department of KBR drafted a review of the construction of the Man Camp, and that review was discussed by an internal KBR review board.

274.   Daoud's failure to properly cure their work on the dormitory is reported in an internal KBR memo dated 4/19/2006.

275.   KBR's internal review of the man camp dormitory reveals that KBR had no intention of curing the defects. The KBR review excuses KBR from doing anything to fix this hazardous construction:

> We have to remember that we are not in U.S. [sic] and can not achieve the same quality, at least not without a lot more expense and lot more construction time. The most effective way to achieve quality construction is up front, closer review of subcontractor's design and construction both. Problems should be fixed as soon as they develop. In the present case, the building is up and we simply can not fix every miscue now, only the serious ones.

276.  The B-6 Man Camp Dormitory defects were never cured and the dormitory is currently uninhabitable.

**L. KBR Thwarts Attempts to Enforce Performance of Man Camp Contract.**

277.  The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

278.  Daoud failed to perform under its contract to build a man camp as detailed Above. Despite the protests of one KBR official, KBR did not attempt to enforce the contract nor did Daoud perform it.

279.  Subcontract # GU84-VC-SW00061 between KBR and Daoud and the scope of work define the terms of construction for a man camp to serve 375 people for a total price of $11,991,850.00.

280.  George Covelli, the subcontract administrator for the B-6, contacted Daoud on numerous occasions concerning multiple violations of the terms of this contract.

281.  On May 1st 2004, Covelli contacted Rami Oweis, of Daoud via e-mail. Covelli noted that Daoud is significantly behind schedule, had not been responsive, and had not provided the required information regarding their lack of progress.

> …in particular no power generation system to support their base camp, portable buildings were delivered and no means to unload them from trucks.  Both of these events were rectified by on site KBR personnel who borrowed a crane and a generator from the U.S. Government.

282.  Covelli also stated that Daoud personnel arrived at the base without proper equipment to support themselves.

283.  On May 2nd 2004, Covelli of KBR again e-mailed Oweis of Daoud with concerns over Daoud's progress including the fact Daoud had not paid its employees.

284.   On May 4th 2004, Covelli contacted Oweis via e-mail with concerns over unauthorized Daoud personnel operating in restricted areas.

285.   On May 8th 2004, Covelli contacted Oweis about Daoud's inability to inform KBR of their progress, as well as Daoud's practice of not responding to queries from KBR. In the same e-mail, Covelli also reminded Oweis of the scope of the initial agreements and informed him that unless requested information was received within five days, KBR would be forced to seek relief in the form of damages.

286.   After the failure of Daoud to comply with the terms of the subcontract, Covelli exercised his authority as subcontract administrator to enforce the subcontract by issuing a change order on behalf of KBR to lower the value of Daoud's subcontract. Citing Daoud's failure to perform and other repeated violatons of the original contract, Covelli authorized a change order on June 22, 2004 which removed $2,522,550.00 from the initial contract.

1.8 Subcontractor is to supply to KBR a performance guarantee in the amount of 100% of awarded subcontract amount.

1.9 General contractor will withhold 5% of the total contract amount for warranty repair for the period of 1 year from time of acceptance of any item.

1.9.1 General Contractor will assess liquid damages in the amount of $1000.00 per day for each day the contract remains unfinished.

287.   Almost immediately after issuing this change order, George Covelli was relieved of his duties by KBR as subcontract administrator for the B-6 site. His release is documented in an internal KBR memo, dated 9th of July 2004, and drafted by George Irizarry. George Irizarry later became the subcontract administrator for the B-6 site.

288.    On July 17, 2004, KBR's new administrator, Mr. Irizarry authorized a second change order.

289.    The second change order effectively restored the $2,522,550.00 which had been subtracted from the contract by the first change order. It also removed the monetary damages Daoud would be responsible for in case of delays. The second change order, however, subtracts $920,850.00 from the reasserted $11,991,850.00.

290.    There is no documented explanation or justification in the files for the second change order.

291.    In addition, a third change order violates the original contract, as the additional $515,000.00 was authorized as payment for materials and services.

> "Provide electrical material & services for four (4) dorms" – 232,000.00 USD "Provide Mechanical Material & Services for four (4) dorms" – 156,000.00 USD
> "Provide material and services to power four dorms" – 89,000.00 USD
> "Mobilization cost"- 38,000.00 USD

292.    There was no competitive bidding or justification provided for this additional work, nor was there any documentation or specifications to explain this change to the scope of work.

**M. KBR allows anti-competitive Bidding For the B-6 Man Camp.**

293.    The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

294.    KBR managed the bidding process to award the $11,991,850.00 subcontract #GU84-VC-SW00061 to build the Iraq site B-6 Man Camp. That process

involved just two subcontractors, Al Musurie and Daoud, each of whom submitted proposals for the construction project's costs to KBR.

295. The initial bid for the B-6 man camp by Daoud was $11,991,000.00. That bid was sent to KBR on January 20, 2004 and signed by Rami Oweis of Daoud.

296. Al Musurie's bid for the B-6 man camp was $15,133,467.00 and is the only other bid on record for this contract. Therefore, the discrepancy between the Al Musurie and Daoud bids was 26 percent.

297. Such a discrepancy is supposed to create a warning in the minds of a competent subcontractor administrator.

298. When the discrepancy is more than 25 percent, additional approval is generally required to be sought from an Administrative Contracting Officer (ACO) of the United States Armed Forces to award the subcontract under the LOGCAP III program.

299. KBR's contracting professionals understand that such requirements are designed to ensure that the bidders fully comprehend the scope and terms of work, as well as to ensure that the contractor is managing a true competitive bidding procedure.

300. Therefore, approval from an ACO should have been sought in this case. Rather than seeking such approval, KBR officials manipulated the bid figures.

301. When a bid tab was compiled for approval within KBR, the Al Musurie bid was listed as $12,594,556.00. The Al Musurie bid is also listed as $12,594,556.00 USD on the green sheet, which is the internal KBR document authorizing the contract to Daoud.

302.   The new changed figure on both the bid tab and green sheet for the Al Musurie bid deducts the overhead, profit and award fee from the amount actually submitted by that bidder.

303.   No record or documentation exists to indicate KBR sought a "best and final offer" from all bidders, or that clarification was sought from either Daoud or Al Musurie regarding these anomalies.

304.   KBR simply eliminated the Al Musurie overhead, profit and award fee figures from their Bid Tab and green sheet, which are ultimately to be provided to the government upon inspection.

305.   Manipulating the bid tab lowered the Al Musurie bid by $2,538,911.00, making Al Musurie's bid to appear as $12,594,556.00. This amount was enough to make the difference between bids appearing to be less than 25 percent, thus avoiding the additional required approvals; but, critically, not enough to make Al Musurie the low bidder.

306.   Covelli's supervisor was Robert Gerlach, the KBR Procurement Supply Manager (PSM) for all B-site. Gerlach e-mailed Tom Quigley, Gerlach's supervisor, seeking funding approval and concerning the disparity between the bids.

307.   In his e-mail Gerlach claims that George Covelli, the subcontractor administrator for the B-6 site was on "R&R", and that Gerlach had finished the proposal in his absence.

308.   In his e-mail, Gerlach also tells Quigley that this is "…the one I asked you about with the incentive fee. That has been removed and we went back and obtained the

BFO's (Best and Final Offers) with the incentive fee deleted from the consideration."

309.   This would explain how the Al Musurie bid appeared lower on the bid tab than it did in Al Musurie's actual proposal. More importantly, it presents evidence that Mr. Gerlach informed senior KBR management as to how he was manipulating the bid.

310.   There is no documentation that Gerlach, as the subcontract administrator empowered by KBR to solicit bids and act on behalf of the company, ever attempted to obtain a Best and Final Offer or that Al Musurie as the bidder actually lowered the bid. The evidence is that KBR simply removed items from the bid to lower the bid.

311.   Subsequently, Quigley approved the award to Daoud. KBR then awarded the subcontract to Daoud without further review, approval or attempt to obtain any other bids from any other contractor.

312.   According to the LOGCAP III protocol, when the two lowest bids have a larger than 25 percent difference, additional review and documentation is required. This includes, but is not limited to a request to both bidders to review the Scope of Work (SOW), a request for a best-and-final offer, and a note to the file documenting that the bidders fully understand the SOW and is capable of performing in accordance with the SOW and terms of the subcontract.

313.   If, after such due diligence is performed by the subcontract administrator and there is still a greater than 25 percent difference, the KBR Project Manager's review and signature approval is required on the bid tab.

314.   Additionally, the contract is supposed to be re-solicited to subcontractors. By manipulating Al Musurie's bid, KBR avoided any such process and ensured that Daoud received the contract.

315.   After the contract was awarded to Daoud, George Covelli protested that his oversight and contractual authority was being bypassed by KBR Management, in particular, Robert Gerlach.

316.   Covelli then e-mailed Quigley with his concerns, and Quigley stated that such authority is not assigned by individual subcontracts, but is delegated uniformly throughout KBR, depending on one's signature authority.

317.   This KBR policy successfully bypassed the ability of the assigned and/or onsite subcontract administrators to ensure that additional costs or adjustments were handled appropriately, and recklessly removed adequate contractual oversight from construction projects and service subcontracts.

**N. The Defendants Double Bill for Selected Labor Services.**

318.   The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

319.   KBR and Daoud repeatedly used the Master Labor Agreement to bill for labor which was already in other contracts.

320.   While other contracts for services and construction included labor, KBR and Daoud would augment those contracts by having Daoud also bill for labor under the Master labor agreement. The examples indicate a pattern and general practice of abuse which in and of themselves demonstrate $1,675,728.00 in work releases

and change orders issued for labor that was already to be provided under other contracts.

321. WL00036, issued March 22, 2004 is a work release for both Water Truck Drivers and SST, or sewage truck drivers. The contract authorizes a total of 14 drivers for 180 days at a cost of $391,003.20.

322. KBR issued a change order to extend this period of performance to 360 days and also doubled the amount for the drivers to $782,006.40.

323. Upon the firsthand observances of the Relator, there were separate subcontracts already in place between KBR and Daoud which provided both trucks and drivers for these purposes.

324. On July 24, 2004, KBR issued work release WL00080 for two employees to "be used as water truck, bus, and flat bed drivers" for a period of one year at a cost of $111,715.20.

325. Again, upon the firsthand observances of the Relator, there were separate subcontracts already in place between KBR and Daoud, which provided drivers for these purposes.

326. KBR issued WL00028 with the effective date of March 13, 2004 for 4 employees to work for 180 days at a cost of $111,715.20.

327. This work release was to provide labor for two class II "ROWPU (reverse osmosis water purification units) operator [sic]" and two class II laborers for "water distribution."

328. Upon firsthand observances of the Relator, the need for these positions did not exist. Water was delivered, by truck, to the berthing units and then gravity-fed by

the water truck driver into the structure. No other operators or technicians were involved in this process.

329.   Furthermore, change order 1 for WL00028 was issued on October 9, 2004 to extend the employment of these unnecessary laborers for an additional 180 days, doubling the amount of the contract to $223,430.40. Both the original requisitions and the additional change order were knowing and willful charges by the defendants for workers who simply were not needed.

330.   On October 28, 2004, material requisition #VCW2945 was submitted for 20 generator mechanics whose skill class was unspecified and for a six month period at an estimated cost of $360,000, even though a separate subcontract already existed with another Iraqi company to provide electrical generator maintenance and repairs for all generators.

331.   This was effective November 21, 2004 and KBR issued work release WL00089 to provide the "20 (Class II TCN) Generator Mechanics" at a total cost of $558,576.

## O. Daoud Double Billed Under Subcontract awarded by KBR for Labor to Perform Laundry Services

332.   The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

333.   The subcontract that governs the construction and operation of the laundry facilities at the B1 site is GU84-VC-SB10005. This contract initially provided $4,015,764.00 for Daoud to build and to provide all labor to run a laundry service on the site.

> "Provide **all labor**, material, equipment, transportation,
> insurance, supervision, permits, supplies, documentation,

> inspection, and all other things necessary [emphasis added]
> to provide laundry services at Al Asad AB, Iraq…"

334. The scope of work that was to be undertaken by Daoud included "providing all labor, material, equipment, transportation, insurance, supervision, permits, supplies, documentation, inspection and all other things necessary to provide laundry services at Al Asad AB, Iraq…"

335. On December 10, 2004, a change order was issued to increase the amount of WL0001 by $1,888.80. The change order states that the increase "is to add additional funds for emergency labor for laundry. These people worked extra hours in support of the KBR laundry."

336. On December 9, a request for $3,455.00 in additional funds was requested for WL00036 for "Emergency Labor for Laundry Operations."

337. On December 10, a change order was issued to WL0036 that added the $3,455.00 to ML00001. This change was stated to be "additional funds to pay for emergency labor for the laundry."

338. Daoud requisitioned personnel for the laundry under MA00001, the first Master Labor Agreement for the B sites in Iraq. There is no evidence that Daoud or KBR officials ever deducted these funds from the original Laundry contract.

339. Any instance of billing for laundry personnel under MA00001 that was not back-charged against the original subcontract is an instance of double-billing and constitutes a false claim by Daoud against the US government.

340. In addition, KBR personnel provided significant "volunteer" support to sustain laundry operations during this period when Daoud's subcontractor failed to maintain adequate labor support levels.

341.   There is no evidence that Daoud deducted KBR's labor all much less at KBR's rates as opposed to the rates for Third Country Nationals from their invoices.

342.   Neither did KBR back charge Daoud for labor which was performed by KBR employees who were not paid for their time.

343.   Nothing indicates KBR allowed KBR personnel to remain on the clock for this assistance – it is therefore, "volunteered."

344.   While KBR personnel volunteered to help keep the laundry going, they were not charging the Government for that time as far as the Relator knows.

345.   However, Daoud still billed for laundry produced at the full subcontract prices, which ultimately were paid by the government.

346.   Daoud was being paid for labor under a subcontract and using volunteers, albeit volunteers from KBR. KBR knew that such costs were being passed on to the government.

347.   Time sheets for Ice Plant worker for the weeks of August 1, 8, 12 and 22, 2004 all show overtime hours. A handwritten note on each timesheet shows that the overtime hours are for "laundry" or "laundry work."

348.   The total number of overtime hours charged to laundry from these four timesheets is 107.

349.   When multiplied by the class II rate of $12.93/hour, the total amount of double-billing is $1,383.51.

350.   In addition, timesheets during this month show 38 overtime hours with no explanation.

351.   Invoice DP226 authorizes payment for all hours for August, including the overtime hours.

## P. Daoud and KBR Double bill for Laundry Service Supplies.

352.   The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

353.   As stated in previous disclosures, Daoud was the sole subcontractor responsible for laundry facilities, operations and services at the B1, B2, and B3 sites in Al Asad, Ramadi and Fallujah, Iraq.

354.   The subcontract that governs the construction and operation of the laundry facilities at the B1 site is GU84-VC-SB10005.

> "Provide all labor, *material, equipment*, *transportation*, insurance, supervision, permits, *supplies*, documentation, inspection, and *all other things necessary* [emphasis added] to provide laundry services at Al Asad AB, Iraq…" (Scope of work undertaken by Daoud)

355.   All equipment and supplies required for the operation of the laundry facility at B1 were to be paid for from the subcontract GU84-VC-SB10005.

356.   Any other equipment, repairs to equipment, or supplies acquired through another contract or purchase order for the purposes of operating the laundry facilities should have been back-charged, with the funds being reallocated away from the original laundry subcontracts.

357.   Daoud failed and refused to maintain equipment in proper working order as required by the original subcontract. As a result of this failure, KBR was required to make significant repairs to equipment and expend significant monies for repair parts.

358.   Daoud also failed to maintain adequate supplies on hand to allow laundry services to be performed timely. As a result, KBR requisitioned equipment and repair parts, repaired equipment, and requisitioned supplies such as soap, laundry bags, laundry tickets and other consumables on several occasions.

359.   Any instance of billing for laundry equipment, repairs, repair parts, supplies by purchase order, and any charges to the government by KBR for KBR repair personnel or laundry labor that was not back-charged against the original subcontract is an instance of double-billing and constitutes a false claim by Daoud and KBR against the US government.

360.   Daoud's failure to supply the laundry also put workers at risk. Daoud had subcontracted work under the laundry subcontract at B1 to a firm called Tepe, apparently a subsidiary of Bilintur, which the Relator believes is a Turkish firm.

361.   In August/September 2004, the laundry at B1 ran short of supplies, particularly laundry soap, water conditioner, and preprinted laundry tickets.

362.   The Relator had several conferences with Daoud's site management at B1 to enforce the subcontract and expedite delivery of the needed supplies.

363.   Daoud's response to these conferences was to go to Tepe's supervisor, berate him, and demand that the supplies be produced. The Tepe employees who were not Iraqis but Third Country Nationals were sent without security into a local town to procure the necessary supplies despite the extremely dangerous security conditions and high insurgent activity.

364.   Two of the Tepe employees failed to return and were discovered killed by insurgents in a local town. It is unknown whether the families of these employees

were ever compensated by Daoud or by KBR under provisions of the Defense Base Act or other insurance.

365. The known facts are that Daoud regularly flew cargo in and out of camp B1 and had the means to supply the contract as it was required to do, without endangering the lives of its subcontractors.

366. In fact, this was Daoud's primary logistics procedure, in order to minimize risk due to insurgency. Daoud flew planes in at least once a week. Daoud was, of course, ultimately responsible for the supplies regardless of with whom they subcontracted and Daoud's supervisor had an office easily within walking distance of their laundry. He could have easily have ensured supplies were brought in by plane.

367. When Daoud's executive, Mr. Rami Oweis, was confronted by the Relator in a meeting in June of 2005, regarding these supplies and equipment charges, Oweis denied there was a problem and refused to discuss the matter further with anyone other than Ed Cetnarski, KBR's acting Procurement Supply Manager.

368. The Relator left the theatre the following day, at the end of his employment contact with KBR. At least two other KBR Subcontract Administrators attended this meeting between Relator and Oweis.

369. The Relator provides a spreadsheet compiling the requisitions made by KBR and Daoud for supplies and materials to run the laundry facility at Camp B1 (Al Asad).

370. The charges on this spreadsheet cover only the time period that the Relator was in Iraq.

371.  The charges were for supplies and material that were supposed to be included in Daoud's contract to build and maintain the laundry facilities at Camp B1.

372.  Any charges that were not cancelled are for supplies and services which were billed in spite of the fact that they were supposed to be included in the original laundry facility contracts.

373.  The Relator's spreadsheet shows there were more than $400,000 of such charges at this one facility for only the time period during which he was still in theatre.

**Q.  KBR awards Daoud the B-Sites Master Labor Agreement by Preventing Competitive Bidding and Misrepresenting the Contract.**

374.  The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

375.  The Master Labor agreement of the B sites was fraudulently awarded by KBR to Daoud.

376.  KBR misrepresented the nature of the contract to another prospective contractor, Rezayat Projects Incorporated. KBR also did not solicit any other contractors, thereby actively working to prevent competitive bidding.

377.  KBR claimed that there was an urgent and compelling need to award this contract to Daoud. They based this "urgent and compelling need" by misrepresenting the nature of the contract.

378.  KBR also claimed there was no other bidder who could have performed the contract, while in fact, the Relator was personally aware of another contractor who had a presence in the sites and could have performed the contract, namely Prime Projects International (PPI).

379. Finally, the record indicates that the required price reasonableness documentation was created well after the contract was awarded, and, in any case, was incorrect as PPI's prices were ignored even though they were lower.

380. On November 25, 2003, KBR and Daoud executed Master Labor Agreement ML00001. Only two contractors were ever solicited for this Agreement-Rezayat and Daoud. The Bid tab produced by KBR to support the award showed that the eventual winner, Daoud, was the only contractor to place a bid.

381. The evidence shows that KBR never intended to have another vendor win the contract.

382. In fact, there is at least one requisition for labor stating that Daoud would be the supplier, which was initiated more than a month before the contract was even awarded.

383. By the time KBR awarded the sole source contract to Daoud they paid $130,000 more to supply the same workers as contemplated under the requisition. Compare the following requisition and work release:

> Material Requisition of 21 Oct 2003 for $232,140
> Work Release WL00001 of 26 Nov. 2003 for $367,070.40.

384. KBR approached only one competitor to bid on the contract, but took measures to induce that contractor to withdraw. KBR told Rezayat that the Master Labor Agreement would be small and for short periods of time so that Rezayat would not be interested in bidding.

385. E-mails were included in the file to justify awarding the contract, titled "Tab One Authorizations and Solicitations." This file shows that KBR's subcontracts administrator, Robert Gerlach, sent an e-mail to Jim Hagan of Rezayat, ostensibly

asking for a bid on November 15, 2003. In this e-mail, KBR acknowledged that they in fact had "… an obligation to solicit… bids under the master labor Agreement."

386.   However, in this same series of e-mails, Mr. Gerlach states he is aware of the possibility that it may not be "reasonable" for Rezayat to submit a proposal because the type of labor being requisitioned for these camps is for a "relatively small number of Third Country Nationals (TCN) for a "relatively short period of time."

387.   Mr. Hagan replied, indicating that Rezayat would decline to submit a bid proposal. He states that it would not be "practical from a cost point of view to establish a camp for a small number of people for a short period – we could not be competitive in this situation."

388.   On November 21, 2003, KBR's Mr. Gerlach sent Mr. Hagan an e-mail in which he asks Mr. Hagan to respond on behalf of Rezayat stating that they wished to be "excused" from future bidding opportunities of this type.

389.   On November 22, 2003, Mr. Hagan complied, sending Mr. Gerlach a formal reply stating that Rezayat did in fact wish to be "…excused from quoting for these requirements in the future," because it was impractical for Rezayat to "… offer a competitive quote."

390.   With the exception of Rezayat, there is no indication that KBR even solicited any additional bids. Subcontract #ML00001 was a sole-source contract awarded to Daoud.

391.   KBR's explanation of an urgent and compelling need justifying such a contract award is found in Tab One Authorizations/Solicitations and in Tab 2 "Responses to Solicitation."

392.   In this Tab 2, KBR included in a form entitled "Justification Other Than Full and Open Competition," which seems to rely on alleged special capabilities of Daoud.

> Daoud …is the only company that can meet KBR's requirement to provide the quantities and types of laborers needed to support U.S. Forces on operations in Iraq in a timely manner until KBR operated assets are fully operational.

393.   In a Memo for the Record, Robert Gerlach states the urgent and compelling need was based on Daoud having existing facilities on the B sites available to respond immediately and "for a relatively small numbers of workers at a time, for a relatively short duration it would be impractical and cost prohibitive for any other supplier…"

394.   KBR made a similar argument to induce Rezayat to withdraw from billing as stated above. KBR told Rezayat that within 90 days there would only be as many as 22 people per base as part of the effort to induce Rezayat not to bid on the contract.

395.   The reality was quite different. Within that time, KBR issued Work Releases for Daoud to hire 60 employees at Camp B1 alone. Only one employee was hired for fewer than 180 days. The rest of the workers were hired for either 180 or 360 days and eventually many of these contracts were also extended or expanded by change orders.

396.  In addition, upon first hand observance of the Relator, Daoud was not the only company that could have been provided the support needed for these camps. Other vendors, such as Prime Projects International (PPI), had a considerable presence in the region that contains the B sites and their pricing was competitive as seen from Gerlach's own attempts to provide a price determination. PPI was not solicited for this agreement.

398.  Mr. Gerlach signed a "Price Reasonableness Determination" on behalf of KBR which was included in the file as part of the Responses to Solicitation. This document offers another bid from "Rezayat projects Incorporate" as a "comparison to previous competitive price paid," and indicates that the prices are from GU84-VC-ML00002, another Master Labor Agreement. It lists those prices as, "Skilled $15.53 per hour, management $32.92." These prices translate to $124.24 and $263.36 per man day.

399.  The next line of the form states, "Comparison to B&R estimate."

400.  The first of these sheets is marked GU84-VCM00005-WR88 includes pricing for four vendors: PPI, La Nouvelle, Yuksel, and Rezayat. The per hour prices for PPI at B1 and B2 and Daoud's price for the Master Labor positions are compared in the chart below:

|  | PPI | Daoud (from ML00001) | Difference |
|---|---|---|---|
| Class 1 (unskilled) | 6.12  USD | 6.65  USD | 0.63/hour |
| Class 2 (skilled) | 9.45   USD | 12.93 USD | 3.48/hour |
| Class 3 (managers) | 15.83 USD | 20.32 USD | 4.49/hour |

401.  The rates quoted for PPI were ignored in the same bid justification. Therefore, the Daoud bid was not the "best" or most "reasonable" bid on the signature page.

Indeed, it appears that on the signature page Gerlach noted only the Rezayat prices and specifically did not note the PPI prices. The prices quoted for PPI are substantially lower for each type of labor than the prices that were paid to Daoud under the master labor agreement:

| Class 1 | 7.96% | lower |
| Class 2 | 26.91% | lower |
| Class 3 | 22.09% | lower |

402.  In addition, both Tab 1 and Tab 2 include pricing information that intended to support the awarding of this contract to Daoud yet appear to be added to the file after the award. The bid dated February 13, 2004, is labeled GU84-VC-ML5005 and is included in Tab One Authorizations and Solicitations.

403.  The Bid sheet labeled GU84-VC-MA00005-WR-88 is included. Both of these bids actually occurred after the award of the Master Labor Agreement to Daoud. Nonetheless, the bid for GU84-VC-ML5005 again shows PPI offering lower prices than Daoud as follows:

| Class 1 | 5.14 |
| Class 2 | 8.70 |
| Class 3 | 11.60 |

404.  Using the price from PPI for class 2 workers for $8.70/hr, PPI prices were 26.03% lower than those agreed upon with Daoud in the mater labor agreement, ML00001.

405.  PPI's bid is dated February 13, 2004, nearly three months after the Master Labor Agreement ML00001 was executed. The fact that such a bid tab was being used to justify the sole sourcing of a contract from another area of Iraq, which was

completed three months later, is additional evidence of fraud on the part of KBR officials.

406.    E-mail correspondence between KBR subcontract administrators Clifton Taylor and Dana Schmidt provides further evidence that KBR officials were "building" the file and the justification months after the contract had been awarded to Daoud.

407.    In an e-mail dated March 15, 2004, Mr. Taylor writes "Bob (Gerlach) asked me to remind you that you are providing some labor rates for us to use in the D&P labor services contract."

408.    On March 16, 2004, Mr. Schmidt responds, referencing the "Principal Site Support Services" bids and indicates that they are attached to the e-mail. The "Principal Site Support Services' spreadsheet referred to in this e-mail is the same as discussed above, and was compiled prior to August 2003. It appears to have been added to the file for the Master Labor Agreement after the fact, but includes PPI's lower prices.

409.    Mr. Taylor indicates that the purpose of the correspondence is to justify the sole sourcing of the labor agreement with Daoud. He says that they (KBR) are attempting to show why they chose to "avoid fair and open competition", and to "justify our single source and price reasonableness"

410.    To justify the Daoud contract, Mr. Schmidt suggested that they place the "Principal Site Support Services" spreadsheet in with the other supporting documentation. He says: "What better way, in the absence of current competition, than to compare what we would have paid another bidder…"

411.  KBR officials deliberately attempted to build the justification for the master labor agreement (ML00001) several months after the subcontract/agreement had been awarded.

412.  KBR officials awarded this contract through a sole source bidding process despite the fact that there was, in fact, legitimate and lower-priced competition available. KBR failed to solicit such competition choosing instead to fabricate supporting documents which, ultimately, also fail to justify the sole source award, even if it were acceptable to justify such an award after the fact.

413.  Several memos found throughout the ML00001 contract File show that the entire file is a "reconstruction" because the originals were purported to be "lost".

414.  Regardless of whether any files were actually lost or the entire file was constructed from the beginning in this manner, the fact is that Daoud was awarded a sole source contract without justification. The file that does exist shows that KBR did not solicit nor obtain a best and reasonable price. The evidence shows that there were other contractors who could have been solicited. The sections above indicate how this contract, once awarded, was also abused.

415.  Given the fraudulent nature of the awarding of this contract, damages to the US Government include, but are not limited to the full value of the contract as it was awarded through a fraudulent and anti-competitive process, if indeed such activity can be called a process. The contract awarded labor in B sites in the following amounts as the Relator's Spread sheets when added up indicate:

Total Amount of Award in B1: $ 14,920,193.23
Total Amount of Award in B2: $  1,932,119.80
Total Amount of Award in B4: $  1,414,562.40
Total Amount of Award in B6: $  1,079,516.40

Total amount awarded
via ML00001                                $ 19,346,391.83

### R. Subcontracts for Wells Awarded by KBR to Daoud Through Fruad do not Produce Drinkable Water.

416.  The allegations contained in the paragraphs above are hereby re-alleged and set forth fully as above.

417.  KBR decided to drill wells at four B-sites (B1, B3, B4 and B7). A government officer (an Administrative Contracting Officer "ACO") must approve all construction subcontracts. In this case, the ACO disapproved KBR's requisition for wells at B1, stating the wells were not needed. KBR was aware of the disapproval as of February 3, 2004 according to internal KBR e-mails.

418.  In order to award the subcontract to Daoud, KBR re-organized the bidding procedure for the sites as "services" subcontracts. KBR's subcontracting officer Robert Gerlach knew that services subcontracts could be processed without review or approval by a government officer. He was therefore able to get around the necessity for a government ACO approval.

419.  KBR solicited bids, and awarded wells subcontracts for two sites to Daoud at Camps B1 and B3. Daoud's costs were extraordinarily high. They were awarded the B1 and B3 sites despite not being the lowest bidder according to KBR's documentation because "…water wells are urgently required…" and "In view of the requirement to accomplish this project the quickest and most cost effective way…"

420.   This contradicts the original government ACO disapproval cited above. It also is in contradiction with the extraordinary costs approved for these wells since the justification letter says this was supposed to be done quickly and cost effectively.

421.   The urgent need for these wells is also contradicted by the fact that the wells actually dug by Daoud were of no use. Speed in execution of the wells could not have been accomplished since the wells were not usefully completed and, of course, the costs were extraordinary.

422.   A KBR official, the theatre's well expert, stated that the Fallujah wells dug by Daoud are not functional or being used.

423.   The D&P Well #1 is reported to have output of 6,600 gallons per hour. TDS's 20,000 mg/l power is provided by the water plant generator. This well is presently being used for non-potable water.

424.   D&P Well #2 reported to have output of 11,800 gallons per hour. This well does not have power at this time.

425.   The above analysis indicates that the second well may have the capacity to produce some water, but without power it is not actually producing water. The second well is only being used for dust abatement. This assessment undermines any urgent and compelling need for the contracts to dig these wells to have been awarded.

426.   Daoud's costs were extraordinary and awarded pursuant to such a stated urgent need. The fact that Daoud's wells did not produce acceptable water forced the Relator to personally contract with a local Iraqi firm to drill two wells in Camp B3 (Fallujah).

427.  Mr. Barko's orders cost approximately $23,000 per well. They operate properly and continuously, and provide a significant amount of the water on the base.

428.  The wells constructed by the local Iraqi Firm are listed KBR wells 1&2 on Mr. Van DeCarr's report. The minor improvements he called for were delayed by insurgent activity until Mr. Barko left Iraq. Nonetheless, these wells continued to function properly.

429.  In contrast, the prices paid to Daoud were the highest of any wells in Iraq while the Relator was in theater. Daoud's contracts included an agreement to drill three wells at camp B1 at a cost of $2,379,000.00 and an agreement to drill two wells at camp B3 for $1,796,000.00.

430.  Hesston/ESSCO bid $914,781.25 to produce the three wells at Camp B1 and $716,567.25 to produce the two wells at Camp B3. Those bids would have been for less than half the total awarded to Daoud.

431.  Even the excessive prices paid the EAMAR as discussed in the original disclosure statement were "only" approximately $170,000 USD per well. KBR originally awarded subcontracts for Wells in the B4 and B7 sites to Hesston/ESSCO for approximately $244,595.00 per well including all costs.

432.  Daoud charged $790,000 per well for three wells in camp B1 and $898,000.00 per well for two wells at B3 and was unable to produce a working well for that price.

433.  KBR had awarded Daoud construction subcontracts to dig wells at camp B1, where Daoud already had a very large presence and access to the second largest airfield in Iraq.

434.   Daoud routinely flew its own supplies and materials directly to this base. Daoud was also awarded a subcontract to provide wells for camp B3, where military convoy from B1 is a frequent occurrence, providing excellent security.

435.   Nonetheless, Daoud charged exorbitant fees for mobilization/demobilization and security.

436.   KBR agreed to and paid $350,000.00 for Mobilization and $200,000.00 for private security for the wells at camp B1 alone.

437.   The justification in the file for awarding such an excessive price to Daoud for the wells was the alleged need to handle the matter quickly as cited above and the "urgent" requirement for water.

438.   However, the wells Daoud constructed and that were paid for lay dormant and unused during the Relator's entire time in theatre.

439.   In fact, the Relator was required to subcontract to a local Iraqi company for two workable wells at B3 to satisfy the requirements there.

440.   KBR's award of this contract was neither justified nor satisfied by Daoud's expensive but unused wells.

441.   While the subcontracts for wells in camps B7 and B4 were initially awarded to another company (Hesston/ESSCO), there was a strong effort by KBR to "terminate for convenience" at site B4, despite Hesston's excellent performance at site B7, and award the B4 wells subcontract to Daoud.

442.   This "termination for convenience" was attempted by KBR, which stated that the requirement for wells at site B4 no longer existed. At the same time, KBR was inducing Hesston/ESSCO with this rationale to accept the "termination for

convenience." KBR stated in its weekly Construction Board Report of January 23, 2005 that they intended to award the B4 wells subcontract to Daoud.

443. There was no competition, and no new bids for the B4 wells were solicited despite the fact that initial solicitations had been done more than 6 months before. A new RFQ should have been disseminated to all competent/interested subcontractors to properly bid the work at B4.

444. The evidence supports that the additional wells contracts were slated to be awarded absent competition to Daoud all along.

445. The Relator, while still in theatre, was able to revive the original contract with Hesston/ESSCO so, at least to that date, KBR was prevented from awarding the contract to Daoud as KBR apparently intended.

## FALSE CLAIMS ACT VIOLATIONS

### COUNT I

446. The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

447. KBR awarded Daoud contracts to build laundry facilities and provide laundry services in three B sector sites.

448. In each case, KBR made the contract award while there was only one other bidder on the record.

449. The only other bid on the record was flawed and was not ever seriously considered by the contract administrator.

450.   The contract administrator admitted that other bids may have been received by KBR prior to his being assigned the contracts, but no effort was made to find other prospective subcontractors.

451.   As a result, Daoud and KBR ended up increasing the value of the contracts substantially higher than the amount originally bid.

452.   Daoud was also awarded an extension of time to provide the services without competition.

453.   No other contractor could have been in the position to provide such services by contract extension.

454.   Furthermore, the lack of competition created contracts, which were assigned to Daoud by fraud *ab initio* indicating damages including but not limited to the the full amount of such contracts.

455.   KBR knowingly, willfully and recklessly authorized contracts in the absence of legitimate competition for the contracts to provide laundry facilities and services for the U.S. Military.

456.   KBR and Daoud have caused the submission of false claims in violation of 31 U.S.C. § 3729 *et seq*., by authorizing contracts in the absence of legitimate competition and directly or indirectly causing increased costs to the United States for Laundry Facilities and Services for the U.S. Military.

457.   Damages to the United States Government include, but are not limited to, the full value of the contracts authorized in absence of legitimate competition and any increased costs directly or indirectly caused by KBR and Daoud.

## **COUNT II**

458.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

459.    Company officials approved a contract bidding process which vastly inflated the cost of the bids to the United States.

460.    The company awarded jobs and allowed work to begin, even prior to proper awarding of contracts based on a lack of competitive bidding process.

461.    KBR issued notices to proceed in all three sites on November 18, 2003.

462.    Actual contracts were not awarded until a full month later.

463.    That month could have been used to solicit other bids and negotiate lower contract prices.

464.    Instead, work had already begun in the absence of approved contracts.

465.    The work reflected the lack of proper contracting, as in many instances the quality reports indicated substandard construction.

466.    KBR knowingly, willfully and recklessly issued Notices to Proceed and allowed work to begin before the proper awarding of any contracts, which created an environment which did not allow any other contractor to work on the sites, allowed work that was not properly supervised to proceed, and worked to ensure that only Daoud could earn the work.

467.    KBR has caused the submission of false claims in violation of 31 U.S.C. § 3729 *et seq.*, by creating an environment that disallowed the solicitation of other bids as well as the negotiation of lower contract prices.

468.    Damages to the United States Government include, but are not limited to, the full value of the contracts, as they were created out of fraud *ab initio*.

469.   The United States Government has also been damaged to the extent that KBR's contracting procedure increased the cost of the work conducted at the sites.

## COUNT III

470.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

471.   The company awarded contracts and change orders which inhibited any attempt to lower costs through a competitive process.

472.   To the extent that two bids were received on any project initially, even that minimal competitive activity was undermined by KBR's award of Change Orders, the only apparent purpose for which was to inflate the price to a contractor.

473.   No competitive procedure was used to award Change Orders.

474.   Defendants have caused the submission of false claims in violation of 31 U.S.C. § 3729 *et seq.*, by fraudulently inflating the costs of laundry facilities through change orders.

475.   Damages to the United States Government include, but are not limited to, the extent that the change orders inflated the costs of the laundry facilities.

476.   Additionally, damages to the United States Government also include, but are not limited to, the extent that the laundry facilities were contracted for with the idea of inflating the price at a later date, thereby preventing competition and preventing a proper cost.

## COUNT IV

477.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

478.  KBR knowingly, willfully and recklessly violated its responsibilities under contract with agencies of the United States Military by purchasing through its own contract procedures the same Laundry Facilities, equipment and Real Property more than once on behalf of the United States.

479.  The company used contracts to purchase laundry facilities, labor, materials, plant equipment and real property, including "all buildings, materials, and equipment necessary for installation, operation, and maintenance of all utilities," which were specifically spelled out in the initial contracts.

480.  KBR then purchased the same equipment and real property again by change order in order to increase the value of the contracts to its subcontractor.

481.  The change orders clearly increase the amount of the contracts by the "construction value" still left on the initial contracts.

482.  Defendants have caused the submission of false claims in violation of 31 U.S.C. § 3729 *et. seq*., by charging twice for the same facilities, materials, buildings and other property and labor which were specifically spelled out in the initial contracts.

483.  These charges were already included in the initial contracts, and any inclusion of them again in the change orders represents a double-billing for facilities, materials, buildings and other property and labor already purchased under the terms of the original contracts.

484.  Damages to the United States Government include, but are not limited to, the full extent of such amounts, specifically $1,093,920 for Site B1, $758,909 for Site B2, and $727,186 for Site B3, for a total amount of $2,580,015.

485.   Additionally, the facilities were often not kept in proper repair, adding to the damages to the United States Government.

## COUNT V

486.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

487.   KBR knowingly, willfully and recklessly purchased interests in Real Property on behalf of the United States which neither it nor its subcontractor was in a position to legally own and of which the United States was already the owner.

488.   The company, through contract and change order, entered into contracts regarding real property.

489.   It supposedly purchased "Real Property" to which neither it nor its subcontractor had a deed.

490.   The actual Real Property was located on U.S. Military bases.

491.   Such a transaction is fraudulent on its face.

492.   Defendants have caused the submission of false claims in violation of 31 U.S.C. § 3729 *et seq.*, by fraudulently purchasing real property which neither KBR nor Daoud owned.

493.    Damages to the United States Government include, but are not limited to, the full extent of any contracts involving such transactions.

## COUNT VI

494.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

495.    KBR contracted via change orders to pay a "negotiated" 25% buyout premium included within costs for equipment and Real Property for the three B Sites.

496.    These premiums alone totaled $1,015,834.00 for the three sites.

497.    These premiums were figured on the full amount of the construction cost and were "negotiated" without any competitive bidding.

498.    KBR knowingly, willfully and recklessly contracted to pay in excess of $1,000,000 for buyout premiums "negotiated" without any competitive bidding.

499.    Defendants have caused the submission of false claims in violation of 31 U.S.C. § 3729 *et seq*., by fraudulently contracting to pay a premium "negotiated" without any competitive bidding.

500.    Damages to the United States Government include, but are not limited to, the full extent of the buyout premiums.

## COUNT VII

501.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

502.    KBR knowingly, willfully and recklessly used subcontractors who acted as "shell" companies and inflated the cost of doing work in Iraq, including drilling wells such as the contract provided to EAMAR.

503.    The EAMAR Company was set up merely to serve as a shell for drilling wells.

504.    The company received money but did not drill wells for water in the country.

505.    Defendants have caused the submission of false claims in violation of 31 U.S.C. § 3729 *et seq*., by charging for work that was never actually done.

506.   Damages to the United States Government include, but are not limited to, the extent of any payments to such a shell company operation.

## COUNT VIII

507.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

508.   KBR knowingly, willfully and recklessly deemed Daoud's construction of a Dormitory at the B-6 Man Camp site acceptable when KBR had knowledge that Daoud's construction was substandard and "hazardous."

509.   The cost to construct the dormitory was $4,800,000.00.

510.   The substandard construction of this dormitory also had a negative impact on the value of the entire "Man Camp" which KBR contracted with Daoud to build.

511.   Damages to the United States Government include, but are not limited to, the extent of the cost to construct the dormitory.

512.   Additionally, damages to the United States Government include, but are not limited to, the extent that the substandard construction of the dormitory had a negative impact on the value of the entire "Man Camp."

## COUNT IX

513.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

514.   KBR knowingly, willfully and recklessly attempted to enforce performance of a subcontract.

515.   George Covelli, the KBR subcontracts administrator assigned to administer the subcontract, tried to penalize the subcontractor by decreasing the value of a subcontract based on the subcontractor's nonperformance.

516.   Covelli was abruptly removed from authority by KBR and new change orders were issued to restore the money to the subcontract without any justification in one case and with fraudulent justification in another.

517.   Change orders added more than $2,000,000.00 to the contract after Mr. Covelli identified Daoud's failure to perform.

518.   Defendants have caused the submission of false claims in violation of 31 U.S.C. § 3729 *et seq*., by adding over $2,000,000 via change orders after KBR's subcontracts administrator identified Daoud's failure to perform.

519.   Damages to the United States Government include, but are not limited to, the extent that the change orders added to the contracts after Mr. Covelli identified Daoud's failure to perform.

## COUNT X

520.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

521.   KBR knowingly, willfully and recklessly manipulated the bidding process for the B-6 Man Camp subcontract in order to award the subcontract to Daoud.

522.   The subcontractor administrators, faced with a 26 percent discrepancy between bids, were supposed to take action to ensure the bidders understood the solicitation and or re-bid the contract.

523.   KBR simply altered the bid so that the difference was less than 25 percent.

524.  Then, KBR awarded the $11,991,000.00 contract to Daoud.

525.  KBR's knowing, willful and reckless manipulation of the bidding process worked to ensure that only Daoud could earn the work.

526.  Damages to the United States Government include, but are not limited to, the extent that KBR's manipulation of the bidding process created an environment where no other contractor could place a winning bid.

527.  The contracts are therefore fraudulent *ab initio*, and the United States Government has been damaged to the full amount of the contracts.

## COUNT XI

528.  The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

529.  KBR and Daoud knowingly, willfully and recklessly repeatedly billed for labor under the master labor agreement when there were already contracts in place that included labor.

530.  The examples in the paragraphs above indicate a pattern and general practice of abuse, and in and of themselves demonstrate $1,675,728.00 of work releases and change orders issued for labor that was already to be provided under other contracts.

531.  Damages to the United States Government include, but are not limited to, the extent that KBR and Daoud repeatedly billed for labor that was already included in the initial contracts.

## COUNT XII

532.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

533.    KBR and Daoud knowingly, willfully and recklessly double-billed for labor to perform laundry services, by using the master labor agreement #ML00001.

534.    These labor services were already included in Daoud's contract to provide the services initially.

535.    Daoud was therefore able to bill twice to provide the same labor services under both the Master Labor agreement and its contracts to provide laundry services.

536.    Also, this demonstrates Daoud's willful actions to abuse its $4,015,764.00 Laundry Subcontract.

537.    Damages to the United States Government include, but are not limited to, the extent that Daoud billed twice to provide the same labor services.

## COUNT XIII

538.    The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

539.    KBR and Daoud knowingly, willfully and recklessly charged for supplies and services incident to a laundry facility that were supposed to be included in the original $4,015,764.00 contract for those services.

540.    The Relator's spreadsheet shows there were more than $400,000.00 of such charges at this one facility for only the time period during which he was still in Iraq.

541.    Daoud also failed to maintain adequate supplies on hand to allow laundry services to be performed timely.

542.    Daoud's failure placed workers at grave risk.

543.    Daoud subcontracted work under the laundry subcontract for Site B1 to a firm called Tepe, apparently a subsidiary of Bilintur, which the Relator believes is a Turkish firm.

544.    In August/September 2004, the laundry at Site B1 ran short of supplies.

545.    Tepe employees were sent without security into a local town to procure the necessary supplies despite the extremely dangerous security conditions and high insurgent activity.

546.    Two of the Tepe employees failed to return and were discovered killed by insurgents in a local town.

547.    Damages to the United States Government include, but are not limited to, the extent that KBR and Daoud charged twice for supplies and services incident to a laundry facility.

548.    Additionally, damages include, but are not limited to, any compensation that may be owed by Daoud or by KBR under provisions of the Defense Base Act or other insurance to the families of workers were killed or injured when sent, without security, into areas with extremely dangerous conditions and high insurgent activity to procure the supplies which Daoud had failed to adequately maintain and which Daoud could have flown into the air bases where it had laundry facilities.

## COUNT XIV

549.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

550.   KBR knowingly, willfully and recklessly fraudulently awarded the Master Labor Agreement to Daoud in the absence of competition.

551.   Daoud charged $19,346,391.83 under work releases pursuant to this agreement while the Relator was in theatre.

552.   The Master Labor Agreement was fraudulently awarded and was therefore void from its inception.

553.   Damages to the United States Government include, but are not limited to, the full extent of the Master Labor Agreement.

## COUNT XV

554.   The allegations contained in the above paragraphs are hereby re-alleged and set forth fully as above.

555.   KBR and Daoud knowingly, willfully and recklessly contracted to build wells at an extremely high price in contradiction of the military's directive that additional wells were neither required nor authorized.

556.   KBR justified awarding the contract to Daoud by stating there was an urgent compelling need.

557.   While KBR paid hundreds of thousands of dollars per well, the compelling need was not justified given that Daoud's wells, when completed, were not used and remained in a state of disrepair/non-use for at least a year.

558.    The Relator was able to contract for wells himself on one of the same sites for approximately $23,000.00 per well.

559.    Unlike the more expensive wells purchased by KBR, those wells did produce water and were in regular/continuous use.

560.    Damages to the United States Government include, but are not limited to, the full extent of the contracts to build wells that KBR justified under the false pretense of an urgent compelling need.

## **Prayer for Relief**

WHEREFORE, plaintiff demands judgment for all of the following:

a)  That this Court enter a judgment against defendants in an amount equal to three times the amount of damages the United States Government has sustained because of defendants' authorization of contracts in the absence of legitimate competition, defendants' manipulation of the bidding process to create an environment where no other contractor could place a winning bid, and defendants' fraudulent awarding of the Master Labor Agreement in absence of competition.

b)  That this Court enter a judgment against defendants in an amount equal to three times the amount of damages the United States Government has sustained because of defendants' issuing of Notices to Proceed and allowing work to begin before the proper awarding of any contracts.

c)  That this Court enter a judgment against defendants in an amount equal to three times the amount of damages the United States Government has sustained because of defendants' fraudulent inflation of the costs of laundry facilities through change orders, defendants' purchase of the same construction materials and equipment twice

when they were covered under the initial contract, defendants' addition of over $2,000,000 to the contracts through change orders after KBR's subcontracts administrator identified Daoud's failure to perform, defendants' repeated billing for labor that was already included in the initial contracts, and defendants' multiple charges for the same supplies and services incident to a laundry facility.

d) That this Court enter a judgment against defendants in an amount equal to three times the amount of damages the United States Government has sustained because of Defendants failure to maintain and supply facilities including laundry facilities, wells, and man camp facilities it knowingly did not keep in repair, build properly or supply as required.

e) That this Court enter a judgment against defendants in an amount equal to three times the amount of damages the United States Government has sustained because of defendants' fraudulent purchase of Real Property not owned by any defendant.

f) That this Court enter a judgment against defendants in an amount equal to three times the amount of damages the United States Government has sustained because of defendants' purchase of wells, which were never completed, from a shell company and defendants' purchase of wells justified under the false pretense of an urgent compelling need.

g) That this Court enter a judgment against defendants in an amount equal to three times the amount of damages the United States Government has sustained because of defendants' purchase and acceptance of construction of a Man Camp Dormitory of which KBR had knowledge was substandard and "hazardous."

h) That each and every false claim including each bid, invoice, contract, contract amendment or charge which is the subject of this complaint be subject to a Civil Fine of five to ten thousand dollars ($5,000 - $10,000) as provided under the False Claims Act.

i) That Relator/Plaintiff be awarded all reasonable attorneys fees and costs, pursuant to 31 U.S.C. § 3730 subsection (d) (1) (b).

j) That in the event the United States Government continues to proceed with this action, the Relator/Plaintiff be awarded and amount for bringing this action of at least 15% but not more than 25% of the proceeds of any award or the settlement of the claims;

k) That in the event that the United States Government does not proceed with this action, the Relator/Plaintiff be awarded an amount that the Court decides is reasonable for collecting the civil penalty and damages, which shall not be less than 25% nor more than 30% of the proceeds of any award or settlement;

l) That the Relator/Plaintiff be awarded pre-judgment and post-judgment interest;

m) That a trial by jury be held on all issues;

n) That the United States Government and the Relator/Plaintiff receive all relief both at law and at equity, to which they may reasonably appear to be entitled.

**JURY TRIAL DEMANDED**

Respectfully submitted,

_/s/ Stephen M. Kohn_____
Stephen M. Kohn
DC BAR # 411513

_/s/ Michael D. Kohn_____
Michael D. Kohn
DC BAR #425617


_/s/ David K. Colapinto_____
David K. Colapinto
DC BAR #416390

KOHN, KOHN & COLAPINTO, LLP
3233 P Street, N.W.
Washington, D.C. 20007-2756
Phone: (202) 342-6980
Fax:    (202) 342-6984

*Attorneys for Plaintiff-Relator*


June 13, 2007