UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
------------------------------------------------------
                                                :
UNITED STATES OF AMERICA                        :
       *ex rel.* HARRY BARKO                    :    CASE NO. 1:05-CV-1276
                                                :
              Plaintiff-Relator,                :
                                                :
vs.                                             :    OPINION & ORDER
                                                :    [Resolving Docs. Nos. 53 & 64]
HALLIBURTON COMPANY, et al.,                    :
                                                :
              Defendants.                       :
                                                :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

   Plaintiff-Relator Harry Barko, a former subcontract administrator for Kellogg Brown and Root (KBR) in Iraq, brings this action alleging violations of the False Claims Act[1] by Defendants KBR, its parent, Halliburton Company (Halliburton), related entities, and subcontractors Daoud & Partners, Inc. (Daoud) and EAMAR Company (EAMAR). Barko says that Defendants engaged in a scheme to defraud the United States by using a subcontracting procedure that vastly inflated the costs of constructing laundry facilities and providing laundry services on at least three American military bases in Iraq.[2] The KBR and Halliburton Defendants move to dismiss the complaint, saying that Barko alleges only poor contracting practices, as opposed to actual false claims.[3] Defendant Daoud also moves to dismiss the complaint, saying that this Court lacks personal jurisdiction over it, that Barko fails to state a claim upon which relief can be granted, and that the law at the time of

---

[1] 31 U.S.C. § 3729 (1994).
[2] Doc. 12, at 7.
[3] Doc. 53.

Case No. 1:05-CV-1276
Gwin, J.

the alleged violations shielded subcontractors from liability.[4] For the following reasons, the Court DENIES both motions to dismiss. The Court also VACATES the existing protective order.[5]

I. BACKGROUND

The facts as alleged in Barko's seventy-eight page complaint are accepted as true for the purposes of this opinion. In 2004, KBR, a private military contracting company, hired Barko to administer contracts pursuant to the third generation of the United States' Logistics Civil Augmentation Program (LOGCAP III). Under LOGCAP III, KBR provided "logistical services such as transportation, maintenance, facilities management, and dining facilities in support of military operations around the world."[6]

KBR worked with subcontractor Daoud & Partners on multiple projects.[7] On certain projects, Daoud was the only bidder.[8] KBR and Daoud built and provided laundry services for several military bases in Iraq.[9] KBR also hired Daoud to dig wells and construct a dormitory.[10] The wells did not produce water, and the dormitory was poorly built.[11] Barko learned about these projects while working for KBR in Iraq.

In 2005, Barko left Iraq and sued Defendants under the False Claims Act. Barko says that KBR and Daoud committed fraud by submitting false claims and faulty accounting to the United States under the LOGCAP III contract. KBR and Daoud deny Barko's allegations, and move this

---

[4] Doc. 64-1.
[5] Doc. 91.
[6] *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 147 (D.D.C. 2011).
[7] Doc. 12.
[8] Doc. 12.
[9] *Id.*
[10] *Id.*
[11] *Id.*

Case No. 1:05-CV-1276
Gwin, J.

Court to dismiss the claims.

## II.  LAW & ANALYSIS

To survive a motion to dismiss, Barko's complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."[12]  This Court must refrain from making any judgment about the probability of Barko's success.[13]  Rather, it must "assume all the allegations in the complaint are true (even if doubtful in fact) and must give [Barko] the benefit of all reasonable inferences derived from the facts alleged."[14]

However, the allegations must allow this Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."[15]  "Facts that are merely consistent with a defendant's liability and demonstrate only a possibility, but not the plausibility, of relief fail to satisfy this standard."[16]

To prove a violation of the False Claims Act, Barko must show that Defendants either (1) knowingly presented or caused to be presented to the government "a false or fraudulent claim for payment or approval;" or (2) knowingly made, used, or caused to be made or used, "a false record or statement to get a false or fraudulent claim paid or approved by the government."[17]  A claim includes "any request or demand . . . for money or property" made to a contractor doing work on the

---

[12] *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP*, 682 F.3d 1043, 1048 (D.C. Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)) (alteration omitted).

[13] *United States ex rel. Bender v. N. Am. Telecomm.*, 750 F. Supp. 2d 1, 5 (D.D.C. 2010).

[14] *Aktieselskabet AF 21. November 2001 v. Fame Jeans Inc.*, 525 F.3d 8, 17 (D.C. Cir. 2008) (internal quotation marks, alterations, and citations omitted).

[15] *RSM Prod.*, 682 F.3d at 1048 (quotation omitted).

[16] *Id.* (quotation omitted).

[17] 31 U.S.C. § 3729(a)(1-2) (1994).  Unless otherwise noted, all references to the False Claims Act are to its 1994 codification.  The Court will consider the effect of the current codification versus the 1994 version of the law when discussing Daoud's retroactivity argument.

Case No. 1:05-CV-1276
Gwin, J.

government's behalf.[18] The knowledge requirement is satisfied if the person "has actual knowledge of the information" or if he "acts in deliberate ignorance" or "reckless disregard" of the truth or falsity of the information.[19] Barko must allege that the false statements were material to the claim approval process.[20]

The False Claims Act is an anti-fraud statute, and complaints brought under it must comply with specific pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.[21] Rule 9(b) requires that Barko "state with particularity the circumstances constituting fraud or mistake."[22] "Thus, to satisfy Rule 9(b), a False Claims Act relator must state the time, place, and contents of the false representations, the facts misrepresented, and what was obtained or given up as a consequence of the fraud."[23] While Rule 9(b) constitutes a "heightened pleading standard," it is "still subject to the general short and plain statement command set out in Rule 8."[24] Rule 9(b)'s particularity requirement "does not completely vitiate the liberality of Rule 8."[25]

KBR and Daoud both ask this Court to dismiss Barko's claims. KBR says that Barko has failed to state a claim upon which relief can be granted, since he did not provide enough factual

---

[18] 31 U.S.C. § 3729 (1994).

[19] *Id*.

[20] 31 U.S.C. § 3729(b)(3); *see United States ex rel. Ervin and Assocs., Inc. v. Hamilton Sec. Group*, 370 F. Supp. 2d 18, 36 (D.D.C. 2005) ("The great weight of case law holds that the materiality of a false record or statement is an element of False Claims Act liability.").

[21] *United States ex rel. Totten v. Bombardier Corp.*, 286 F.3d 542, 551-52 (D.C. Cir. 2002) ("Every circuit to consider the issue has held that, because the False Claims Act is self-evidently an anti-fraud statute, complaints brought under it must comply with Rule 9(b).").

[22] Fed. R. Civ. P. 9(b).

[23] *Bender*, 750 F. Supp. at 6 (citing *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1385 (D.C. Cir. 1981)).

[24] *United States ex rel. Brown v. Aramark Corp.*, 591 F. Supp. 2d 68, 72 (D.D.C. 2008).

[25] *United States ex rel. Ortega v. Columbia Healthcare*, 240 F. Supp. 2d 8, 18 (D.D.C. 2003).

-4-

Case No. 1:05-CV-1276
Gwin, J.

information to support his claims.[26] Daoud also says that Barko has failed to properly state a claim.[27] In addition, Daoud says that this Court lacks personal jurisdiction, that service was improper, and that the amendments to the False Claims Act cannot be applied retroactively.[28] The Court considers each argument in turn.

*A. KBR's Motion to Dismiss*

Halliburton, KBR, and their related entities ask the Court to dismiss Barko's claims on behalf of the United States under Federal Rule of Civil Procedure 12(b)(6) for failing to state a claim upon which relief can be granted.[29] KBR says that Barko failed to plead enough specific facts, as required by Rule 9(b).[30] KBR says that Barko "does not allege facts suggesting that KBR *knowingly* defrauded the Government."[31] KBR says that, at best, Barko's complaint alleges "poor contract performance, not false claims."[32]

Barko, however, provides a great deal of factual allegations to support his fraud claims. Barko says that the LOGCAP III contract gives KBR incentives to increase the cost of operations, because the contract provides KBR with an award of 3% of all costs.[33] Barko says that bidding was faulty, with KBR manipulating the process to ensure that Daoud was either the only bidder or the lowest bidder on numerous projects.[34] Barko identifies the specific contracts and subcontract work

---

[26] Doc. 53.
[27] Doc. 64-1 at 18.
[28] Doc. 64-1 at 7, 32.
[29] Fed. R. Civ. P. 12(b)(6).
[30] Doc. 53 at 10-12; Fed. R. Civ. P. 9(b).
[31] *Id*. at 12 (emphasis in original).
[32] *Id*. at 21.
[33] Doc. 12 at 10.
[34] *Id*. at 13-14; 31; 38-39; 50-51; 53-56; 58.

-5-

Case No. 1:05-CV-1276
Gwin, J.

that he says was fraudulent.[35/]

Barko says that KBR and Daoud agreed to "Change Orders" that increased the value of the contract through a practice of double billing for materials already purchased under the original contract.[36/] Barko provides a detailed accounting of these Change Orders, saying exactly how much money was double billed.[37/] Barko says that Daoud and KBR agreed to Change Orders to purchase real property, but neither party ever had title because the facilities were located on military bases.[38/] Barko says that the items in the Change Orders were falsely labeled in order to obtain approval.[39/] Barko discusses specific subcontracts for the projects he mentions,[40/] and gives the names of KBR employees who worked on the projects, as well as quotes from documents in the project files.[41/] Finally, Barko says that KBR and Daoud passed these increased costs on to the United States.[42/]

Although KBR attempts to put a more positive spin on the allegations, Barko gives sufficient facts to survive a motion to dismiss. While the Court need not accept Barko's legal conclusions, his factual allegations, if believed, support plausible fraud claims. Barko has sufficiently pleaded facts to support his claims of "fraudulent attempts to cause the government to pay out sums of money."[43/] Because his claims are plausible, they will not be dismissed.

---

[35/] *Id*. at 9 (laundry facilities at Camps B1, B2, &B3); 32 (the B6 Man Camp subcontract for a dormitory); 58 (subcontract to drill wells at B1, B3, B4, & B7).

[36/] *Id*. at 9.

[37/] *Id*. at 19-20 (at least $1,093,920 in double billing for the B1 project); 24-25 (at least $758,909 in double billing for the B2 project); 28 ($727,186 in double billing for the B3 project).

[38/] *Id*. at 19, 24, & 28.

[39/] *Id*.

[40/] *Id*. at 14 (subcontract numbers for the laundry camp construction); 36 (subcontract number for the Man Camp dormitory); 42-44 (work release numbers under the Master Labor Agreement); 54 (subcontract number for a Master Labor Agreement).

[41/] *Id*. at 12-13; 16; 33-38; 40-42; 51-57.

[42/] *Id*. at 10.

[43/] *United States ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 297 F.Supp. 2d 272, 278 (D.D.C. 2004) (discussing *United States ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995)).

Case No. 1:05-CV-1276
Gwin, J.

*B. Daoud's Motion to Dismiss*

    1. Failure to State a Claim

Daoud moves to dismiss Barko's complaint under Rule 12(b)(6) for failing to state a claim upon which relief can be granted.[44] Daoud says that Barko provides only "speculative and conclusory allegations."[45]

As Daoud notes, the Supreme Court ruled on a False Claims Act case prior to the amendments.[46] In that case, the Court considered whether a subcontractor was liable in a plaintiff's False Claims Act *qui tam* action.[47] The Court said that, in order to be liable under § 3729(a)(2), the claim must be paid by the government but need not be submitted to the government directly.[48] Rather, the Court said that "a subcontractor violates § 3729(a)(2) if the subcontractor submits a false statement to the prime contractor intending for the statement to be used by the prime contractor to get the government to pay its claim."[49] If a subcontractor intends to defraud the government, it does not matter if the false claim was submitted to the government through a contractor. The False Claims Act thus covers both direct and indirect attempts to defraud the government.

As described in Barko's complaint, Daoud's actions plausibly violated the False Claims Act. Barko sued both the contractor and subcontractor, KBR and Daoud. Barko says that Daoud intended to defraud the government, not the contractor with whom it collaborated to perpetrate the fraud.[50]

---

[44] Doc. 64-1 at 18; Fed. R. Civ. P. 12(b)(6).
[45] Doc. 64-1 at 27.
[46] *See Allison Engine Co. v. United States,* 553 U.S. 662 (2008).
[47] *Id.* at 662.
[48] *Id.* at 671 ("While § 3729(a)(1) requires a plaintiff to prove that the defendant 'present[ed]' a false or fraudulent claim to the Government, the concept of presentment is not mentioned in § 3729(a)(2).").
[49] *Id.*
[50] *See* Doc. 12 at 66 ("Defendants have caused the submission of false claims in violation of 31 U.S.C. § 3729 *et seq.*, by charging twice for the same facilities, materials, buildings and other property and labor already purchased under the terms of the original contracts.").

Case No. 1:05-CV-1276
Gwin, J.

Barko provides enough factual allegations to support his claims. Barko says that Daoud and KBR agreed to "Change Orders" to purchase real property, but neither party ever had title because the facilities were located on military bases.[51] Additionally, Barko says that Daoud and KBR created Change Orders that added charges for goods and services that KBR had already purchased.[52] Barko says that Daoud and KBR agreed to add these costs because "KBR could pass these costs along to the United States Government."[53] Barko provided a "detailed description of the specific falsehoods that are the basis for his suit," and as such, he has sufficiently stated a claim upon which relief can be granted.[54]

Daoud argues that a subcontractor cannot be found liable under the False Claims Act. Daoud cites two cases. Both actually support a claim that Daoud could have violated the False Claims Act.[55] Daoud says that, in *Allison Engine Co. v. United States*, 553 U.S. 662 (2008), the Supreme Court held "that subsection (a)(2) did not reach subcontractors whose false records or statements resulted in the payment of government money."[56] Daoud misstates the Court's holding, however. The Allison Engine Court actually held that "a subcontractor violates § 3729(a)(2) if the subcontractor submits a false statement to the prime contractor intending for the statement to be used by the prime contractor to get the Government to pay its claim."[57] A subcontractor can violate the False Claims Act if it presents false documents to a contractor so that the Government approves a

---

[51] *Id.* at 19, 24, & 28.
[52] *Id.* at 9.
[53] *Id.* at 7.
[54] *Bombardier Corp.*, 286 F.3d at 552.
[55] *See Allison Engine*, 553 U.S. 662 (requiring that a subcontractor intend to defraud the government, not the contractor to whom it submits false claims, for liability under the False Claims Act); *Bombardier Corp.*, 380 F.3d 488 (holding that § 3729(a)(1) and (a)(2) require the subcontractor intend to have the government pay the false claims).
[56] Doc. 64-1 at 40.
[57] *Allison Engine*, 553 U.S. at 671.

-8-

Case No. 1:05-CV-1276
Gwin, J.

claim,[58] which is exactly what Barko accuses Daoud of doing.[59] The cases Daoud cites to support its argument actually bolster the finding that it could have violated § 3729(a)(2).

Daoud is correct to point out that Barko does not allege Daoud's involvement in Claims II, VIII, and X.[60] But it does not follow that the Court will dismiss the claims altogether, as Daoud seems to suggest. Daoud need only concern itself with claims to which it is a party. Barko's claims against Daoud are sufficiently well-pleaded to survive a motion to dismiss.

2. Lack of Personal Jurisdiction

Daoud also says that the Court lacks personal jurisdiction over it. Daoud is located in Jordan and does business primarily in the Middle East.[61] Daoud says that it lacks the necessary "minimum contacts" to be subject to an action in an American court.[62]

As Daoud notes in its motion, "[i]n False Claims Act cases, 'the relevant inquiry is whether the defendants have minimum contacts with the United States as a whole.'"[63] A court can exercise personal jurisdiction over a defendant when doing so would not "offend 'traditional notions of fair play and substantial justice.'"[64] It does not offend traditional notions of justice to exercise personal jurisdiction when "the defendant himself" makes "a 'substantial connection' with the forum."[65] A court has personal jurisdiction when a defendant's contact with a forum is so significant that the

---

[58] *Id.*
[59] *See Allison Engine*, 553 U.S. 662.
[60] Doc. 64-1 at 26.
[61] *Id.* at 15.
[62] *Id.* at 16.
[63] *Id.* at 15 (quoting *United States ex rel. Thistlethwaite v. Dowty Woodville Polymer, Ltd.*, 976 F.Supp. 207, 210 (S.D.N.Y. 1997)).
[64] *Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).
[65] *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1950).

Case No. 1:05-CV-1276
Gwin, J.

defendant "should reasonably anticipate being haled into court there."[66] When a party has the required minimum contacts with a forum, jurisdiction "may not be avoided merely because the defendant did not physically enter the forum."[67]

Daoud had enough contact with the United States Government that it could reasonably anticipate being brought into a suit in the United States. Since 1999, Daoud has registered as a subcontractor with and worked for the U.S. Government.[68] On at least one occasion, Daoud's employees have traveled to the United States for business meetings with KBR officials.[69] While working with KBR, Daoud performed over $159 million worth of U.S. Government subcontracts.[70] Daoud has worked with other American companies as well.[71] In order to increase its business with American contractors, Daoud established an English-language website.[72]

Considering all of its contact with the United States Government and citizens, Daoud could reasonably anticipate being haled into federal court. Daoud has directly targeted American companies and purposefully availed itself of government subcontracting opportunities. At least one other federal court has already held that Daoud is subject to its personal jurisdiction.[73]

Daoud cites the Supreme Court for the proposition that "'general jurisdiction is appropriately exercised' only in a forum 'in which the corporation is fairly regarded as at home.'"[74] The case

---

[66] *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).
[67] *Mwani v. bin Laden*, 417 F.3d 1, 12 (D.C. Cir. 2005) (quoting *Burger King Corp.*, 471 U.S. at 477).
[68] Doc. 69 at 9.
[69] Doc. 107 at 16; Doc. 111 at 23.
[70] Doc. 111 at 16.
[71] Doc. 106 at 22.
[72] Doc 69 at 15-16.
[73] *See Adhikari v. Daoud & Partners*, No. 09-cv-1237, 2012 WL 718933, at *2 (S.D. Tex. Mar. 5, 2012) ("[T]he Court conducted an in-depth analysis of Daoud's contacts with the United States, ultimately concluding that these contacts give rise to this Court's general personal jurisdiction over Daoud.").
[74] Doc. 107 at 10 (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S.Ct. 2846 (2011).

Case No. 1:05-CV-1276
Gwin, J.

Daoud cites, *Goodyear*, is distinguishable from this case. In *Goodyear*, the plaintiff argued that the court had personal jurisdiction over the foreign defendant based on a few products that made their way to the forum in the stream of commerce.[75] Here, Daoud has done a good deal of business with American corporations and the United States Government. Daoud's website, its contracts with KBR and other corporations, and its contracts with the Government all indicate that Daoud has purposefully availed itself of the United States. Therefore, Daoud is subject to suit therein.

### 3. Improper Service

Daoud next argues that Barko's complaint should be dismissed under Rule 12(b)(5) of the Federal Rules of Civil Procedure for insufficient service of process. Specifically, Daoud says that service conflicted with Jordanian law, which does not allow for service by email or fax.[76] Daoud says that service by fax or email is only proper when the plaintiff can demonstrate "likely futility of attempts to serve citizens" of a foreign nation.[77]

Federal Rule of Civil Procedure 4(f)(3) authorizes a court to permit service on a party in a foreign country "by other means not prohibited by international agreement, as the court orders."[78] This rule is "neither a 'last resort' nor one of 'extraordinary means,'" but is "merely one means among several which enables service of process on an international defendant."[79] Daoud concedes that Jordan is not a signatory to the Hague Service Convention,[80] an international agreement that

---

[75] *Goodyear*, 131 S.Ct. at 2854-55.

[76] Doc. 64-1 at 20.

[77] *Id*. at 21 (discussing *Nabulsi v. H.H. Sheikh Issa Bin Zayed Al Nahyan*, No. H-06-2683, 2007 WL 2964817, at *7 (S.D. Tex. Oct. 9, 2007)).

[78] Fed. R. Civ. P. 4(f)(3).

[79] *Rio Props., Inc. v. Rio Int'l Interlink*, 284 F.3d 1007, 1015 (9th Cir. 2002). *See also Williams v. Advertising Sex, LLC*, 231 F.R.D. 483, 486 (N.D.W.Va. 2005) (holding that a plaintiff's petition for service under Rule 4(f)(3) "may proceed without seeking service under the other provisions of Rule 4(f)").

[80] Doc. 64-1 at 24.

Case No. 1:05-CV-1276
Gwin, J.

governs service of process over foreign citizens [81].

The Court has already found that Barko showed good cause to serve Daoud in this manner.[82] Service of process on defendants by electronic mail can be proper, as it was here.[83] Daoud's argument to the contrary is weak at best. Daoud says that, when a foreign defendant is to be served, "an earnest effort should be made to devise a method of communication that is consistent with due process and minimizes offense to foreign law."[84] Daoud says that the service here was improper because Jordanian law does not allow service by email. The Advisory Committee foresaw this type of situation; as Daoud's own memorandum notes, service should *minimize* offense to foreign law.[85] The Court took foreign law into consideration and limited any offense to Jordanian law. Service by email might be improper if this Court were located in Jordan, but without an international agreement to the contrary, this Court can authorize a plaintiff to serve a defendant by the necessary means per Rule 4(f)(3).[86]

The means of service are not prohibited by international agreement and were deemed appropriate by the Court. Service of process was proper under Rule 4(f)(3).

4. Retroactivity of amendments to the False Claims Act

Daoud's fourth and final argument is that the recent amendments to the False Claims Act

---

[81] *See Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 698 (1988) ("The primary innovation of the Convention is that it requires each state to establish a central authority to receive requests for service of documents from other countries. Once a central authority receives a request in the proper form, it must serve the documents by a method prescribed by the internal law of the receiving state or by a method designated by the requester and compatible with that law").

[82] The Court's Minute Order of June 3, 2009 authorized Barko to serve Daoud by email.

[83] *See Rio Props.*, 284 F.3d at 1015.

[84] Doc. 64-1 at 23 (quoting Fed. R. Civ. P. 4 advisory committee's note (1993)).

[85] *Id.* at 23.

[86] *See Rio Props., 284 F.3d 1007; U.S. Commodity Futures Trading Comm'n v. Aliaga*, 272 F.R.D. 617, 619 (S.D. Fla. 2011) ("Service may be accomplished under Rule 4(f)(3) as long as it is (i) ordered by the court, and (ii) not prohibited by an international agreement.").

Case No. 1:05-CV-1276
Gwin, J.

cannot apply retroactively. In 2009, Congress passed the Fraud Enforcement and Recovery Act, which amended the False Claims Act.[87] The amendment says that § 3729(a)(1)(B) applies "as if enacted on June 7, 2008, and appl[ies] to all claims under the False Claims Act . . . that are pending on or after that date."[88] Daoud says that, if the amendments are applied retroactively, it would violate its Ex Post Facto and Due Process rights.[89]

The Court need not address that issue, however. The Fraud Enforcement and Recovery Act states that § 3729(a)(1)(B) applies "to all claims under the False Claims Act" pending on or after June 7, 2008.[90] Claim is defined in the statute as "any request or demand" for money from the government or an agent spending the money on behalf of the government.[91] The retroactive provisions apply, then, to fraudulent requests for money pending on or after that date.[92] Barko's complaint does not allege that any of KBR or Daoud's false claims were pending on or after that date. Only Barko's lawsuit was pending on that date, and the amendment does not apply to court cases pending on that date.[93] This Court joins those courts that have so held.[94]

Thus, the Court will apply the version of the False Claims Act as it existed when Barko

---

[87] Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4 (2009). § 3729(a)(2) in the previous version of the False Claims Act was replaced with § 3729(a)(1)(B).

[88] *Id*.

[89] Doc. 64-1 at 41.

[90] Fraud Enforcement and Recovery Act of 2009, Pub. L. No. 111-21, § 4 (2009).

[91] *Id*.

[92] *Id*.

[93] *Id*. This distinction between "claims" and "cases" is evident in the FERA. The amendments to § 3729(a) retroactively apply "to all *claims* under the False Claims Act," while the amendments to § 3731(b) apply "to *cases* pending."

[94] *See United States v. Sci. Applications Int'l Corp.*, 653 F.Supp. 2d 87 (D.D.C. 2009) *rev'd on other grounds*, 626 F.3d 1257 (D.C. Cir. 2010); *see also Hopper v. Solvay Pharm., Inc.*, 588 F.3d 1318, 1327 n.3 (11th Cir. 2009) ("While this case was pending on and after June 7, 2008, the relators do not allege that any claims, as defined by § 3729(b)(2)(A), were pending on or after June 7, 2008. Therefore, we conclude the Fraud Enforcement and Recovery Act does not apply retroactively to this case."); *United States ex rel. Carpenter v. Abbott Labs., Inc.*, 723 F.Supp. 2d 395, 402 (D. Mass. 2010) ("[S]ubsequent case law has almost uniformly interpreted "claims" to mean claims for reimbursement.").

Case No. 1:05-CV-1276
Gwin, J.

began this action.

*C. The Protective Order*

The parties have stipulated to a protective order covering documents that they say could disclose "confidential, trade secret, or other proprietary business or financial information."[95] The Court previously granted the protective order.[96] Granting a protective order is within the Court's discretion, but that discretion must be limited by "the citizen's desire to keep a watchful eye on the workings of public agencies."[97] A court can grant a protective order "only when essential to shield a party from significant harm or to protect an important public interest."[98] A court must tailor a protective order so that it restricts access no more than necessary.[99]

Here, the parties have failed to show that disclosure of particular information would cause serious harm. Instead, the parties would allow any party to "designate as 'Confidential Information' any information, document, or material" that the party believes to be confidential.[100] A party's belief is not enough to show that public disclosure of any information might cause serious harm. Nor is the protective order sufficiently narrow when any party can restrict any document.

The parties may move to seal individual documents provided that the requisite particularized showing is made. For example, upon a proper motion, the Court will consider limiting public disclosure of information that is trade secret. But the showing required to seal documents is great and approval for sealing documents will seldom be given. The Court will not simply grant the

---

[95] Doc. 90.
[96] Doc. 91.
[97] *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978).
[98] *Doe v. District of Columbia*, 697 F.2d 1115, 1119 (D.C. Cir. 1983).
[99] *Id.*
[100] Doc. 90.

Case No. 1:05-CV-1276
Gwin, J.

parties blanket authorization to cloak the entire case under a veil. The Court thus VACATES the protective order.[101]

### III. CONCLUSION

For the foregoing reasons, the Court DENIES both motions to dismiss and VACATES the existing protective order.

IT IS SO ORDERED.

Dated: July 8, 2013              s/  *James S. Gwin*
                                 JAMES S. GWIN
                                 UNITED STATES DISTRICT JUDGE

---

[101] In keeping with the parties' reasonable expectations at the time of filing, all documents previously filed under seal will remain under seal.