UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>*ex rel.* HARRY BARKO,<br><br>                     Plaintiff-Relator,<br>v.<br><br>HALLIBURTON COMPANY, *et al.*,<br><br>                  Defendants. | Case No. 1:05-CV-1276 (JSG) |

## PLAINTIFF-RELATOR'S MOTION TO COMPEL DISCOVERY AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF

Pursuant to Fed. R. Civ. P. 37, Plaintiff-Relator Harry Barko, by and through counsel, hereby moves for an order compelling Defendants Kellogg Brown & Root Services, Inc., KBR Technical Services, Inc., Kellogg, Brown & Root Engineering Corporation, Kellogg, Brown & Root International, Inc., and Halliburton Company (collectively "KBR") to produce certain documents relating to KBR's Code of Business Conduct ("COBC") investigations.  In support of this motion Plaintiff-Relator refers the Court to the memorandum of points and authorities included herein, and the supporting exhibits.  Plaintiff-Relator's proposed Order also accompanies this motion.

Prior to filing this motion counsel for Plaintiff-Relator conferred with counsel for the KBR Defendants and determined that there is opposition to the relief sought and that the parties were unable to narrow the areas of disagreement.  In addition, Plaintiff-Relator refers the Court to the certification pursuant to Fed. R. Civ. P. 37(a)(1) that Plaintiff-Relator's counsel has in good faith conferred or attempted to confer with counsel for the KBR Defendants in an effort to obtain the requested information without court action.

Plaintiff-Relator respectfully requests an order compelling production of the requested

documents, or alternatively, that the Court conduct an *in camera* review and order production of all non-privileged materials responsive to Plaintiff-Relator's discovery requests.

**Memorandum of Points and Authorities**

## I. PLAINTIFF'S DISCOVERY REQUESTS

On November 14, 2013 Plaintiff-Relator served Relator's First Request for Production of Documents to Defendant KBR and requested documents pertaining to internal audits and investigations of the subject matter of the First Amended Complaint ("FAC"). See, Exhibit 1, Excerpts from KBR Defendants' Responses to Relator's Request for Production of Documents Request Nos. 18, 19, 23, 31, 32 and 33 (Dec. 23, 2013).[1] Plaintiff-Relator's follow up discovery requests asked for additional information related to KBR's investigations of the alleged misconduct. Exhibit 2, Excerpts from KBR Defendants' Responses to Relator's First Set of Interrogatories and Second Request for Production of Documents, Interrogatory Nos. 3 and 20 and Document Request Nos. 1-3 (Jan. 24, 2014).

KBR counsel filed its written responses on December 23, 2013 and later confirmed that certain documents responsive to this request were being withheld on the basis of the attorney-client privilege and the attorney work product doctrine. (Ex. 3.) On January 16, 2014 the parties concluded their meet and confer obligations, (Ex. 4), resulting in KBR producing, for the first time, six separate reports made pursuant to KBR's Code of Business Conduct ("COBC") (Ex. 5). A seventh report was produced for the first time on February 3, 2014.  Ex. 5 (last 2 pages).

These seven reports were submitted by individuals to KBR between June and November 2004, and concern allegations of fraudulent conduct on the part of Robert Gerlach and other

---

[1] Most of the documents produced by KBR were produced on a rolling basis in mid- to late-January, 2014.   Another 1,000 pages of documents were delivered on February 3, 2014. Plaintiff-Relator's counsel has not had an opportunity to review many thousands of pages of documents that have been late-produced by KBR.

KBR employees with respect to the subcontracts KBR awarded to Daoud & Partners (D&P). The reports assert, inter alia, that Gerlach was "cooking" the books, "fixing contracts," "in bed" with D&P, taking "bribes" and defrauding the federal government. (Ex 5.) KBR investigated the allegations of fraud and terminated Gerlach.  Ex 10, Barko Declaration (Feb. 3, 2014).

Counsel for KBR has asserted that the entirety of the COBC investigations resulting from the seven reports and all documents related thereto (including witness statements and fact finding reports by company investigators) are protected from disclosure by the attorney-client privilege and/or work product doctrine. (Ex. 3 at 2.)  KBR produced a privilege log on January 20, 2014 limited to the withheld CBOC information. (Ex. 6.).

## II. FACTS RELATING TO THE REQUESTED DOCUMENTS

The federal government awarded Kellogg Brown & Root Services, Inc. ("KBR") the Army Logistics Civil Augmentation Program Contract, No. DAA09-02-0007, on December 14, 2001 ("LOGCAP III"). "LOGCAP III was structured as an 'indefinite delivery/indefinite quantity contract,' under which the Army issue[d] KBR discrete task orders that KBR may fulfill on its own or by retaining subcontractors. KBR periodically bill[ed] the Army for the costs of performing the task orders, including costs incurred by its subcontractors, and [was] also permitted to charge the Army mark ups of one percent as profit and an award fee of up to two percent." *United States ex rel. Vavra v. Kellogg Brown & Root, Inc.,* 727 F.3d 343, 344-345 (5th Cir. Tex. 2013).

Under LOGCAP III, KBR owed a fiduciary duty to the United States with respect to the subcontracts KBR engaged to carry out its contracting obligations with the federal government. KBR understood that Federal Acquisition Regulations (FAR) address "contractor's responsibilities to the government," *see*, FAR § 21.31.201-3(b)(3); and that it was KBR's sole burden to prove the reasonableness of the subcontract billing costs—whether from D&P or any

other subcontractor—that KBR passed on to the United States. *See,* FAR § 32.201-3(a) ("No presumption of reasonableness"). Further, section 42.202(e)(2) of the FAR clearly states that it is the prime contractor's—i.e. KBR's—responsibility to manage its subcontractors. To this end, ensuring that KBR was not overbilling the government as a result of fraud in the execution of LOGCAP III subcontracts was a necessary and ordinary business function of KBR. KBR's contracting business required the implementation of adequate auditing systems to satisfy its clients and comply with legal obligations.

To meet these needs, KBR implemented Halliburton's COBC. (Ex. 7.) The COBC was published as part of Halliburton's filings with the U.S. Securities and Exchange Commission, and was required to be communicated to all of its employees, including employees of KBR. The COBC established a mandatory duty on the part of KBR employees to report of fraud and conflicts of interest, and further promised KBR employees, customers, and the business community writ large that KBR would conduct a meaningful investigation of any COBC reports of fraud or conflicts, and that any employee(s) found in violation of the COBC will be disciplined. To this end, the CBOC specifically states:

> Directors and Employees are both encouraged and *obligated* to promptly report any violations of the Code of Business Conduct. The Policy Committee shall establish a reporting system that will allow violations of the Code of Business Conduct to be reported and acted upon by Directors, officers or other Employees of the Company with sufficient authority to deal objectively with the reported matters. The existence and nature of the reporting system shall be communicated to all Employees and, to the extent appropriate, to agents of the Company. The reporting system shall include an Ethics Helpline. If in doubt about the person to contact, reports should be made to the Ethics Helpline, the General Counsel or any representative of the Law Department.

(Ex. 7 at 10.)

Under the heading "Investigation of Violations," the COBC states:

> If, through operation of the Company's compliance monitoring and auditing systems or its violation reporting systems or otherwise, the Company receives

information regarding an alleged violation of the Code of Business Conduct, the person or persons authorized by the Policy Committee to investigate alleged violations of the Code of Business Conduct shall, as appropriate, in accordance with procedures established by the Policy Committee:

a.    evaluate such information as to gravity and credibility;

b.    initiate an informal inquiry or a formal investigation with respect thereto;

c.    prepare a report of the results of such inquiry or investigation, including recommendations as to the disposition of such matter;

d.    make the results of such inquiry or investigation available to the Board of Directors or the Policy Committee for action (including disciplinary action by the Policy Committee); and

e.    recommend changes in the Code of Business Conduct necessary or desirable to prevent further similar violations.

The Company may disclose the results of investigations to law enforcement agencies.

(*Id.* at 10-11.)

Under the heading "Disciplinary Measures," the CBOB promises that all KBR:

Directors and Employees will be held accountable for failure to adhere to the Company's Code of Business Conduct. The Company shall promptly and consistently enforce its Code of Business Conduct through appropriate means of discipline. Pursuant to procedures adopted by it, the Policy Committee or its designee shall determine whether violations of the Code of Business Conduct have occurred. *If the violation involves an Employee or agent of the Company, the Policy Committee or its designee shall determine the disciplinary measures to be taken against such Employee* or agent. If the violation involves a Director, the violation will be reported to the Board of Directors and the Board of Directors shall determine the disciplinary measures to be taken against such Director.

The disciplinary measures which may be invoked include, but are not limited to, counseling, oral or written reprimands, warnings, probation or suspension without pay, demotions, reductions in salary, termination of employment and restitution. Persons subject to disciplinary measures shall include, in addition to the violator, others involved in the wrongdoing such as (i) persons who fail to use reasonable care to detect a violation, (ii) persons who if requested to divulge information withhold material information regarding a violation, and (iii) supervisors who approve or condone the violations or attempt to retaliate against Employees or agents for reporting violations or violators.

(*Id.* at 11 (emphasis added).)

Moreover, KBR acknowledged that it would prepare and retain documentation of its compliance efforts and results of its investigations undertaken in compliance with the COBC:

> Subject to the applicable document retention program, *the Company shall document its compliance efforts and results* to evidence its commitment to comply with the standards and procedures set forth above.

(*Id.* (emphasis added).)

KBR published a web page explaining its confidential COBC reporting system, which states, in part:

> Conducting KBR business with ethics and integrity is a key priority. In following the Code of Business Conduct, employees may not in any way accept, condone, or tolerate any instance of unethical behavior.
>
> To help us comply with the principles reflected in the Code, KBR has selected EthicsPoint, an independent company that specializes in the handling of confidential and anonymous reporting of workplace and ethical issues and concerns. KBR values and encourages your input and, *as indicated in the Code of Business Conduct, if you are aware of a violation, you must report it*.
>
> EthicsPoint will report all information it receives to KBR on a confidential basis. You have the option to submit claims anonymously if you wish. KBR will review every submission received, investigate all complaints, and, where appropriate*, implement corrective action*.

(Ex. 8, KBR Ethics Point website)(emphasis added).[2]

KBR concedes that, between June 26, 2004 and November 20, 2004, it received six separate reports that some of its managers—in particular Robert Gerlach—had "cooked" the books, was "fixing contracts," was "in bed" with D&P, had taken "bribes" from D&P, and had otherwise engaged in "criminal" and "illegal" activity concerning subcontracts KBR awarded to D&P. (Ex. 5.) Significantly, Gerlach is a central figure in the Amended Complaint, and is identified by Plaintiff-Relator as directly involved with the false claims identified therein.

---

[2] KBR's Procurement Manual likewise states that Halliburton's COBC applied to all KBR employees and that "[a]ll potential instances of impropriety or violations of the Code of Business Conduct must be referred to senior Procurement Management or KBR General Counsel for investigation and resolution." (Ex. 13).

The COBC reports of fraud in KBR's handling of the D&P contracts triggered an overriding business necessity and obligation on the part of KBR to investigate the allegations of bribery and contract fraud. The fact that any part of the investigation was handled, reviewed or directed by an attorney does not trigger application of the attorney-client privilege because KBR's investigation was carried out predominantly as a function of KBR's normal and ordinary course of business, rather than for the purpose of obtaining legal advice. The compelling business purposes for KBR's investigation of the COBC reports flow from: (1) KBR's contractual obligation to investigate the potential fraud pursuant to KBR's LOGCAP III contract with the government; (2) KBR's fiduciary duty to the United States government to investigate and resolve allegations of potential mischarging on the subcontracts it awarded to D&P; (3) KBR's promise to its stockholders and clients that it would, in all cases, fully investigate violation of the COBC and take appropriate action; (4) maintenance of KBR's image and reputation among its contracting clients; and (5) internal personnel management with respect to its own employees.

Plaintiff-Relator was himself interviewed as part of KBR's COBC investigations. *See* Ex. 10, Declaration of Harry Barko (Feb. 3, 2014).  In early July 2004, Barko arrived at the B-1 Site in Iraq.  *Id*.  In late October 2004 Robert Gerlach met with all of the subcontracts administrators stationed at the B-1 and stated that an investigator would be interviewing them. *Id*.  Gerlach held a meeting in late October 2004 at which time he informed Barko and the other subcontract administrators that a KBR investigator or auditor was on site and that when questioned they were not to volunteer information. *Id*.  The investigator met with Barko and the other subcontracts administrators individually. *Id*.  The lead investigator identified himself as Rick Ervin.  *Id*.  At no time during the course of Barko's interview did the investigators indicate to Barko that they were

attorneys or that they were conducting the interview or investigation at the direction of KBR's counsel. *Id*.  The investigators also gave no indication that the purpose of their investigation was to obtain legal advice for KBR. *Id*..  Barko answered the investigators' questions and did not volunteer information as directed. *Id*.  Gerlach was terminated in January 2005. Following Gerlach's termination, Barko gained access to contract files that had been maintained and locked in Gerlach's office at all times.  *Id*.  It was not until after Barko gained access to those files and concluded the CBOC investigation was ineffective that he considered going outside the company. *Id*.

## III.   THE ATTORNEY-CLIENT PRIVILEGE DOES NOT APPLY TO THE REQUESTED DOCUMENTS

The documents being withheld by KBR, and listed in its January 20, 2013 privilege log, are not subject to the attorney-client privilege on the grounds that they (1) were not created for a primarily legal purpose, or were not created in a professional legal capacity, and (2) were created with the intent of disclosing the communications to the government or other third parties, if necessary, for the benefit of KBR. Additionally, KBR waived the privilege through issue-injection waiver.

### A.   KBR Conducted the Investigations in Question With a Predominantly Non-Legal, Business Purpose

When a corporation seeks to protect communications made by an attorney who serves the corporation in a legal and business capacity, the "corporation must clearly demonstrate that the advice to be protected was given 'in a professional legal capacity.'" *Avianca, Inc. v. Corriea*, 705 F. Supp. 666, 676 (D.D.C. 1989) (citing *In re Sealed Case*, 737 F.2d 94, 99 (D.C. Cir. 1984); *see also SEC v. Gulf & W. Indus., Inc.*, 518 F. Supp. 675, 683 (D.D.C 1981) (lawyer merely acted as scribe; consultation was therefore not "professional" and was not privileged). This showing is

"necessary to prevent corporations from shielding their business transactions from discovery simply by funneling their communications through a licensed attorney." *Id.*

Although KBR  has made a blanket claim of privilege, it has not made the requisite showing regarding the extent of its attorneys' involvement, and to what extent such involvement was 'in a professional legal capacity' as opposed to non-legal in nature. It is clear however, that at least some of the work was performed by non-lawyers, and that much of the investigative work was non-legal in nature. *Federal Trade Comm'n v. TRW*, Inc., 628 F.2d 207, 212-13 (D.C. Cir. 1980) (credit reporting company and its counsel hired research group to put technical information concerning the company's computerized credit reporting system into a form that lawyers could understand; study held not privileged because its legal purpose was not clear).

Similarly, it is well-established that investigations carried out for business purposes are not entitled to protection under the attorney-client privilege. Where legal and business purpose are mixed, the legal purpose must predominate. *Neuder v. Battelle Pac. N.W. Nat'l Lab.,* 194 F.R.D. 289, 292-93 (D.D.C. 2000) (in case of employee termination, legal advice sought or received was "incidental to considerations of what is most prudent for the successful operation of the business"); *see also U.S. v. Cohn*, 303 F. Supp. 2d 672, 683-84 (D. Md. 2003).  Indeed, "even if a business decision can be viewed as both business and legal evaluations, 'the business aspects of the decision are not protected simply because legal considerations are also involved.' *Complex Sys., Inc. v. ABN AMRO Bank N.V.*, 279 F.R.D. 140, 150 (S.D. N.Y. 2011) (*quoting NXIVM Corp. v.  O'Hara*, 241 F.R.D. 109 (N.D.N.Y. 2007); *see also Johnson v. Bd. of Pensions of the Evangelical Lutheran Church*, 2012 U.S. Dist. LEXIS 174230 (D. Minn. 2012) (privilege applies only to communications whose primary purpose is legal, not business); *Kramer v. Raymond*

*Corp.,* 1992 U.S. Dist. LEXIS 7418, 1992 WL 122856 (E.D. Pa. 1992)) (narrow construction of privilege especially apt when in-house involved).

Moreover, this Circuit has applied a strict "but for" standard to determine whether the purpose of a communication is predominantly non-legal--"the communication[s] would not have been made 'but for' the fact that legal advice was sought." *United States v. ISS Marine Servs.*, 905 F. Supp. 2d 121, 128 (D.D.C. 2012) (quoting cases and concluding a "but for" standard comports with Circuit law requiring "narrowest possible" construction of attorney-client privilege).KBR cannot meet this standard, as the requested communications were produced for primarily non-legal business purposes, and would have been made even if no legal advice was sought in connection thereto. *See Id.* ("If a communication would have been made even if legal advice were not explicitly being sought, then it is difficult to say that that communication's primary purpose was to seek legal advice.").

KBR's investigation of Mr. Gerlach's fraudulent contracting activity with KBR's subcontractor under the LOGCAP III contract was carried out in furtherance of its business interests and operations, and not primarily for the purpose of obtaining legal advice. As described above, upon entering into the LOGCAP III contract, KBR owed both a fiduciary duty and contractual obligation to the government to investigate credible allegations of fraud.

Indeed, Department of Defense ("DOD") contracting regulations stated that "Government contractors *must* conduct themselves with the highest degree of integrity and honesty." Ex. 11, 48 C.F.R. § 203.7000 (10-1-2001 edition) (emphasis added). In order to carry out this mandate DOD advised contractors such as KBR to implement internal control systems such as KBR's CBOC program and hotline that would "facilitate timely discovery and disclosure" to the Government of "any suspected or possible violation of law in connection with Government

contracts or any other irregularities in connection with such contracts."  *Id.*, 48 C.F.R. §§ 203.7000- 203.7001(a) (10-1-2001 edition).   A Government contractor's establishment of a "written code of business ethics," "internal controls for compliance," "a hotline, by which employees may report suspected instances of improper conduct," "audits", "disciplinary action for improper conduct…," timely reporting to the Government of suspected or possible violation of law…," and "[f]ull cooperation with any Government agencies responsible for either investigation or corrective action," are essential elements of  DOD's "Contractor Standards of Conduct."  *Id.*

KBR's CBOC policy required the involvement of internal auditors and other business personnel in fraud investigations.  *See* Ex. 7, *supra*.[3]  These required business functions and the lack of any mention of legal counsel or the attorney-client privilege reflects that KBR did not conduct CBOC investigations for primary purpose of receiving legal advice.[4]

As soon as KBR received credible allegations that its subcontractor, D&P, and its

---

[3] "The Company's Director - Audit Services shall be notified of suspected significant Fraud (more than $50,000 of estimated loss), and any Fraud, whether material or not, that involves management or other employees who have a significant role in the Company's internal controls. The Company Director – Audit Services shall notify the Chief Executive Officer, the Chief Financial Officer and Audit Committee of any suspected Fraud involving management or other employees who have a significant role in the Company's internal controls and shall also notify the Audit Committee if it appears that there is any substance to the alleged Fraud." (Ex. 5.)

"Fraud involving more than $50,000 of estimated loss, and any Fraud, whether material or not, that involves management or other employees who have a significant role in the Company's internal controls, will be reported to the Audit Committee of the Board of Directors, the Chief Executive Officer and the Chief Financial Officer." (*Id.*)

"The Company's Director - Audit Services, the General Counsel, the Chief Financial Officer and the Director of Business Conduct will maintain close liaison with each other and will participate in joint investigations as deemed appropriate under the circumstances." (*Id.*)

[4] The KBR privilege log (Ex. 6) lists Chris Heinrich as an attorney, but under oath in response to interrogatories KBR identified him only as "Vice President for KBR's Infrastructure, Government and Power business group" and that he "may have knowledge related to KBR's Code of Business Conduct Program."  Ex. 2 (excerpted page 16 of Interrogatory Response).

employees, including Mr. Gerlach, had engaged in fraud, a clear business purpose to comply

with DOD regulations and other legal requirements motivated KBR's investigation of the

allegations.   The underlying factual investigation was inevitable and would have occurred

regardless of whether or not attorneys were involved in the audit or investigation.   Indeed, this

exact business motive was addressed by this court in *ISS Marine Servs*:

> [T]he [corporation] had a clear business motivation to conduct the internal
> investigation and prepare the Audit Report: it had a contractual obligation to
> return any overpayments to the Government […]. The fact that [the corporation]
> had an obvious and compelling business purpose to conduct an internal audit to
> ascertain any overpayments further militates in favor of concluding that the
> privilege does not apply because it suggests that the Audit Report would have
> been created even if Inchcape was not seeking legal advice.

905 F. Supp. 2d at 132 (internal citations omitted).

The investigations at issue in this case are not dissimilar to routine claims investigations

carried out on behalf of insurers. Courts have routinely found such investigatory records to

constitute unprivileged business advice, rather than predominantly legal advice. *See. e.g., St.*

*Paul Reinsurance Co., Ltd. v. Commercial Fin. Corp.,* 197 F.R.D. 620, 642 (N.D. Iowa 2000);

*Mission National Ins. Co. v. Lilly,* 112 F.R.D. 160, 163 (D. Minn 1986); *SR International*

*Business Ins. Co. v. World Trade Center Properties LLC,* 2002 U.S. Dist. LEXIS 11949

(S.D.N.Y July 3, 2002).

It is reasonable to conclude that KBR would have conducted the investigation whether or

not it sought legal advice because it is difficult to imagine that KBR:

> would have simply sat on its hands in the face of these allegations absent the
> possibility of litigation, and for good reason: any responsible business
> organization would investigate allegations of fraud, waste, or abuse in its
> operations. *See In re Kidder Peabody Sec. Litig.*, 168 F.R.D. 459, 465 (S.D.N.Y.
> 1996) (noting that the company in question 'would have hired outside counsel to
> perform such an inquiry even if no litigation had been threatened' because
> allegations of wrongdoing 'presented [the company] not only with a serious legal
> problem, but with a major business crisis').

*ISS Marine Servs.,* at 137-138.

The allegations of fraud, waste, and abuse that KBR received through the COBC program presented a similarly significant business problem for KBR. Because of the effect of the COBC allegations on KBR's accounting practices, efficiency, client development and client relations, as well as other ordinary, essential business imperatives, KBR would have investigated the COBC allegations even absent any legal implications whatsoever. Accordingly, the investigatory records resulting from the COBC allegations are not protected by the attorney-client privilege.

Moreover, pursuant to its COBC, it was KBR's own policy to investigate such allegations. *See* Ex. 7, *supra.;* Ex. 8; Ex. 9. KBR, therefore, had already promised, or otherwise made representations, to its clients, the Government and shareholders that it would investigate fraud reports it received under its COBC program, and had specifically promised as well that it would take disciplinary action against any of its employees if the investigation demonstrated that a KBR employee violated the COBC. *Id.* The ensuing investigation was carried out for the compelling business purpose of determining whether to take disciplinary action against Mr. Gerlach and any other implicated KBR employees and/or to detect fraud, contracting irregularities and overcharges to the Government.

In any event, the privilege protects only disclosure of communications, and does not does not protect disclosure of the underlying facts by those who communicated with the attorney. *Upjohn Co. v. United States*, 449 U.S. 383, 395, 66 L. Ed. 2d 584, 101 S. Ct. 677 (1981). In this case, the KBR defendants have not disclosed the facts learned from said CBOC investigations.

There are other indicia supporting a finding that KBR's investigatory records were created predominantly for business and other non-legal reasons, and are therefore not privileged. First, the attorney-employees purportedly involved in the investigations at issue were "KBR

attorneys within its Code of Business Conduct group." (Ex. 3 at 2.) As argued above, this division conducts such investigations in the ordinary course of KBR's business. The law is unequivocal on the point that "[a] communication is not privileged simply because it is made by or to a person who happens to be a lawyer." *Diversified Indus. v. Meredith*, 572 F.2d 596, 602 (8th Cir. 1977) (citing WRIGHT & MILLER). Moreover, "in-house counsel's law degree and office are not to be used to create a "privileged sanctuary for corporate records." *United States v. Davis*, 131 F.R.D. 391, 401 (S.D.N.Y. 1990) (internal citations omitted). Therefore, while attorneys may have been involved in the process, their functions were predominantly non-legal. The mere fact that KBR employs attorneys to supervise or oversee routine fact-finding investigations is not a sufficient basis to extend a blanket privilege to all investigatory materials, especially given this Circuit's imperative to interpret the attorney-client privilege as narrowly as possible.

**B.    KBR Created the Communications with the Intent of Disclosing Them, If Necessary, To Benefit The Corporation and To Fulfill A Business Function**

KBR did not implement the COBC primarily to provide legal advice in the context of the attorney-client relationship, but rather for a variety of non-legal or business reasons. Among these reasons is KBR's express desire to meet standards established under the United States Sentencing Guidelines and by regulations implementing the Sarbanes-Oxley Act. (See Ex. 7 at 7 (explicitly stating the purpose of the CBOC)), or the DOD Contractor Standards of Conduct. (Ex. 11, 48 C.F.R. 2003.7000-203.7001). In particular, the CBOC process was intended to promote "full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the SEC and in other public communications made by the Company." (Ex. 7 at 7). Such internal auditing and public reporting is an ordinary business function of a publicly traded company such as KBR, and is, moreover, antithetical to the confidentiality expected and required of the attorney-client relationship. Internal investigations

created by a corporation with the intent of sharing them with the government are neither privileged nor work product in the first instance, and no privilege ever attached to these documents. *See In re Syncor ERISA Litig.*, 229 F.R.D. 636, 645 (C.D. Cal. 2005) (finding no privilege applied to "internal investigation" because it was conducted with the intent to disclose to the government if necessary, to benefit the company).

In its CBOC statement of policy, KBR explicitly states that the "[p]urpose" of the COBC is, among other things, to qualify the program as one that "that, under the United States Sentencing Guidelines, is reasonably designed, implemented and enforced so as to be generally effective in preventing and detecting criminal conduct," as well as to comply with regulations implementing Section 406 of the Sarbanes-Oxley Act. (Ex. 7 at 7).

The Sentencing Guidelines provide favorable treatment for corporations implementing effective compliance programs. However, this benefit contemplates the disclosure of communications and other materials produced as a result of such a compliance program to the government. Accordingly, KBR designed and implemented its CBOC program with the intention that the findings of COBC investigations be disclosed, when necessary, to benefit KBR by obtaining favor from investors, regulators, clients, and other third parties. As such, the COBC investigatory materials are not encapsulated by the attorney-client privilege, which requires the intention of strict confidentiality, and is interpreted as narrowly as possible. Indeed, the fundamental principle underlying the privilege is that full and honest communications are best encouraged between a client and his or her attorney if they are protected from disclosure. Notwithstanding the issue that many of the individuals communicating with KBR attorneys during their COBC are not 'clients' of KBR attorneys, the principle of encouraging frank communications among attorney and client does not apply with the same force if the

communications are made—as they were here—with the intent that they be disclosed as needed to obtain favorable treatment for KBR under the U.S. Sentencing Guidelines.

In explaining the COBC reporting and investigatory process to its own employees, KBR states that "confidentiality shall be maintained *unless* disclosure is: [r]equired or advisable in connection with any governmental investigation or report; [i]n the interests of the Company; consistent with the Goals of the Code; or [r]equired or advisable in the Company's legal defense of the matter." (Ex. 9, KBR Brochure at KBR-BARKO-032329-30).

Compliance with section 406 of the Sarbanes-Oxley Act requires a 'code of ethics' to promote full and accurate disclosure by the company in its required periodic reports. (SEC Release No. 33-8177). Accordingly, as the CBOC process was intended to comply with the requirements of section 406, and therefore to promote full and accurate disclosure of wrongdoing or liability on the part of the company in its periodic reports, KBR's investigations were intended to be disclosed if found to benefit the corporation. KBR cannot now selectively shield the result of its code of ethics investigations, choosing to disclose only favorable results and claiming privilege when negative results may be disclosed.

Indeed, with respect to the sort of investigative records at issue here, KBR's CBOC provides that "the Company shall document its compliance efforts and results to evidence its commitment to comply with the standards and procedures set forth above." (Ex. 7 at 11.) Accordingly, KBR conducts COBC investigations with the intent of disclosing them, if necessary, to the government, regulatory bodies, auditors, and other third parties, for the benefit of KBR.

**C.      Issue-Injection Waiver By the KBR Defendants Requires the Information to Be Compelled.**

A party may not claim privilege over material that it may place at issue in litigation.

*Navajo Nation v. Peabody Holding Co.,* 255 F.R.D. 37, 44 (D.D.C. 2008).   Notably, a party "waives privilege under a theory of issue-injection waiver when it raises an affirmative defense that makes [its] intent and knowledge of the law relevant.'"  *Id.*, quoting *United States v. Exxon Corp.,* 94 F.R.D. 246, 248 (D.D.C. 1981).   As noted in *Navajo Nation,* once a party waives privilege that privilege is relinquished for all purposes and the party may no longer use the privilege to prevent access to the communications at issue.  *Id.*

When a party raises defenses by placing its knowledge of the law in controversy all information that bears on that defense must be disclosed.  *Id.,* 255 F.R.D. at 44.  Plaintiff-Relator may prove that the KBR defendants committed "knowing" violations of the FCA by either acting with the actual knowledge of information or in deliberate ignorance or reckless disregard of the truth or falsity of information.  31 U.S.C. § 3729(b).  *United States v. TDC Mgt. Corp.,* 24 F.3d 292, 297-298 (D.C. Cir. 1994) ("party 'knowingly' presented false or fraudulent claims to the government if he had 'actual knowledge' or acted with 'deliberate ignorance' or 'reckless disregard' of the truth or falsity of his claims.").   Additionally, as noted above, the KBR defendants were required to "conduct themselves with the highest degree of integrity and honesty," and the DOD established criteria for a contractor's system of management controls to provide for the timely discovery and reporting of improper conduct, which included timely reporting of "any suspected or possible violation of law in connection with Government contracts or any other irregularities in connection with such contracts."  Ex. 11, 48 C.F.R. §§ 203.7000-203.7001.

In this case, Plaintiff-Relator has alleged that the KBR defendants acted both knowingly and recklessly.   *See* First Amended Compl. ("FAC"), ¶¶ 317, 455, 466-467, 478-487, 498-499, 502-505, 508, 514, 521-525, 529-530, 533-536, 539-546, 550-552, 555-559 [Doc. # 12].   In

response to the FAC, the KBR defendants have expressly denied those allegations and raised affirmative defenses. *See* KBR Def.'s Answer, ¶¶ 317, 455, 466-467, 478-487, 498-499, 502-505, 508, 514, 521-525, 529-530, 533-536, 539-546, 550-552, 555-559 [Doc. # 122]. Notably, four affirmative defenses raised by the KBR defendants in response to the FAC, *see* KBR Answer, at pp. 102-103 (Affirmative Defenses, ¶¶ 1, 3-6) [Doc. #122], turn on whether the KBR defendants knew or should have known of the possibility of liability to the United States in deciding whether to return funds to the United States or not charge the United States resulting from false claims or fraud. *Cf., Navajo Nation,* 255 F.R.D. at 44. Like all federal government contractors, the KBR defendants "had a contractual obligation to return any overpayments to the Government." *United States v. ISS Marine Servs.,* 905 F. Supp. 2d at 132.

The KBR defendants' repeated denials that they acted knowingly or recklessly, their defense that they "are not legally responsible" for the acts of others (including their own employees and subcontractors), their defense that the FAC is barred by "laches, waiver and/or estoppel," their defense that the FAC is barred by the Government's knowledge, and their defense that their conduct was "within the scope of the LOGCAP III contract and the Federal Acquisition Regulation," all raise affirmative defenses that place the KBR defendants' intent and knowledge of the law squarely at issue. In essence, the KBR defendants are defending by claiming they acted "legally" while at the same time preventing access to the CBOC information by asserting the attorney-client privilege and work product doctrine. However, the CBOC investigations and other related information at issue cannot be withheld by the KBR defendants because the attorney-client privilege and work product doctrine "cannot be used both as a sword and a shield." *Navajo Nation,* 255 F.R.D. at 44, quoting *Recycling Solutions, Inc. v. D.C.,* 175 F.R.D. 3, 4 (D.D.C. 2000). If the KBR defendants are going to assert they acted legally, they did

not act knowingly or recklessly or pursue their affirmative defenses they cannot claim privilege over the challenged information.

### D.     KBR Has Failed to Carry Its Burden To Establish the Privilege With Respect to the Requested Documents

The "party claiming privilege, and resisting discovery, has the burden of establishing the existence of the privilege in all respects." *United States v. Davis*, 131 F.R.D. 391, 402 (S.D.N.Y. 1990). *Also see, United States v. ISS Marine Servs.*, 905 F. Supp. 2d at 127, citations omitted. Because the attorney-client privilege "is in derogation of the search for truth, it is 'narrowly and strictly construed.'" *Verizona Cal. Inc. v. Ronald A. Katz Tech. Licensing, L.P.,* 266 F. Supp. 2d 1144, 1147 (C.D. Cal. 2003). *Accord., United States v. ISS Marine Servs.,* 905 F. Supp. 2d at 128 ("the 'but for' formulation of the primary purpose standard is most faithful to this Circuit's guidance that 'the attorney-client privilege must be strictly confined within the narrowest possible limits consistent with the logic of its principle.'"), citing *In re Lindsey,* 158 F.3d 1263, 1272 (D.C. Cir. 1998); *In re Sealed Case,* 676 F.2d 793, 807 n. 44 (D.C. Cir. 1982); *Fisher v. United States,* 425 U.S. 391, 403, 96 S.Ct. 1569 (1976).

"The *sine qua non* of any claim of privilege is that the information sought to be shielded is legal advice." *United States v. Rockwell Int'l.,* 897 F.2d 1255, 1264 (3d Cir. 1990). "In order for the privilege to apply, the attorney must be acting as an attorney and not simply as a business advisor." *Southern Union v. Southwest Gas Corp.,* 205 F.R.D. 542, 546 (D. Ariz. 2002).

Where, as here, internal corporate compliance functions, audits and investigations are undertaken to fulfill a business function, the involvement of in-house corporate counsel does not make the communications at issue privileged. *See United States v. ISS Marine Servs.,* 905 F. Supp. 2d at 128-129. Many courts have relied on two rebuttable presumptions (though often not stated expressly) regarding the role of a corporate lawyer in determining the nature of the advice:

(1) if outside counsel is involved, the confidential communication is presumed to be a request for and the provision of "legal advice"; and (2) if "in-house" counsel is involved, the presumption is that the attorney's input is more likely business than legal in nature.  As a result, most of these courts apply a "heightened" scrutiny to communications to and from in-house counsel in determining whether the attorney-client privilege applies.  As one court noted:

> [U]nlike the situation where a client individually engages a lawyer in a particular matter, staff attorneys may serve as company officers, with *mixed business-legal responsibility; whether or not officers, their day-to-day involvement in their employers' affairs may blur the line between legal and nonlegal communications; and their advice may originate not in response to the client's consultation about a particular problem but with them, as part of an ongoing permanent relationship with the organization…* [T]he need to apply [the privilege] *cautiously and narrowly is heightened in the case of corporate staff counsel, lest the mere participation of an attorney be used to seal off disclosure.*

*Rossi v. Blue Cross and Blue Shield of Greater New York,* 73 N.Y.2d 588, 542 N.Y.S.2d 508, 540, 540 N.E.2d 703, 705 (1989) (emphasis added); *see also Neuder,* 194 F.R.D. at 296; *Neuberger Berman Real Estate Income Fund, Inc. v. Lola Brown Trust No. 1B,* 230 F.R.D. 398, 411 n. 20 (D. Md. 2005) ("While courts state that they do not intend to weaken the privilege [by imposing a "higher burden on in-house counsel to 'clearly demonstrate'" that counsel was giving legal advice], they are mindful that corporate clients could attempt to hide mountains of otherwise discoverable information behind a veil of secrecy by using in-house legal departments as conduits of otherwise unprivileged information.").  "A corporate client should not be allowed to conceal a fact by disclosing to the corporate attorney."  *SEC v. Gulf & Western Indus.,* 518 F. Supp. 675, 681-82 (D.D.C. 1981).

Additionally, "when the legal advice is merely incidental to business advice, the privilege does not apply."  *Great Plains Mutual Ins. Co. v. Mutual Reinsurance Bureau,* 150 F.R.D. 193, 197 (D. Kan. 1993).  "Because the privilege promotes the 'dissemination of sound legal advice,

it applies only where the advice is legal in nature, and not where the lawyer provides non-legal business advice." *Faloney v. Wachovia Bank, N.A.,* 254 F.R.D. 204, 209 (E.D. Pa. 2008).

Notably, an attorney performing investigative, compliance or corporate management functions is performing a business, not a legal function. *See Anderson v. First Commodity Corp. of Boston,* 618 F. Supp. 262 (W.D. Wis. 1985); *Neuder,* 194 F.R.D. at 295.

In this case, Halliburton's CBOC policy and the KBR Procurement Manual demonstrate that the involvement of attorneys in any investigation of employee complaints of the type at issue here (Exs. 5, 7-11, 13) were incidental to fulfilling KBR's business function to ensure compliance, take disciplinary action or managerial changes, to make reports to the Government and to refund any taxpayer funds to the Government in the event there was wrongful conduct in billing the Government under KBR contracts.

Moreover, KBR's privilege log fails to meet KBR's burden that any of the documents at issue are privileged. Indeed, the privilege log that was produced on January 20, 2014 (Ex. 6) fails to provide sufficient information to establish the capacity in which each listed individual acted. Plaintiff-Relator's counsel asked for additional information about the privilege log on January 22, 2014. However, the KBR response by letter dated January 31, 2014 fails to identify all of the individuals listed on the privilege log and KBR's response confirms that the listed attorneys who were involved in the CBOC investigations were in fact responsible for corporate business functions and to manage the CBOC operation for KBR. Ex. 12. On its face, the KBR privilege log (Ex. 6) and the KBR response dated January 31, 2014 (Ex. 12) fail to establish that the CBOC information withheld by KBR was "'for the purpose of securing *primarily* … (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding.'" *United States v. ISS Marine Servs.,* 905 F. Supp. 2d at 128, quoting *In re Grand Jury,* 475 F.3d 1299, 1304

(D.C. Cir. 2007) (emphasis added).

Additionally, the KBR privilege log appears does not list any documents reflecting interviews with witnesses.   KBR's privilege log does not establish that KBR's attorneys conducted any interviews of witnesses.   However, no witness statements or interviews or notes of interviews conducted by KBR pursuant to the CBOC have been produced by the KBR defendants and those witness statements or interviews are not listed as privileged on the privilege log.   As such, the KBR defendants have failed to establish any privilege to protect those documents.

The individual entries and descriptions on the privilege log are also so vague and conclusory that they fail to establish KBR's burden that the privileges apply.   Multiple documents appear to be grouped in each listing without specifying who authored or listed each one, or identifying how many pages are the subject of each entry.   Ex. 6.   Each and every description repeats the KBR spin that the withheld documents withheld were created by a person "acting at direction of counsel" or by counsel.   However, it appears that every attorney listed on the log by KBR performed a business management role.   *Id.   See also* Footnote 4, *supra.*

There is even one withheld document listed on page one of the privilege log in which the authors and recipients are not identified as attorneys or persons working at the direction of an attorney.   Ex. 6, p. 1 (Document 2, dated 10/1/05).   However, all of the persons listed are KBR business managers and there is no evidence that the authors or recipients disclosed the KBR memorandum to any attorney.   *Id.*

In the alternative, the documents withheld by KBR should be submitted to the Court for *in camera* review because Plaintiff-Relator is also entitled to receive factual material that is not intertwined with legal advice, and there is no indication from the privilege log what documents

constitute purely factual material or the carrying out of business functions as opposed to what documents involve primarily legal advice.

## IV.     THE WORK-PRODUCT DOCTRINE DOES NOT APPLY

The work-product doctrine does not reach many--if not all--the documents KBR claims are privileged.  Whether or not the work product is discoverable depends on whether it contains facts or opinions.  *United States v. ISS Marine Servs.,* 905 F. Supp. 2d at 133.

First, given the corresponding dates of the documents listed in the privilege log, there was no "specific claim […] which would lead to likely litigation," *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 865 (D.C. Cir. 1980), nor was litigation "foreseeable," *Schiller v. NLRB*, 964 F.2d 1205, 1208 (D.C. Cir. 1992), abrogated on other grounds by *Milner v. U.S. Dep't of Navy*, 131 S. Ct. 1259 (2011).  At the preliminary stages of KBR's investigations, there could be no reasonable anticipation of litigation until, at the earliest, some facts had been gathered, confirmed, and reviewed by KBR. More fundamentally, KBR explicitly states in its COBC policy, excerpted above, that "KBR will review every submission received." Given its own policy, KBR cannot now claim that its review, and the documents created thereby, were prepared in anticipation of litigation.

Second, given KBR's description of the documents, it is clear they were not prepared or obtained because of the prospect of litigation, but rather in the course of KBR's normal business of investigating claims made through its Ethics Helpline and CBOC policy, and are too preliminary or too attenuated from litigation, whether actual or prospective, to fall within the protection of the work-product doctrine.  Indeed, KBR "bears a heavier burden when seeking work-product protection for a multi-purpose document because the D.C. Circuit has also recognized that 'the [work-product] privilege has no applicability to documents prepared by lawyers in the ordinary course of business.'" *United States v. ISS Marine Servs.,* 905 F. Supp. 2d

at 134, quoting *In re Sealed Case*, 146 F.3d at 887.  Moreover, as argued above, KBR would have created an internal investigative record in the ordinary course of business, even absent any prospect of litigation: "any responsible business organization would investigate allegations of fraud, waste, or abuse in its operations." *United States v. ISS Marine Servs.,* 905 F. Supp. 2d at 137.

Third, many documents listed in KBR's privilege log were not prepared by attorneys. While documents produced by non-attorneys *may* be protected under the work-product doctrine, the fact that a document was not prepared by an attorney further attenuates the connection between the communication and any actual litigation--prospective or not--and is further evidence that the documents were not prepared in anticipation of litigation.  *Id.,* 905 F. sup. 2d at 133-139. KBR has not met its burden to protect from discovery investigative documents prepared by non-attorneys, especially considering the multiple non-legal purposes for which the documents were intended.

Fourth, to the extent the documents claimed to be protected contain fact, rather than opinions, they are discoverable, and Plaintiff-Relator has substantial need and undue hardship necessary to obtain such documents. Due to the investigative nature of the documents sought, it is likely that the documents contain a great deal of discoverable facts that are not discoverable by other means or without undue hardship.  Even if KBR were to produce all of the underlying documents and information contained in the CBOC documents that are withheld it would take an enormous effort by Plaintiff-Relator to interview witnesses who presumably have already been interviewed and conduct other investigative reviews of documents that have already been reviewed in the CBOC investigations that were conducted over a period of years (2004-2006). Given the amount of time for Plaintiff-Relator to obtain discovery, sift through thousands of

pages of documents and prepare for trial.  Additionally, in light of KBR's denials and affirmative defenses that place KBR's intent and knowledge of the law at issue, Plaintiff-Relator "needs not only the facts contained in the" CBOC investigations, but also needs to know whether the CBOC investigative report contents for all of the investigations were known by KBR at the time and whether the suspected wrongdoing and overpayment was reported to or withheld from the Government.  *See United States v. ISS Marine Servs.,* 905 F. Supp. 2d at 139 (investigative or audit report is "both a factual document and historical document—a snapshot in time of not only 'what [the company knew' but also '*when* [they] knew it.'")(emphasis added).  These withheld documents may be the only evidence of when KBR became aware of any potential overpayments, "which is likely to 'go[] to the heart of the case against" KBR.  *Id.*

## CONCLUSION

For the foregoing reasons, Plaintiff-Relator's motion to compel should be granted.  In the alternative, the Court should conduct an *in camera* review of the withheld documents to make privilege determinations.

Respectfully submitted,

 /s/ Michael D. Kohn
Michael D. Kohn, DC BAR #425617

 /s/ David K. Colapinto
David K. Colapinto, DC BAR #416390

KOHN, KOHN & COLAPINTO, LLP
3233 P Street, N.W.
Washington, D.C. 20007-2756
Phone: (202) 342-6980
Fax:    (202) 342-6984

*Attorneys for Plaintiff-Relator*

February 3, 2014