UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA
--------------------------------------------------------

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : |  |
| *ex rel.* HARRY BARKO, | : | CASE NO. 1:05-CV-1276 |
|  | : |  |
| Plaintiff-Relator, | : |  |
|  | : |  |
| v. | : | OPINION AND ORDER |
|  | : | [Resolving Docs. 180, 216, 217] |
|  | : |  |
| HALLIBURTON COMPANY *et al,* | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |

--------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

In an earlier order, the Court concluded that KBR's Code of Business Conduct ("COBC") documents were not attorney-client privileged because they were not created for the primary purpose of securing legal advice.[1] The Court of Appeals vacated this order because "[i]n the context of an organization's internal investigation, if one of the significant purposes of the internal investigation was to obtain or provide legal advice, the privilege will apply."[2]

The Court of Appeals remanded, stating: "[t]o the extent that [Plaintiff-Relator] Barko has timely asserted other arguments for why these documents are not covered by either the attorney-client privilege or the work-product protection, the District Court may consider such arguments."[3]

Separately, this Court has found that KBR waived any attorney client privilege over the

---

[1] Doc. 150.
[2] *In re Kellogg Brown & Root, Inc.,* 756 F.3d 754, 760 (D.C. Cir. 2014).
[3] *Id.* at 764.

COBC documents.[4]  Because KBR has indicated it may seek interlocutory review of this waiver ruling, the Court separately considers whether certain summary reports prepared by a KBR investigator are otherwise subject to disclosure.

In this order, the Court considers whether portions of the COBC documents are non-privileged fact work product that is discoverable based on substantial need.[5] The COBC documents include two long reports from KBR investigator Richard Ervin sent to William Rice and Chris Heinrich, in-house counsel for KBR. These reports include witness statements and summaries of those statements. If KBR had not otherwise waived its privilege, the witness statements are attorney-client privileged. But more important to this decision, Ervin's reports contains summaries of KBR's subcontracts with Daoud & Partners Inc. ("Daoud") and summaries of Daoud's performance under those subcontracts.  The two reports are reproduced several times in KBR's *in camera* production.[6]

 KBR argues that both of the reports are, in their entirety, attorney-client privileged, opinion work product protected, and, alternatively, not subject to the substantial need exception to fact work product protection.[7] Barko responds that the investigator's factual summaries are not attorney-client privileged and do not qualify for fact work product protection, or in the alternative, are discoverable based on substantial need.[8]

For the following reasons, the Court **DENIES** Barko's request to compel production of

---

[4]The Court found KBR had waived its privilege rights.  This opinion deals with the separate issue of whether certain of the COBC reports would nonetheless be discoverable independent of KBR's waiver.

[5]In its November 20, 2014, order, the Court outlined the factual background of the case, its procedural history, and the nature of the COBC reports. Doc. 205. The Court found that Defendant KBR waived attorney-client privilege and work product protection over its COBC reports by affirmatively putting the contents of those documents at issue. KBR then filed a motion for reconsideration, in part arguing that the Court's November 20 order was too broad. Doc. 208. This order stands independent of the Court's November 20, 2014, order.

[6]There are two unique COBC reports. Each COBC Report appears on KBR's privilege log more than once because they were incorporated into more than one COBC File. One COBC Report, dated February 8, 2005, is listed as items 25, 56, and 64, while the other COBC Report, dated September 11, 2006 is listed as items 11 and 85.

[7]Doc. 217.

[8]Doc. 216.

witness statements contained in the COBC reports but **GRANTS** Barko's motion to compel production of parts of the COBC reports because they are discoverable fact work product and Barko shows substantial need. KBR will produce portions of the reports, with redactions as explained in this order. KBR will make these disclosures by 4:00PM on December 26, 2014.

The Court **ORDERS** Barko not to disclose the contents of the documents. If Barko uses or refers to the documents in subsequent filings in this case, the Court orders that such filings be made under seal. This order will remain in effect unless modified or lifted by the Court.

## I. Background

Barko sued certain government contractors who provided services and materials to support the United States war effort in Iraq.[2] He brings qui tam claims on behalf of the United States and says these contractors defrauded the United States by submitting false claims. In general, Barko alleges KBR wrongly gave subcontracts to Daoud & Partners ("Daoud") despite terrible contract performance. In part, Barko claims Daoud obtained the contracts by bribing KBR employees responsible for awarding and supervising the subcontracts.

Barko also says KBR was conflicted when it awarded subcontracts to Daoud. KBR was seeking to do business in Jordan. As a foreign company, KBR needed a Jordanian sponsor to work in Jordan. Daoud, a Jordanian company, agreed to act as KBR's Jordanian sponsor. The Plaintiff says KBR failed to supervise Daoud contracts or terminate Daoud contracts for nonperformance to benefit KBR's Jordanian effort. And Plaintiff Barko alleges American citizens paid the cost of

---

[2] The Defendants include Kellogg Brown & Root Services, Inc., Kellogg Brown & Root, Inc., KBR Technical Services, Inc., Kellogg Brown & Root Engineering Corporation, Kellogg Brown and Root International, Inc. (A Delaware Corporation), Kellogg Brown & Root International, Inc. (A Panamanian Corporation), and Halliburton Company (the "KBR Defendants," or "KBR"), Daoud & Partners, Inc. and Eamar Combined for Trading and Contracting Company. Eamar is a Kuwaiti company. Barko sued Eamar for making false claims associated with well drilling contracts but never served Eamar.

3

Daoud's failure to complete contracts as Daoud had agreed. Barko sued both KBR and Daoud. Daoud has settled with the Plaintiff and with the United States.

With the government contracts, KBR agreed to set up an anti-fraud, anti-kickback monitoring system. KBR established a third-party monitored tip line to receive reports of potential contract fraud or kickbacks. KBR received calls complaining that contract awards and payments to Daoud were fraudulent. KBR received tip calls alleging that certain KBR employees were likely receiving kickbacks and that those employees were aggressively steering contracts and payments to Daoud.

After receiving these tips, KBR tasked Richard Ervin, an investigator working for KBR's legal department, to investigate the fraud and kickback allegations. Ervin assembled emails and other documents related to the Daoud contracts. Ervin also took statements from witnesses. Finally, Ervin summary reports discussing the award, payment, and supervision of contracts with Daoud.

## II. Standards

The attorney-client privilege protects confidential communications between clients and attorneys if one of the significant purposes of the communication is receiving legal advice.[10] The privilege prevents disclosure of confidential communications, but does not stop discovery of underlying factual information, even if that information finds its way into employee statements.[11] The statements are protected; the underlying information is not.

The privilege applies in the corporate context and protects confidential communications made by company employees to company lawyers, acting as such.[12] The Court of Appeals has already

---

[10]/*In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 758 (D.C. Cir. 2014).

[11]/*Id.* at 765.

[12]/*Upjohn Co. v. United States*, 449 U.S. 383, 394 (1981).

determined that a significant purposes of the COBC investigations was to secure legal advice.[13]

The privilege also protects confidential communications between a client and agents acting at the direction of client's attorneys. "If internal investigations are conducted by agents of the client at the behest of the attorney, they are protected by the attorney-client privilege to the same extent as they would be had they been conducted by the attorney who was consulted."[14] The privilege "focuses on the attorney-client relationship. Thus . . . communications that do not involve *both attorney and client* are unprotected."[15]

While work product protection has a broader scope than attorney-client privilege, the protection it offers is also less absolute.[16] The work product doctrine was announced in *Hickman v. Taylor*[17] and has been codified in part by Civil Rule 26(b)(3), which states:

> (A) Documents and Tangible Things. Ordinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those materials may be discovered if:
>
> (i) they are otherwise discoverable under Rule 26(b)(1); and
>
> (ii) the party shows that it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means.
>
> (B) Protection Against Disclosure. If the court orders discovery of those materials, it must protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation.[18]

A document is prepared "in anticipation of litigation" if "'in light of the nature of the

---

[13] *In re Kellogg Brown & Root*, 756 F.3d at 760.

[14] *Id.* at 758 (quoting 1 Paul R. Rice, Attorney–Client Privilege in the United States § 7:18, at 1230–31 (2013)).

[15] *In re Sealed Case*, 676 F.2d 793, 808 (D.C. Cir. 1982) (emphasis added).

[16] *Id.*

[17] 329 U.S. 495 (1947).

[18] Fed. R. Civ. P. 26.

document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation.'"[19] The party preparing the document must have actually believed that litigation was a real possibility, and this belief must have been objectively reasonable.[20]

Rule 26 draws a distinction between "fact" and "opinion" work product. Opinion work product, which reveals the attorney's mental impression, opinions, legal theories or strategy, "is virtually undiscoverable."[21] But "under certain circumstances purely factual material embedded in attorney notes may not deserve the super-protection afforded to a lawyer's mental impressions."[22]

In *Hickman*, the Court explained that the work product doctrine balances the tension between protecting an attorney's mental impressions and facilitating meaningful discovery:

> Where relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had. . . . Were production of written statements and documents to be precluded under such circumstances, the liberal ideals of the deposition-discovery portions of the Federal Rules of Civil Procedure would be stripped of much of their meaning. But the general policy against invading the privacy of an attorney's course of preparation is so well recognized and so essential to an orderly working of our system of legal procedure that a burden rests on the one who would invade that privacy to establish adequate reasons to justify production through a subpoena or court order.[23]

### III. Analysis

**A. Attorney-client Privilege**

The COBC reports include copies of witness statements signed by KBR employees and given

---

[19] *United States v. Deloitte LLP*, 610 F.3d 129, 137 (D.C. Cir. 2010) (quoting *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir 1998)).

[20] *In re Sealed Case*, 146 F.3d at 884.

[21] *Dir., Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1307 (D.C. Cir. 1997).

[22] *Id*. at 1308.

[23] *Hickman v. Taylor*, 329 U.S. 495, 511 (1947).

to KBR investigators. Investigator Ervin attached these statements to his reports and sent them to KBR lawyers. The Court finds that these employee statements are confidential communications between corporate employees and the agents of an attorney, and are attorney-client privileged.

KBR also argues that the reports themselves, drafted by Ervin and sent to KBR lawyers, are attorney-client privileged. First, KBR argues that *Upjohn Co. v. United States* and the Court of Appeals's opinion granting KBR's mandamus petition protect the communications between KBR investigators and lawyers. KBR argues that the reports fit the standard articulated in *Upjohn* because they are confidential communications from Ervin, a KBR employee, to KBR's counsel.

Under KBR's logic, any communication between a company attorney and his agent is automatically attorney-client privileged, because both are employees of the company and part of the client itself. This reasoning runs against this Circuit's requirement that "communications that do not involve *both attorney and client*, are unprotected."[24] KBR seeks to collapse this distinction.

But *Upjohn* recognizes a distinction between statements from ordinary employees and reports from lawyers and their agents. The more relevant question is whether the agent's report reveals the contents of prior confidential communications from the client. "[T]he cloak of the privilege simply protects the communication from discovery, [but] the underlying information contained in the communication is not shielded from discovery."[25]

In *Upjohn*, the Court determined that questionnaires from employees sent to counsel, and notes revealing the content of those questionnaires, were attorney-client privileged. But because counsel's notes did more than just record employee responses, portions of the notes were *not* attorney-client privileged.  They were, instead, analyzed under the work product doctrine:

---

[24] *In re Sealed Case*, 676 F.2d at  808(emphasis added).
[25] *In re Six Grand Jury Witnesses*, 979 F.2d 939, 943-44 (2d Cir. 1992).

Our decision that the communications by Upjohn employees to counsel are covered by the attorney–client privilege disposes of the case so far as the responses to the questionnaires and any notes reflecting responses to interview questions are concerned. The summons reaches further, however, and *[Upjohn's General Counsel] has testified that his notes and memoranda of interviews go beyond recording responses to his questions.* To the extent that the material subject to the summons is not protected by the attorney–client privilege as disclosing communications between an employee and counsel, we must reach the ruling by the Court of Appeals that the work–product doctrine does not apply. . . . [26]

The *Upjohn* Court concluded, "[t]he notes and memoranda sought by the Government here, however, are work product based on oral statements. *If they reveal communications*, they are, in this case, protected by the attorney–client privilege."[27] Indeed, the Court of Appeals has noted that *Upjohn* implies that even an attorney's notes of a witness interview are "analytically divisible" into attorney-client communications and mental impressions shielded by the work product protection.[28]

*Upjohn* does not give attorney-client privilege to an attorney's agent sending a summary report to an in-house lawyer. Otherwise, a company could filter any document through its legal department and give it attorney-client privilege it would not otherwise have. Communications between in-house lawyers may reveal attorney plans, attorney mental impressions, and attorney strategy. However, the shield for such communications is work product protection, not attorney-client privilege. The attorney-client privilege protects communications between employees and lawyers or their agents, but not communications only between lawyers, or their agents, alone.

Investigator Ervin is not a lawyer, but acted under the direction of KBR's legal department.

---

[26] *Upjohn Co. v. United States*, 449 U.S. 383, 397 (1981).

[27] *Id*. at 401 (emphasis added).

[28] "But the [*Upjohn*] Court did not decide whether factual elements embodied in such notes should be accorded the virtually absolute protection that the privilege gives to the attorney's mental impressions. Indeed, its reasoning seems to presuppose that such notes are analytically divisible; in refraining from formulation of a specific test, the Court said that the notes in question represented either communications protected by the attorney-client privilege (which was applicable, in contrast to the present case) or mental impressions protected by work product privilege." *In re Sealed Case, 124 F.3d 230, 236 (D.C. Cir. 1997), rev'd on other grounds sub nom. Swidler & Berlin v. United States, 524 U.S. 399 (1998)* (internal citation omitted).

For the purpose of receiving employee communications, he stepped into the shoes of a KBR lawyer. His role is analogous to that of the attorney in *Upjohn* who collected employee questionnaires and used them to write reports. Unlike the employees filling out questionnaires in *Upjohn*, the KBR investigators were not themselves witnesses to alleged misconduct.

The investigators went to sites in Iraq to interview witnesses and, separately, collect facts. The reports themselves show this distinction. One of Ervin's reports, for instance, has separate sections labeled "Interviews" and "Investigative Activity." Ervin assembled contract information, change order information, back charge information, and subcontract file discrepancies. While the witness interviews qualify for the attorney-client privilege, the investigator's factual summaries do not receive attorney-client protection simply because they were later sent to a lawyer.

KBR next argues that Proposed Federal Rule of Evidence 503, and the Restatement (Third) of the Law Governing Lawyers, support its argument that reports sent from investigators to lawyers are attorney-client privileged communications.[29] Proposed rules are instructive, but do not control.

Furthermore, KBR misinterprets the thrust of the Restatement. Insofar as investigators collect and transmit witness statements, those statements are confidential communications within the meaning of the attorney-client privilege. But once the investigators collect facts and write reports on their own, they are not simply conduits for client confidences.

The Restatement notes that the attorney-client privilege "may be invoked" for communications made by certain "confidential agents."[30] But in the Restatement's accompanying illustrations, a confidential agent's communication is privileged if that agent is merely transcribing information, translating a statement for a lawyer's use, or explaining terms the client cannot

---

[29] Doc. 217 at 4.
[30] Restatement (Third) of Law Governing Law § 68 (2000).

otherwise understand.[31]

Here, the KBR investigators were more than secretaries, translators, or interpreters. The Restatement does not help KBR. It only confirms that the privilege protects communications between a client and his attorney, but does not protect an agent's work product that does more than record such confidential communications.[32]

KBR makes effectively the same argument in citing to *FTC v. TRW*. KBR argues that "the attorney-client privilege can attach to reports of third parties made at the request of the attorney or the client where the purpose of the report was to put in usable form information obtained from the client."[33] But a "usable form" is not simply one that is more convenient or concise. In *FTC*, the report in question was necessary to explain a complicated computerized reporting system in "a form that lawyers could understand."[34]

KBR used the investigators in part to gather bid information and contract completion information. KBR did not use investigators because only the investigators could decipher or interpret technical material. Indeed, the court in *FTC* cautioned *against* extending the privilege to most third party reports, noting that otherwise, "the attorney-client privilege would engulf all manner of services performed for the lawyer that are not now, and should not be, summarily excluded from the adversary process.[35]

The Court concludes that the reports drafted by KBR investigators, to the extent they do not reveal confidential employee communications, are not attorney-client privileged.

_____

[31] *Id.*, § 70 cmt. f.

[32] "The privilege also extends to communications to and from the client that are disclosed to independent contractors retained by a lawyer, such as an accountant or physician retained by the lawyer to assist in providing legal services to the client and not for the purpose of testifying." *Id.*

[33] 628 F.2d 207, 212 (D.C. Cir. 1980).

[34] *Id.*

[35] *Id.*

**B. Work Product Protection**

### 1. Fact or Opinion Work Product

KBR used the COBC reports to summarize its investigation of tips and to help decide whether to disclose potential fraud to the United States. As an initial matter, the Court finds that the two reports qualify for work product protection because they were prepared in anticipation of litigation.[36/]   Rule 26 extends work product protection to documents that reveal the "mental impressions, conclusions, opinions, or legal theories of a party's attorney or other representative concerning the litigation."[37/]

But the Court must still review whether the reports are entirely opinion work product. In *United States v. Deloitte*, the United States moved to compel the production of a report that Dow Chemical Company's independent auditor, Deloitte & Touche, had prepared for Dow in connection with tax litigation between Dow and the United States. The Court of Appeals reversed the district court's finding that the report was "purely work product." The Court of Appeals explained:

> [T]he memorandum does contain thoughts and analyses by legal counsel, but this does not rule out or even render unlikely the possibility that it also includes other facts, other thoughts, other analyses by non-attorneys which may not be so intertwined with the legal analysis as to warrant protection under the work product doctrine. We will therefore remand this question to the district court for the purpose of independently assessing whether the document was entirely work product, or whether a partial or redacted version of the document could have been disclosed.[38/]

The Court therefore performs an independent assessment of the COBC reports, as contemplated by *United States v. Deloitte*, and notes that "the analysis of whether an attorney's

---

[36/]"[W]here an attorney prepares a document in the course of an active investigation focusing upon specific events and a specific possible violation by a specific party, it has litigation sufficiently 'in mind' for that document to qualify as attorney work product." *SafeCard Servs., Inc. v. SEC.*, 926 F.2d 1197, 1203 (D.C. Cir. 1991).

[37/]Fed. R. Civ. P. 26(b)(3)(B).

[38/]*United States v. Deloitte LLP*, 610 F.3d 129, 139 (D.C. Cir. 2010).

work product constitutes 'fact' or 'opinion' work product is inherently and necessarily fact-specific."[39]

Sometimes, a collection of facts can reveal an attorney's strategy or opinion regarding a case. During "interviews conducted as part of a litigation-related investigation," "the facts elicited necessarily reflected a focus chosen by the lawyer."[40] But "[t]he 'difficult matter' of deciding what 'degree of selection [is] necessary to transform facts into opinions' has yet to be resolved by the District of Columbia Circuit."[41]

KBR argues for extremely broad opinion work product protection. KBR maintains that all of the COBC reports, including the identity of the witnesses interviewed, and the lists of documents reviewed or attached are protected opinion work product. KBR argues that the reports reveal "Investigator Ervin's 'mental impressions, conclusions, and opinions' regarding the witness interviews he conducted and the documents he reviewed during his investigation."[42]

After an *in camera* review of the reports, the Court comes to a different conclusion. Contrary to KBR's characterization, the reports scrupulously avoid stating conclusions about the allegations investigated.

Moreover, Ervin's selection of witnesses gives no insight into his strategy. Ervin simply interviews seemingly every available witness to events surrounding complaints of fraud. Ervin's reports do not give opinion on witness credibility, demeanor, or evasiveness. The reports do not directly judge credibility even when witnesses have given inconsistent statements. The reports do not label certain documents as relevant or irrelevant, and do not state that certain statements or

---

[39] *United States v. Clemens*, 793 F. Supp. 2d 236, 253 (D.D.C. 2011).

[40] *In re Sealed Case*, 124 F.3d 230, 236 (D.C. Cir. 1997), *rev'd on other grounds sub nom. Swidler & Berlin v. United States*, 524 U.S. 399 (1998).

[41] *United States v. Clemens*, 793 F. Supp.2d. at 245 (quoting *Dir., Office of Thrift Supervision v. Vinson & Elkins, LLP*, 124 F.3d 1304, 1308 (D.C. Cir. 1997)).

[42] Doc. 217 at 9.

records are prima facie indicators of fraud.  And as stated, apart from waiver on other grounds, the witness statements themselves would not be discoverable.

Significant portions of the reports give raw factual contract background material for KBR's legal department. The reports mostly describe Daoud's subcontract bids, list which KBR employee chose Daoud to receive subcontract awards, describe Daoud subcontract completion performance, describe work that KBR or other contractors were required to complete on Daoud's contracts, and describe whether back charges or late charges were levied against Daoud.

The reports are far removed from the core of the work product protection for attorney strategy or opinions.  The reports do not reveal KBR's litigation strategy or KBR's defense plans. The reports do not discuss contract or federal regulation requirements requiring fraud reporting. Documents that provide background information meant to assist a lawyer in eventually reaching a conclusion are fact, not opinion, work product.

## 2. Demonstrating Substantial Need

KBR and Barko disagree over whether Barko has made a sufficient showing for the discovery of fact work product contained in the reports. Rule 26 allows for the discovery of fact work product if a party shows "substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means."[43]

KBR argues that Barko already has all non-privileged documents "that relate to the particular subcontracts on which his allegations are based," and that access to an investigator's summaries of these documents would be cumulative.[44] In response, Barko points to the passage of time since the

---

[43] Fed. R. Civ. P. 26(b)(3)(A)(ii).
[44] Doc. 217 at 10.

underlying events and the sheer number of individuals KBR has identified who may have relevant knowledge. Barko argues that the COBC reports are the only contemporaneous written record of the witnesses contacted and documents assembled.[45/]

The Court finds Barko's argument more persuasive. This case involves events occurring more than ten years ago in Iraq. Many witnesses played small roles in awarding and supervising contracts. Many, if not most, have left KBR employment. Some are foreign citizens.

Although this case was filed in 2005, it remained under seal until January 2009 to allow the United States to decide whether it would prosecute the case itself. While the case was under seal[46/] Barko could not "publicly discuss[] the filing of the *qui tam* complaint."[47/] Barko was more than five years removed from the underlying events before he could do discovery or speak with any witnesses.

Even after the seal was lifted, KBR sought an order to prevent Barko from doing discovery. On July 23, 2010, KBR moved for a protective order to stop all discovery until it obtained a ruling on KBR's motion to dismiss.[48/] The Court granted KBR's motion and "[barred] plaintiff from seeking discovery against the KBR defendants at this time."[49/] The stay on discovery was not lifted until July 8, 2013, when KBR's motion to dismiss was denied.[50/]

Plaintiff Barko sought discovery from KBR regarding which witnesses had knowledge relevant to his complaint. KBR gave only a cursory response indicating the names of witnesses who "may have knowledge related to" the contracts at issues. KBR gave Barko a list of 205 individuals who may have some knowledge regarding the contracts at issue in Barko's complaint.[51/] Although

---

[45/]Doc. 216 at 8.
[46/]18 U.S.C. § 3730(b)(2).
[47/]*Am. Civil Liberties Union v. Holder*, 673 F.3d 245, 254 (4th Cir. 2011).
[48/]Doc. 75.
[49/]Doc. 86.
[50/]Doc. 116.
[51/]Doc. 217-2.

Barko asked KBR to describe KBR's "understanding of the facts about which [the witnesses] have knowledge," KBR gave no specific response despite being aware of what knowledge the witnesses had.[52]

KBR's disclosure gave almost no notice regarding what issues, beyond certain numbered contracts, the identified witnesses could testify about.  Barko would have to run through 205 deponents to determine which have actual knowledge of the alleged fraud and misconduct at the center of the suit. Given the passage of time, most of these witnesses would be unlikely to remember details.  Deposing so many individuals scattered across the globe, in the hopes that a few might recall useful information ten years after the fact, crosses from necessary diligence to undue hardship.

The bigger picture supports this conclusion.[53]  KBR designated Cheryl Ritondale and Chris Heinrich as its Rule 30(b)(6) witnesses.  Ritondale claimed almost complete ignorance regarding whether KBR steered business and overpaid Daoud to secure Daoud's sponsorship to allow KBR to operate in Jordan.  And KBR attorneys, asserting attorney-client privilege, prevented Heinrich from testifying about the facts underlying the alleged kickbacks.

After blocking Heinrich from giving any meaningful testimony on why KBR chose Daoud and did not terminate Daoud, KBR then solicited testimony from Heinrich that KBR invariably discloses when reasonable grounds suggest that bribes or kickbacks occurred, and that KBR made

---

[52] *DCFS USA, LLC v. D.C.*, 803 F. Supp. 2d 29, 36 (D.D.C. 2011) ("Counsel responding to interrogatories is not at liberty to say she does not know the answers to very legitimate questions, but must provide 'true, explicit, responsive, complete, and candid' responses." (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 246 F.R.D. 29, 32 (D.D.C.2007))).

[53] *See, e.g.*, *Miller v. Holzmann*, 238 F.R.D. 30, 33 (D.D.C. 2006) (finding a sufficient showing to disclose fact work product because "As HII notes, this is an extremely complex case with many parties. It is also a case which has been in litigation for over 10 years and is now procedurally in the midst of an expedited discovery schedule which involves numerous depositions and the review of thousands of documents."). Potential discrepancies between the content of fact work product and representations made during litigation point in favor of substantial need.

no report after investigating the allegations in this case.[54]

The clear suggestion was that no reasonable grounds existed to suspect that fraud occurred in the present case. KBR presented this inference before it knew that any *in camera* review of COBC documents would occur.

KBR's suggested inference is false.  KBR's COBC documents are filled with evidence that certain KBR employees steered contracts to Daoud; are filled with evidence that Daoud gave lousy and late contract performance; and are filled with evidence that KBR nevertheless overpaid Daoud with United States funds.[55]  Counsel's duty of candor requires better.[56]

The Court is persuaded that pursuing the information in the COBC reports would require

---

[54]In listing "material facts as to which there is no genuine dispute," KBR told the Court:

KBR's internal Code of Business Conduct ("COBC") program, which was in effect during the events at hand, provides a mechanism for the company to learn of potentially illegal activities and conduct investigations as appropriate to assess whether they were actually committed.  The COBC program is headed by a COBC Director who is an attorney. The COBC investigations are confidential and are done at the direction and under the supervision of attorneys so that the lawyers can provide legal advice to the company. . . . When a COBC investigation provides reasonable grounds to believe a violation of 41 U.S.C. §§ 51-58 ("the Anti-Kickback Act") may have occurred requiring disclosure to the Government under FAR 52.203-7, KBR makes such disclosures.  KBR has made reports to the Government when it has reasonable grounds to believe that a violation of the Anti-Kickback Act may have occurred.  KBR conducted COBC investigations related to D&P and Gerlach, and made no reports to the Government following those investigations.

Doc. 136 at 44  (internal citations omitted).  KBR used the same inference to oppose Barko's motion to compel. Doc. 139 at 10-11.

[55]**SEALED**

[56]"This Court must rely on counsel to present issues fully and fairly, and counsel have a continuing duty to inform the Court of any development which may conceivably affect an outcome." *Fusari v. Steinberg*, 419 U.S. 379, 390–91 (1975) (Burger, C.J., concurring); American Bar Association, Model Rules of Professional Conduct, Rule 3.3: Candor Toward the Tribunal  ("(a) A lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer; . . .  or (3) offer evidence that the lawyer knows to be false.").

undue hardship and not be available through other means. KBR responds, as it has repeatedly in earlier briefing, that Barko has conducted only three depositions and that he seeks to have KBR do his discovery for him.[57] Even if accepted, this argument does not overcome substantial need and undue hardship. Against this case's backdrop, where the sealing order and the discovery stay prevented Barko from conducting discovery until ten years after the relevant conduct, the Court is unpersuaded that Barko would first have to demonstrate the futility of his efforts.

Thus, the Court concludes that substantial portions of the COBC reports constitute fact work product, and that Barko has made an adequate showing to overcome the protection afforded to the documents. The Court orders disclosure of portions of the COBC reports as explained below.

### C. Disclosures Required

<u>From the report dated February 8, 2005:</u>

1.   The list of witnesses interviewed and exhibits attached to the report.

2.   The section labeled "Synopsis," on pages 1-2, with the following redactions:

   a.   The sentence starting on the sixth line below the heading "Synopsis," beginning with "Two" and ending with "contract."

   b.   The four consecutive sentences starting on the tenth line below the heading "Synopsis," beginning with "One" and ending with "site."

   c.   The five consecutive sentences starting on the twenty-third line below the heading "Synopsis," beginning with "There" and ending on the following page with "dangerous."

   d.   The four consecutive sentences starting on the tenth line of page 2 of the report,

---

[57]/Doc. 217 at 11.

beginning with "One" and ending with "D&P."

    e.    The sentence starting on the twenty-first line of page 2 of the report, starting with "One" and ending with "mobilizing."

    f.    The last sentence in the section labeled "Synopsis," starting on the twenty-eighth line of page 2 of the report, beginning with "One" and ending with "management."

3.    On page 13 of the report, the eleven-line section starting on the sixteenth line of the page with "On 18" and through the line ending "185:"

4.    The section labeled "Summary" on page 14 of the report, with redaction of the sentence starting on the fourth line below the heading, beginning "Witnesses" and ending in "contracts."

<u>From the report dated September 11, 2006:</u>

1.    The list of witnesses interviewed and exhibits attached to the report.

2.    The sections labeled "Synopsis," consisting of page 1 of the report, and "Investigative Activity," consisting of pages 8-20 of the report.

3.    The section labeled "Interviews," with the following redactions:

    a.    On page 2 of the report, the sentence starting on the second line under the section labeled "3.", beginning with "B" and ending with "5."

    b.    On page 2 of the report, the sentence starting on the sixth line under the section labeled "3.", beginning with "B" and ending with "pursued."

    c.    On page 2 of the report, the sentence starting on the ninth line under the section labeled "3.", beginning with "According" and ending with "documents."

    d.    On page 3 of the report, the sentence starting on the first line of the page beginning

with "According" and ending with "endorsed."

e.  On page 3 of the report, the sentence starting on the fifth line of the page beginning with "B" and ending with "5."

f.  On page 3 of the report, the two consecutive sentences starting on the twelfth line of the page beginning with "According" and ending with "contract."

g.  On page 3 of the report, the paragraph on the nineteenth line of the page beginning with "B" and ending with "disappear."

h.  On page 4 of the report, the sentence starting on the third line of the page beginning with "It" and ending with "6."

i.  On page 4 of the report, the sentence starting on the thirty-second line of the page beginning with "The" and ending with "C."

j.  On page 4 of the report, the sentence starting on the thirty-fifth line of the page beginning with "A" and ending with "site."

k.  On page 4 of the report, the sentence starting on the thirty-seventh line of the page beginning with "A" and ending with "confirmed."

l.  On page 5 of the report, the sentence starting on the third line of the page beginning with "According" and ending with "KBR."

m.  On page 5 of the report, the first sentence in the section labeled "4.", beginning with "On" and ending with "4."

n.  On page 5 of the report, the two consecutive sentences starting on the thirty-third line of the page, beginning with "A" and ending with "y."

o.  On page 6 of the report, the two consecutive sentences starting on the fifth line of the page, beginning with "A" and ending with "(5)."

p.    On page 6 of the report, the second sentence in the section labeled "5.", beginning with "According" and ending with "considered."

q.    On page 6 of the report, the fourth, fifth, and sixth sentences in the section labeled "5.", beginning with "P" and ending with "Asad."

r.    On page 6 of the report, the eighth sentence in the section labeled "5.", beginning with "When" and ending with "y."

s.    On page 6 of the report, the entire fourth line of the section labeled "6.", beginning with "C" and ending on the following line with "sites."

t.    On page 6 of the report, the sentence starting on the twelfth line of the section labeled "6.", beginning with "As" and ending with "project."

u.    On page 6 of the report, the three consecutive sentences starting on the fourteenth line of the section labeled "6.", beginning with "C" and ending with "late."

v.    On page 7 of the report, the sentence starting on the first line of page 7, beginning with "C" and ending with "payment."

w.    On page 7 of the report, the sentence starting on the eighth line of the page beginning with "C" and ending with "W."

x.    On page 7 of the report, the sentence starting on the eleventh line of the page beginning with "A" and ending with "n."

y.    On page 7 of the report, the sentence starting on the twentieth line of the page beginning with "Concerning" and ending with "consumables."

z.    On page 7 of the report, the two consecutive sentence starting on the twenty-sixth line of the page beginning with "C" and ending with "situation."

aa.   On page 7 of the report, the sentence starting on the thirty-sixth line of the page

20

beginning with "C" and ending with "1)."

bb.     On page 7 of the report, the two consecutive sentence starting on the fortieth line of the page beginning with "C" and ending with "information" on the following page.

cc.     On page 8 of the report, the sentence starting on the fifth line of the page, beginning "C" and ending with "5."

dd.     On page 8 of the report, the two consecutive sentences starting on the tenth line of the page, beginning "C" and ending with "KBR."

ee.     On page 8 of the report, the two consecutive sentences starting on the seventeenth line of the page, beginning "C" and ending with "him."

ff.     On page 8 of the report, the two consecutive sentence starting on the twenty-seventh line of the page, beginning "C" and ending with "taken."

gg.     On page 8 of the report, the sentence starting on the thirty-second line of the page, beginning "(C" and ending with "date)".


<u>From other documents included in the COBC file:</u>

4.     Documents 46, 47, 48, and 49 from KBR's Feb 27, 2014, *in camera* production, each labeled "Attorney Fact Sheet." However, in Document 47, under the heading "TAB THREE" the sentence beginning "This" and ending in "10-10-03" may be redacted.


KBR will make these disclosures by 4:00 PM on December 26, 2014. The Court **ORDERS** Barko not to disclose the contents of the documents. If Barko uses or refers to the documents in subsequent filings in this case, the Court orders that such filings be made under seal. This order will

remain in effect unless modified or lifted by the Court.

IT IS SO ORDERED

Dated: December 17, 2014.                          s/              James S. Gwin
                                                   JAMES S. GWIN
                                                   UNITED STATES DISTRICT JUDGE