**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** ) | |
| **ex rel. HARRY BARKO** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No: 05-cv-1276-RCL** |
| ) | |
| **HALLIBURTON COMPANY, et al.** ) | |
| ) | |
| **Defendants.** ) | |

**MEMORANDUM OPINION**

## I.   INTRODUCTION

In the early 2000s, the United States engaged in a war in Iraq, which persisted for several years.  To support the military on the ground, the United States government contracted with civilian companies to provide a wide variety of services.  Defendant Kellogg, Brown & Root ("KBR") received one of these contracts.  This dispute revolves around KBR's contracting practices while in Iraq, specifically, KBR's subcontracts with defendant Daoud & Partners ("D&P").[1]  Relator Harry Barko filed an amended complaint in 2007 alleging numerous violations of the False Claims Act [ECF No. 12].  KBR has moved for summary judgment [ECF No. 136].[2]

---

[1] Defendants Daoud and Partners, Ltd. [JOR] and Daoud & Partners, Ltd. [BVI] ("D&P") filed a motion for summary judgment in 2014 [ECF No. 137].  The case against D&P has since been voluntarily dismissed [ECF No. 179].

[2] The motion for summary judgment was brought by the following defendants: Kellogg Brown & Root Services, Inc.; Kellogg Brown & Root, Inc.; KBR Technical Services, Inc.; Kellogg Brown & Root Engineering Corporation, Kellogg Brown and Root International, Inc.; Kellogg Brown & Root International, Inc.; and Halliburton Company (parent company).  For the sake of clarity, the Court will refer to all of the defendants as "KBR".   KBR originally filed a motion for summary judgment on February 10, 2014 [ECF No. 136], and then filed an amended motion on November 21, 2014 [ECF No. 207].  The Court finds that the changes made do not affect its analysis or decision.  The Court will cite to and quote from the original motion.  It will not reference any of the information later removed from the motion or accompanying materials.

The Court will grant KBR's motion and will award summary judgment to KBR on the entirety of Mr. Barko's Amended Complaint.  It will not allow additional time for discovery.

## II.      BACKGROUND

In 2007, Mr. Barko, a former subcontract administrator for KBR in Iraq from July 2004 through June 2005, brought claims under the False Claims Act, 31 U.S.C. § 3729 *et al.*, against KBR and D&P, a KBR subcontractor.  KBR is a government contractor who provided services and materials to the United States government during the war in Iraq under the U.S. Army's Logistics Civil Augmentation Program ("LOGCAP").  In 2001, the government awarded the LOGCAP III contract to KBR, a prime contractor.  KBR then selected subcontractors, such as D&P, to provide labor, laundry services, construction, and well-drilling at the "B Sites" in Western Iraq.  Mr. Barko paints a picture of a contracting environment rife with fraud, collusion, and other anticompetitive activity, claiming that KBR submitted false claims to the government by accepting kickbacks, rigging bids, inflating costs, and otherwise engaging in improper procurement practices.  The Court will first discuss the LOGCAP III contract, then will summarize the four subcontract areas at issue as well as Mr. Barko's allegations with regard to each of them, and finally will address the procedural history of this case.

### A.      LOGCAP III

In order to analyze Mr. Barko's claims and the propriety of summary judgment, the Court finds it prudent to first summarize the fairly complicated contracting scheme at issue here. LOGCAP "was established in 1985 to facilitate civilian contractor logistical support for United States military forces deployed overseas, principally in countries with which the United States does not have treaties or agreements that would enable the host country to provide such support." *United States ex rel. Watkins v. KBR, Inc.*, 106 F. Supp. 3d 946, 951 (C.D. Ill. 2015).  Under

LOGCAP, the government awards contracts to a single company—a prime contractor—to provide various services in support of the military, such as laundry, construction, and food.   The government awarded KBR the LOGCAP III contract on December 14, 2001 to provide logistical services to the military in Iraq and other countries.   Under the LOGCAP III contract, KBR solicited bids for certain services and awarded subcontracts to various bidders for those services.   At times, KBR and subcontractors negotiated change orders that modified the terms of the subcontract.

Although the Court will quote from an exhibit submitted by KBR—the declaration of Global Director of Procurement and Materials for KBR Cheryl Ritondale—the Court finds that there are no genuine disputes of material facts regarding the following information.   The LOGCAP III contract was "an Indefinite Delivery/Indefinite Quantity umbrella contract, pursuant to which the Army Sustainment Command ("ASC") issue[d] Task Orders to KBR to perform certain services.   Cost Plus Award Fee ("CPAF") Task Orders were issued to [KBR] against the LOGCAP III contract for particular types of services in particular locations."   KBR Ex. 3, Ritondale Decl. ¶ 5, ECF No. 136-2.   A cost plus award fee contract is "a cost-reimbursement contract that provides for a fee consisting of (a) a base amount (which may be zero) fixed at inception of the contract and (b) an award amount, based upon a judgmental evaluation by the Government, sufficient to provide motivation for excellence in contract performance."   48 C.F.R. 16.405-2.   LOGCAP III and the Task Orders issued under it are governed by the Federal Acquisition Regulation ("FAR"), codified at Title 48 of the Code of Federal Regulations.

After the government issued Task Orders, KBR and the government engaged in the process of definitization, meaning "the agreement on, or determination of, contract terms, specifications, and price, which converts the undefinitized contract action to a definitive contract."   48 C.F.R. 217.7401(b).   During this process, KBR evaluated the statement of work ("SOW") accompanying

a Task Order and prepared an estimate of its cost to perform those services.  Ritondale Decl. ¶ 7.

KBR and the government then negotiated the SOW and KBR's cost estimates before agreeing on

a "negotiated estimated cost" for the services.  *Id.*  KBR was reimbursed for the costs it incurred

in performing the services, including subcontractor costs.  *Id.*  It was not reimbursed for delivering

particular results, but rather was "obligated to use its best efforts to achieve the scope of work

specified in each Task Order," and was then "entitled to be reimbursed its allowable direct and

indirect costs incurred in performing the contract."  Ritondale Decl. ¶ 6–7.

   After incurring costs for each Task Order, KBR submitted invoices for reimbursement to

the government on public vouchers—Standard Form 1034.  *Id.* ¶ 9.  KBR extracted from its

accounting system all direct and indirect allowable costs incurred on the Task Orders, including

subcontractor costs, and submitted them on these forms.  *Id.*  These invoices were then reviewed

by the Defense Contract Audit Agency ("DCAA").  *Id.* ¶ 10.  The DCAA determined whether to

allow the claimed costs based on reasonableneness, allocability, Cost Accounting Standards Board

standards or other general accounting principles and practices, the contract terms, and certain

regulatory limitations.  *Id.*; 48 C.F.R. 31.201-2.  "A cost is reasonable if, in its nature and amount,

it does not exceed that which would be incurred by a prudent person in the conduct of competitive

business," which depends on "a variety of considerations and circumstances."  48 C.F.R. 31.201–

3.  A cost is generally allocable "if it is assignable or chargeable to one or more cost objectives on

the basis of relative benefits received or other equitable relationship."  48 C.F.R. 31.201–4.  If

DCAA found that a cost was not allowable, it would recommend the suspension or disallowing of

payment to KBR, after which the Defense Contract Management Agency ("DCMA") could

disallow claimed costs.  Ritondale Decl. ¶¶ 10–11.

### B.      Subcontracts

Mr. Barko's allegations relate to four types of subcontract: those for construction of the "man camp" at Site B6 (Counts VIII–X); those for laundry services (Counts I–VI, XII, XIII); those for water well drilling (Counts VII, XV); and those for labor (Counts XI, and XIV).   Generally, Mr. Barko alleges that KBR employee Robert Gerlach had an improper and collusive relationship with D&P and was accepting kickbacks in exchange for rigging bids, suppressing competition, and awarding contracts to D&P.   He also alleges double billing and overcharges on D&P subcontracts, and that KBR submitted material false statements in a Certified Claim for the work completed on the man camp construction contract after the contract was terminated for convenience.   Mr. Barko claims that several instances of fraud were reported to KBR via its Code of Business Conduct ("COBC") policy—which it was required to investigate under the terms of the LOGCAP III contract—and via other reporting up the chain of command.   The parties' briefs discuss in detail the four subcontracting areas and the allegations surrounding them.   Many of the following facts and claims are disputed.   The Court will briefly summarize Mr. Barko's allegations.

### 1.      Site B6 "Man Camp" Construction Subcontract

First, with respect to the Site B6 "man camp" construction subcontract, Mr. Barko alleges various instances of anticompetitive bidding and activity.   Mr. Barko claims that although the Subcontracts Administrator for the B6 subcontract was George Covelli, Gerlach made the contract award to D&P and falsely stated that Covelli had approved and signed the contract and determined the price fair and reasonable, Pl.'s Opp'n at 6–7, ECF No. 265.   In addition, Mr. Barko claims that the B6 contract was a "time is of the essence" project, but that D&P was unable to meet the construction schedules—as known by KBR.   *Id.* at 7.   He states that D&P should have also been disqualified because the bid package was missing certain elements, and that the contract should

have gone to Prime Projects International, "because they were the only contractor to mobilize to B6 at the time the B6 man camp was to be constructed, had already been awarded a Master Contract by KBR and had already demonstrated excellent construction capabilities at B6, and much liked by the client." *Id.* at 7–8.  Mr. Barko claims that KBR employees had raised concerns that the contract had been improperly awarded to D&P, and that PPI was improperly excluded from consideration in violation of FAR Clause 52.203-7, which prohibits kickbacks.  Barko SOF ¶¶ 88–89, ECF No. 265.

In addition, Mr. Barko raises issues with respect to D&P's performance of the man camp construction subcontract.  He claims that D&P continuously failed to meet the requirements of the construction subcontract and was unable to cure its deficiencies, and that KBR knew it had to execute a termination for default, but failed to do so.  Pl.'s Opp'n at 8–12; Barko SOF ¶ 136.  When the government cancelled KBR's outstanding LOGCAP III subcontracts in July 2005, it "provided KBR with the opportunity to deceive the government of its knowledge that the B6 man camp subcontract was in long-standing default and presented an opportunity for KBR to falsely bill the government for the construction of the B6 man camp."  Barko SOF ¶ 137–38.  KBR concealed D&P's default and presented a "Certified Claim" for $3,326,832.24 containing allegedly material false statements regarding the submission of bids on a competitive basis, performance failures and deficiencies, and percentages of completion.  Pl.'s Opp'n at 12; Barko SOF ¶¶ 145–68.

### 2.    *Laundry Subcontracts*

KBR also contracted with D&P to construct laundry facilities and provide laundry services at the B sites.  Mr. Barko first takes issue with the bidding process.  He claims that Gerlach knew that he should have solicited bids from at least three vendors, but that he only solicited bids from D&P and Rezayat (another subcontractor), that Gerlach knew Rezayat had priced itself out of

6

being competitive, and that Gerlach awarded the subcontract to D&P before Rezayat submitted its final bid proposal. Pl.'s Opp'n at 14. Next, Mr. Barko claims that Gerlach did not comply with the Spore Directive, which stated that "'construction of buildings which may exceed $750K' could proceed provided 'the [Administrative Contracting Officer's ("ACO")] approval [is] annotated on any such requisitions.'" *Id.* at 13, 15. After being asked whether the Spore Directive had any implications for the laundry subcontract, Mr. Barko alleges that Gerlach falsely responded that the contract bid tabulation submitted by D&P did not specifically indicate the building costs, even though he knew that the construction costs exceeded $750,000, and then failed to seek or obtain ACO approval for the cost of constructing the laundry facility. *Id.* at 15. Mr. Barko also argues that the procurement file was deficient because it does not include a copy of the final Rezayat proposal, Barko SOF ¶ 39, and that Gerlach prepared and submitted an unauthorized Notice to Proceed, *id.* ¶ 40.

Mr. Barko posits that D&P intentionally submitted a low bid, then KBR and D&P later modified the contract to seek more money. Mr. Barko claims that despite instructions to base negotiations on actual usage (unit rate), not overall troops, Gerlach disobeyed these instructions and priced the laundry subcontracts on overall troops. *Id.* at 16–17. "Instead of executing a subcontract specifying a unit basis for doing the laundry Gerlach defrauded the government by permitting D&P to invoice the laundry subcontracts as a firm fixed price subcontract based on projected troop strength instead of on actual usage." Barko SOF ¶ 47. This resulted in overcharges. Pl.'s Opp'n at 16. KBR then engaged in a renegotiation with D&P so that the subcontracts would reflect that they were priced out on a unit basis, although no documents of such negotiations exist. Barko SOF ¶ 44.

Many of Mr. Barko's claims with respect to the laundry subcontracts relate to double billing—for the laundry facilities, laundry labor, and laundry supplies.  Mr. Barko claims that Gerlach "suggested KBR use the renegotiation to obtain title to the laundry facilities," even though KBR allegedly took title of the facilities on behalf of the government under the original subcontract.  *Id.* at 18.  Thus, KBR "double billed" for the facilities.  Mr. Barko alleges that "[t]he double purchase of the laundry facilities was ultimately accomplished using a change order to avoid alerting the ACO that the purchase was to take place and to avoid having to allow other bidders to compete."  *Id.* at 19.  He states that "Gerlach purchased the laundry facilities for 125% of the original construction cost," and that "KBR's strategy of negotiating the purchase of the laundry facilities D&P had already constructed for KBR amounts to a 'predetermined' outcome that D&P would end up being paid be purchased for a 25% premium above what KBR originally paid for the facilities instead of obtaining competitive bids."  Barko SOF ¶ 65.

In addition, Mr. Barko makes several allegations with respect to double billing for maintenance and service of the laundries.  Pl.'s Opp'n at 19.  He claims that KBR had to step in and operate the laundries for D&P—who had subcontracted the work and then failed to produce replacement labor when its subcontractor abandoned the sites—for several months.   Then, "Gerlach was asked to backcharge D&P for the cost of KBR labor, but did not."  *Id.*  Furthermore, Mr. Barko claims that he found approximately $400,000 worth of laundry supplies charges that KBR paid for, but which should have been backcharged to D&P.

### 3. *Water Well Drilling Subcontracts*

Mr. Barko also alleges that the water well drilling subcontracts were procured by collusion and fraud because "KBR improperly steered business to D&P and manipulated the bidding to award subcontracts at site B-1 that were expressly not approved by the ACO," but which actually

required ACO approval.  *Id.* at 19–20.  Therefore, Mr. Barko claims that "[i]n an attempt to get around the requirement that a construction contract was needed for the wells and that KBR needed to have ACO approval, KBR committed fraud.  It created requisitions indicating drilling for wells would be a service rather than a construction contract."  Barko SOF ¶ 172.  He claims that KBR then awarded the subcontracts to D&P at grossly inflated prices "and the bids were rigged to favor D&P over other subcontractors who could provide well drilling for less money."  Pl.'s Opp'n at 20.  Mr. Barko finally details apparent problems with D&P's performance: D&P was unable to commence drilling in a timely fashion; KBR overcharged for D&P's security; and a different company was able to obtain water by drilling wells at shallow depths for better water at a reduced cost.  *Id.* at 20–21.

### 4.      *Labor Subcontract*

Finally, Mr. Barko brings claims based on the labor subcontract.  He alleges that "KBR and Robert Gerlach engaged in anti-competitive activity designed to ensure D&P would receive payment for the labor subcontract throughout the B-sites" and then KBR "presented false claims to the United States for as much as $23 million in labor."  *Id.* at 21.  According to Mr. Barko, Gerlach (1) told KBR managers that D&P was the "only approved source" for the labor subcontract, even though other contractors were available; (2) he misrepresented the scope of the subcontract to a competitor, thereby inducing them to withdraw from bidding, and never contacted other potential bidders; and (3) he created one price reasonableness determination memorandum, which was used to substantiate prices for the contract instead of competition, and which substantially inflated the competing price for two classes of labor "creat[ing] the false impression that D&P's rates were competitive and fair."  *Id.* at 22.  He states that KBR further "misled the DCAA that the Master Agreement had been competitively bid."  *Id.*

KBR largely disputes Mr. Barko's factual allegations and argues that Mr. Barko is "attempt[ing] to manufacture a fraud case from a hodge-podge of procurement issues and purported irregularities without in a single instance making out the basic elements of a False Claims Act ("FCA") action." Defs.' Reply at 1, ECF No. 268. In general, KBR argues that all of the allegations regarding an improper relationship between D&P and Gerlach are merely "rumors, speculation, and creative (often inaccurate) interpretation of the written record," refuted by Gerlach and not supported by a deposition of Gerlach. *Id.* Regarding the procurement allegations, KBR claims that Mr. Barko's allegations are unsupported or contradicted by the evidence and, more importantly, that "he is unable to tie any alleged kickback to an inflated cost to the government, he fails to set out 'objective falsehoods' constituting false claims, he does not establish the materiality of supposed procurement irregularities to the government's payment of KBR claims, and he falls short on showing KBR's scienter." *Id.* at 2.

## C.     Procedural History

This case has now been pending for nearly twelve years. The parties have engaged in several years' worth of discovery, which has been the subject of numerous District Court and Court of Appeals' opinions. Much of this dispute has revolved around whether KBR's COBC reports were protected by the attorney client privilege. In March 2014, the District Court Judge previously assigned to this case determined that the attorney client privilege did not apply to documents related to KBR's internal investigations into alleged fraud pursuant to its COBC policy and ordered the production of such documents. *United States ex rel. Barko v. Halliburton Co.*, 37 F. Supp. 3d 1, 5 (D.D.C. 2014). The Court of Appeals, finding that "there can be no serious dispute that one of the significant purposes of the KBR internal investigation was to obtain or provide legal advice," reversed the decision of the District Court and vacated its order compelling the production of the

COBC documents.  *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 760 (D.C. Cir. 2014) (*KBR I*).

Then, on remand, the District Court found that KBR had waived its claim of privilege over the reports for two reasons: 1) KBR waived its privilege under Federal Rule of Evidence 612 because it had used the COBC reports to refresh the memory of its Rule 30(b)(6) witness prior to his deposition; and 2) KBR had used the contents of the COBC reports in its filings, thereby placing the contents of the documents at issue and implicitly waiving its claim of privilege.  *See United States ex rel. Barko v. Halliburton Co.*, No. 05-cv-1276, ECF No. 205 at 23 (D.D.C. Nov. 20, 2014).  Several weeks later, the District Court compelled the production of parts of the COBC reports because "they [were] discoverable fact work product and Barko show[ed] substantial need."  *United States ex rel. Barko v. Halliburton Co.*, 75 F. Supp. 3d 532, 536 (D.D.C. 2014). The Court of Appeals vacated both of these decisions.  *In re Kellogg Brown & Root, Inc.*, 796 F.3d 137, 152 (D.C. Cir. 2015) (*KBR II*).  The Supreme Court denied certiorari.  *See U.S. ex rel. Barko v. Kellogg Brown & Root, Inc.*, 135 S. Ct. 1163 (2015); *U.S. ex rel. Barko v. Kellogg Brown & Root, Inc.*, 136 S. Ct. 823 (2016).

## III.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Courts must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor."  *Athridge v. Aetna Cas. & Sur. Co.*, 604 F.3d 625, 629 (D.C. Cir. 2010) (internal quotation marks omitted).  To show that a dispute is "genuine" and defeat summary judgment, the nonmoving party must present evidence "such that a reasonable

jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* (internal citations omitted).  Furthermore, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Summary judgment is also appropriate when, "after adequate time for discovery," the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

### B.    False Claims Act

Mr. Barko brings these claims under the False Claims Act, 31 U.S.C. § 3279 *et seq.*  The FCA prohibits "(A) knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval; [and] (B) knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3279(a)(1)(A)–(B).  The elements of an FCA claim are as follows: "(1) the defendant submitted a claim to the government, (2) the claim was false, and (3) the defendant knew the claim was false."  *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 91 (D.D.C. 2014) (internal quotation marks omitted).  A defendant "knows" a claim is false if he or she "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information."  31 U.S.C. § 3729(b)(1)(A).

### *1.      Factual Falsity*

A claim may be either factually or legally "false."  A factually false claim is one that "is untrue on its face," for example if it "include[s] 'an incorrect description of goods or services provided or a request for reimbursement for goods or services never provided.'"  *United States v. Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d 143, 154 (D.D.C. 2011) (citing *United States v. Sci. Applications Int'l Corp. (SAIC II)*, 626 F.3d 1257, 1266 (D.C. Cir.2010)); *see also U.S. ex rel. Hockett v. Columbia/HCA Healthcare Corp.*, 498 F. Supp. 2d 25, 64 (D.D.C. 2007).

### *2.      Legal Falsity*

A legally false claim—a "false certification"—may be either express or implied.  *Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d at 154.  An express false certification "occurs when a claimant explicitly represents that he or she has complied with a contractual condition, but in fact has not complied."  *Id.*  An implied false certification "occurs when the claimant makes no affirmative representation but fails to comply with a contractual or regulatory provision 'where certification was a prerequisite to the government action sought.'"  *Id.*; *accord U.S. ex rel. Barrett v. Columbia/HCA Healthcare Corp.*, 251 F. Supp. 2d 28, 33 (D.D.C. 2003) ("The theory of implied certification . . . is that where the government pays funds to a party, and would not have paid those funds had it known of a violation of a law or regulation, the claim submitted for those funds contained an implied certification of compliance with the law or regulation and was fraudulent.")  The Supreme Court recently held that to succeed on a theory of implied false certification, two conditions must be satisfied: "first, the claim does not merely request payment, but also makes specific representations about the goods or services provided; and second, the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes

those representations misleading half-truths." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2001 (2016).

To succeed on a theory of false certification, however, plaintiffs must also demonstrate that the misrepresentation was material to the government's decision to pay. *Id.* at 2002. "Material" "means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). It "look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 126 S. Ct. at 2002. The Supreme Court recently discussed the contours of the "demanding" materiality requirement, finding that

> [a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment. Nor is it sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance. Materiality, in addition, cannot be found where noncompliance is minor or insubstantial.
>
> In sum, when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 2003–04.

### 3.     *Fraudulent Inducement*

One may also rely on a theory of fraudulent inducement to succeed on an FCA claim. Fraud in the inducement liability was recognized by the Supreme Court in *United States ex rel Marcus v. Hess*, in which the Court held contractors liable under the FCA for collusive and

fraudulent bidding. *U. S. ex rel. Marcus v. Hess*, 317 U.S. 537, 543–44 (1943). The D.C. Circuit has upheld this theory of liability, finding that "[a]lthough the focus of the FCA is on false 'claims,' courts have employed a 'fraud-in-the-inducement' theory to establish liability under the Act for each claim submitted to the Government under a contract which was procured by fraud, even in the absence of evidence that the claims were fraudulent in themselves." *U.S. ex rel. Bettis v. Odebrecht Contractors of Cal., Inc.*, 393 F.3d 1321, 1326 (D.C. Cir. 2005); *see also U.S. ex rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 199 (D.C. Cir. 1995) ("PRC made an initial misrepresentation about its capability to perform the contract in order to induce the government to enter into the contract and . . . this original misrepresentation tainted every subsequent claim made in relation to the contract.").

District courts within this Circuit have followed *Bettis* and *Schwedt*, focusing largely on whether a contract was "procured by fraud" to determine whether FCA liability flows from fraudulent inducement. *See, e.g.*, *United States ex rel. Shemesh v. CA, Inc.*, 89 F. Supp. 3d 36, 47–48 (D.D.C. 2015) (finding that relator stated a claim under a theory of fraudulent inducement by alleging that the contractor knowingly provided the government with price lists and discounts containing false information in order to induce it to enter into the contract); *United States v. Honeywell Int'l Inc.*, 798 F. Supp. 2d 12, 22 (D.D.C. 2011) (finding that a complaint stated an FCA claim under a fraudulent inducement theory when the government alleged that "[defendant's] misrepresentations about Zylon's accelerated deterioration induced Armor Holdings to sell Z Shields to the government . . . and these misrepresentations tainted all of Armor Holdings' claims for payment from the government"); *United States v. Toyobo Co.*, 811 F. Supp. 2d 37, 46 (D.D.C. 2011) ("The government's complaint here alleges . . . that Toyobo's misrepresentations about

Zylon's accelerated deterioration induced the vest manufacturers to sell Zylon vests to the government.").

Courts have found that the fraudulent inducement theory also applies when "a party makes promises at the time of contracting that it intends to break." *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 196 (D.D.C.2011); *see also United States ex rel. Tran v. Computer Scis. Corp.*, 53 F. Supp. 3d 104, 130–31 (D.D.C. 2014) (finding that relator adequately alleged a fraudulent inducement claim by claiming that although the contractor's bid "'represented that a minimum of forty percent (40%) of its subcontractor spending' would go to small business subcontractors . . . [t]his representation was false, as [the contractor] never had any intention of complying with its subcontracting plan"); *Keaveney*, 2016 WL 6988787, at *6 ("To state a claim for fraudulent inducement, a plaintiff may allege that the defendant 'made an initial misrepresentation about its capability to perform the contract in order to induce the government to enter into the contract,' . . . [or may allege] that the government would not have entered into the contract absent a defendant's false statements."). In either situation, FCA liability attaches for later claims submitted because "had the government known about the fraud in the inducement, it never would have entered the contract, and no payments would have been made." *Hockett*, 498 F. Supp. 2d at 70.

Fraudulent inducement may occur in instances of bid rigging. *Id.* at 70 n.33; *U.S. ex rel. Miller v. Bill Harbert Int'l Const., Inc.*, No. CIV.A.95 1231 RCL, 2007 WL 915237, at *2 (D.D.C. Mar. 27, 2007). For example, in *Hess*, electrical contractors entered into a collusive bidding scheme in which they averaged the price of the prospective bids and then chose from among the contractors one who would submit a bid for the averaged amount, while the others submitted higher bids. *Hess*, 317 U.S. at 540 n.1. The Court found that this type of collusive bidding qualified as

a false claims violation.  *Id.* at 543.  Courts in other circuits have also found that bid rigging may result in FCA violations.  *See, e.g.*, *United States v. Azzarelli*, 647 F.2d 757 (7th Cir.1981); *United States ex rel. McGee v. IBM Corp.*, 81 F. Supp. 3d 643, 663 (N.D. Ill. 2015); *United States v. Inc. Vill. of Island Park*, 888 F. Supp. 419, 439 (E.D.N.Y. 1995).

### 4.      Limitations of the False Claims Act

It is important to note that the FCA does not reach all bad behavior undertaken by government contractors.  As noted by the Supreme Court, "[t]he False Claims Act is not 'an all-purpose antifraud statute,' or a vehicle for punishing garden-variety breaches of contract or regulatory violations." *Escobar*, 136 S. Ct. at 2003 (internal citation omitted).  The FCA does not reach breach of contract claims or complaints involving contractual performance when no falsehood exists.  *See U.S. ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 378 (4th Cir. 2008); *Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d at 155.  It also does not reach kickback schemes that lack false claims.  *See Kellogg Brown & Root Servs., Inc. v. United States*, 99 Fed. Cl. 488, 513 (2011), *aff'd*, 728 F.3d 1348 (Fed. Cir. 2013) ("[H]owever strong the policy concerns may be that are implicated by [kickbacks], they are not a substitute for the specific requirements that defendant allege facts showing the falsity of a claim and plaintiff's knowledge of that falsity under § 3729(a)(1).").   In sum, "[t]he FCA is not a catchall anti-fraud provision; it only goes after claims that are false, not claims that are submitted while fraud is afoot." *Hockett*, 498 F. Supp. 2d at 71.

## IV.   ANALYSIS

The parties' briefs and statements of facts contain countless discrepancies and disagreements.  They have each submitted dozens of pages worth of statements of facts and hundreds of exhibits in support.  After wading through the parties' submissions, the Court finds

that, regardless of any disputes of fact, KBR is entitled to judgment as a matter of law.  First, the Court finds that Mr. Barko has failed to offer evidence that a reasonable jury could use to find the existence of kickbacks from D&P to KBR in exchange for contracting favors.  Second, the Court finds that KBR is entitled to judgment as a matter of law on the Counts based on anticompetitive activity because Mr. Barko has failed to show the falsity of claims or that the government was fraudulently induced to enter into a contract.  Third, the Court finds that allegations regarding performance defects cannot constitute the basis of an FCA violation.  Fourth, the Court finds that Mr. Barko has failed to provide evidence showing that KBR knowingly double billed for the purchase of the laundry facilities or that it was obligated to, and failed to backcharge for laundry labor and supplies.  Finally, the Court finds that Mr. Barko cannot succeed on his claims relating to the B6 man camp construction subcontract for many of the same reasons listed above and because his Amended Complaint does not state a claim with regard to the Certified Claim submitted by KBR.

> ### A.  Kickbacks/Bribes

Mr. Barko's arguments revolve largely around an improper relationship between Gerlach and D&P.  He makes numerous allegations regarding kickbacks or bribes accepted by Gerlach or KBR employees from D&P in exchange for a favorable contract award or other contracting favors. FAR Clause 52.203-7 prohibits any person from providing, soliciting, or accepting kickbacks, from including the amount of any kickback in the contract price charged by a subcontractor to a prime contractor, or by a prime contractor to the government, and mandates that contractors shall have in place procedures to detect and prevent kickback violations.  48 C.F.R. 52.203-7.  In certain circumstances, the existence of kickback schemes or non-compliance with anti-kickback laws has been found to be material to the government's decision to pay the claims at issue, resulting in FCA

liability. *See Barrett*, 251 F. Supp. 2d at 33; *U.S. ex rel. Pogue v. Diabetes Treatment Centers of Am., Inc.*, 238 F. Supp. 2d 258, 264 (D.D.C. 2002).

The Court does not decide here whether acceptance of the alleged kickbacks would be material to the government's decision to pay KBR because Mr. Barko has failed to present facts evidencing a genuine dispute regarding whether kickbacks actually occurred. The purported evidence supporting Mr. Barko's allegations is as follows: (1) reports through the COBC Policy, and the fact that KBR has refused to produce its COBC findings, which provides the inference that the investigation showed wrongdoing; (2) other statements by KBR employees regarding kickbacks; and (3) declarations of four former KBR employees allegedly corroborating allegations of kickbacks. The Court finds that none of Mr. Barko's proffered evidence creates a genuine dispute of material fact regarding kickbacks; Mr. Barko does not provide admissible evidence that kickbacks occurred in exchange for contracting favors to D&P.

### 1. Reports of Kickbacks

First, Mr. Barko claims that KBR received reports that Gerlach and other KBR employees were accepting bribes and/or kickbacks from D&P through its COBC policy or other reporting mechanisms. Barko SOF ¶¶ 17, 19, 20. He claims that, on October 20, 2004, a "COBC report was received identifying that KBR managers, Mssrs. Gerlach, Poe, Stallard, Cetnarski and Irizarry, 'have received kickbacks from D&P,'" *id.* ¶ 17, and that Procurement and Supply Manager Paula Battles wrote in a memo that she was told by another subcontracts administrator and a buyer that Gerlach had engaged in unethical practices including the "exchange of money and suppression of competition, [and] receipt of gifts." *Id.* ¶ 19. Mr. Barko sought the results of the COBC investigations of these incidents, over which KBR claimed privilege. This issue was the subject

of several years of litigation.  The Court of Appeals determined that these documents were in fact privileged and were not subject to waiver.  *See KBR II*, 796 F.3d at 152; *KBR I*, 756 F.3d at 760.

The Court finds first that the COBC reports and allegations of kickbacks or bribes are not evidence of kickbacks or bribes sufficient to raise a genuine dispute of material facts.  First, some of this evidence constitutes inadmissible hearsay, particularly Battles' statement that she was told by others that Gerlach had received kickbacks.  The evidence that one who opposes summary judgment presents "must be capable of being converted into admissible evidence. . . .  Verdicts cannot rest on inadmissible evidence." *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000).  Battles' statements cannot be converted into admissible evidence as she would be prohibited from testifying about the alleged conversations regarding kickbacks.  *Id.* (finding that the plaintiff's "evidence about [a conversation between two individuals regarding plaintiff that she was informed of] is sheer hearsay; she would not be permitted to testify about the conversation at trial," and that "[i]t therefore counts for nothing").  Therefore this evidence does not create a genuine dispute of material fact regarding the presence of kickbacks or bribes.

Furthermore, the COBC reports alleging that kickbacks were received from D&P are just that—allegations, not evidence.  A party cannot rely on mere allegations to oppose summary judgment; it must proffer evidence creating a genuine dispute of material fact.  *See MDB Commc'ns, Inc. v. Hartford Cas. Ins. Co.*, 479 F. Supp. 2d 136, 140 (D.D.C. 2007) ("The non-moving party's opposition must consist of more than mere unsupported allegations or denials, and must be supported by affidavits, declarations or other competent evidence setting forth specific facts showing that there is a genuine issue for trial."); *see also Akers v. Beal Bank*, 845 F. Supp. 2d 238, 241 (D.D.C. 2012), *aff'd sub nom. Akers v. Beal Bank & Countrywide Home Loans*, No.

12-7045, 2012 WL 4774676 (D.C. Cir. Oct. 2, 2012) ([F]or the court to accept anything less [than 'factual representations made in a sworn affidavit' or 'direct testimonial evidence'] 'would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial.'"); *Gross v. Smith*, No. 97-7075, 1997 WL 811803, at *1 (D.C. Cir. Nov. 21, 1997) ("Because Gross failed to establish evidence of a genuine factual dispute in response to the defendants' motion for summary judgment on his excessive force claim and adduced no evidence, as opposed to unsworn allegations, on his inadequate medical treatment and interference with treatment claim, summary judgment was proper.").  The allegations here were received through KBR's tip line; they are not supported by actual evidence in the record and are therefore insufficient to defeat summary judgment.

The Court will also not accept the inference that because KBR claimed privilege over the results of the COBC investigations—a privilege which was upheld by the Court of Appeals—the investigations must have revealed wrongdoing.  An assertion of privilege in this context cannot create an adverse inference.  *See Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1344 (Fed. Cir. 2004); *Parker v. Prudential Ins. Co. of Am.*, 900 F.2d 772, 775 (4th Cir. 1990); *Whitney v. City of Milan. Tenn.*, No. 109CV01127JDBEGB, 2014 WL 11411675, at *1 (W.D. Tenn. Feb. 27, 2014); *Astra Pharm. Prod., Inc. v. Beckman Instruments, Inc.*, No. CA-79-1445, 1983 WL 51933, at *4 (D. Mass. Mar. 24, 1983), *aff'd*, 718 F.2d 1201 (1st Cir. 1983).  It is clear that the policy concerns which enshrine "the oldest of the privileges"— including encouraging frank and open discussion, *see Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981)—could not allow for such results.  If the assertion of attorney client privilege could produce an adverse inference "persons would be discouraged from seeking opinions, or lawyers would be discouraged from giving honest opinions.  Such a penalty for invocation of the privilege

would have seriously harmful consequences." *Nabisco, Inc. v. PF Brands, Inc.*, 191 F.3d 208, 226 (2d Cir. 1999) *abrogated by Moseley v. V Secret Catalogue, Inc.*, 537 U.S. 418 (2003); *accord Whitney*, 2014 WL 11411675, at *1 (There is . . . an abundance of authority holding that an adverse inference cannot be drawn from invocation of the attorney-client privilege, as doing so would, to quote some of the cases, 'have seriously harmful consequences,' 'intrude upon the protected realm' of the privilege, and even ultimately 'oblige the client to produce the privileged materials.'" (internal citations omitted)).  Mr. Barko has not offered any caselaw to the contrary nor has he persuasively argued that an adverse inference should be adopted here.

Therefore, Mr. Barko's first two pieces of evidence—the COBC reports and Battles' memorandum, as well as KBR's assertion of privilege over the reports—are not admissible evidence of kickbacks or bribes from D&P to Gerlach or anyone at KBR.

### 2.    *KBR Employee Declarations*

The Court now turns to Mr. Barko's third piece of evidence—declarations of former KBR employees.   Mr. Barko submits the declarations of George Covelli (KBR subcontracts administrator), Suzanne Raku (morale welfare and recreation regional manager), Roy Ramey (B-1 site construction supervisor), and Mr. Barko himself (subcontracts administrator).   None, however, show actual evidence of kickbacks from D&P.   First, George Covelli's declaration contains his concerns that D&P would be unable to perform the B6 man camp subcontract, his assertion that his "observations caused [him] to conclude that Mr. Gerlach had established an improper relationship with D&P," his assertion that D&P did not win the bid competitively and should have been disqualified from bidding, and descriptions of various issues with D&P's performance.   Barko Ex. 64, Covelli Decl., ECF No. 265-18.   It does not, however, describe—

beyond assertions of an improper relationship—specific instances in which Gerlach took kickbacks from D&P, nor does it outright assert that kickbacks were present at all.

Suzanne Raku declares that she confronted Gerlach regarding D&P's lack of performance, that he "became quite agitated and responded that [she] did not know what [she] was talking about and that there were other considerations," and that he "had all the contracts under lock and key and was loathe to share the details of any of them with anyone."  Barko Ex. 136, Raku Decl., ECF No. 265-34.  Again, however, her declaration contains no descriptions of kickbacks or bribes and no assertions that any kickbacks or bribes were given or received.

Mr. Barko's own declaration describes "discussion amongst various coworkers whether Gerlach and Cetnarski were colluding with D&P on a number of issues, including kickbacks," and that he observed that Gerlach and D&P's manager spent "an inordinate amount of time" in each other's offices.  He also describes various other presumably improper behavior, such as Gerlach taking "Rest & Recovery" periods in venues alleged to be hosted by D&P, using sailing as a platform to conduct business in international waters, and the assertion that Gerlach bragged about a BMW that "he had presented to his wife as a result of his work in Iraq for KBR."  Barko Ex. 61, Barko Decl., ECF No. 265-14.  He also reiterates that KBR had received COBC reports indicating kickbacks and that Paula Battles had received reports that Gerlach was taking kickbacks.  *Id.*

Mr. Barko was deposed by KBR.  KBR Ex. 14, Barko Depo., ECF No. 136-3.  He was asked "[w]hat evidence do you have that Mr. Gerlach was either colluding with [D&P] or accepting money or gifts in return for favorable treatment."  *Id.* at 10:5–10:8.  Mr. Barko responded that he had seen Gerlach spend an "inordinate amount of time" in the D&P facility conducting private business.  *Id.* at 10:21–11:4.  But, Mr. Barko admits that he does not know what was discussed during these meetings.  *Id.* at 234:4–234:7.  He also testified that he had discussed sailing in

international waters with Gerlach, but that he did not make a connection between that statement and Gerlach's relationship with D&P at the time and that there was no mention of D&P during this discussion. *Id.* at 12:16–13:8, 239:7–241:6. Mr. Barko then discussed Gerlach's relationship with Rami Oweis of D&P, noting that after Mr. Oweis died, Gerlach stated that if not for Mr. Oweis, Gerlach would not have his sailboat and that he owed the last six and a half years of his life in Jordan to Mr. Oweis. *Id.* at 13:8–14:19. Mr. Barko also stated that Gerlach spoke about a BMW for his wife, but that he also did not "connect that with any opportunities that came to [Gerlach] as a result of his friendship with [D&P]" and states that there was no mention of D&P in relation to the BMW. *Id.* at 12:5–16:11, 238:20–238:22. Mr. Barko also repeated "rumors" from the camp that Gerlach spent time on a yacht courtesy of D&P, *id.* at 16:13–16:21, and that Gerlach wore a Rolex watch acquired at the hands of D&P, *id.* at 20:15–21:13. In addition, he testified about a rest and relaxation trip where Gerlach bragged about spending $20,000, but also stated that he did not know where the trip or the money came from, and that there was no reference to D&P. *Id.* at 41:8–41:22, 241:7–242:7. Finally, with regard to the laundry subcontracts, Mr. Barko acknowledged that he had no direct evidence that D&P had a role in KBR's award decision. *Id.* at 261:5–262:12. In sum, Mr. Barko failed to provide testimony evidencing bribes or kickbacks. He only disclosed rumors or admitted that he did not know whether D&P was involved in the various luxuries apparently enjoyed by Gerlach.

Ramey's declaration comes the closest to providing actual evidence of kickbacks or bribes. It describes preferential treatment received by D&P and details the following situation that he observed in the D&P field office: "David Poe [KBR's B1 site manager] was standing next to the D&P supervisor. There was an empty envelope lying on the desk between them. Mr. Poe had a large stack of bills in his hand the top one being a $100 bill. I watched as Mr. Poe put the stack of

bills into his pocket.  Poe made a comment that he was making change for the D&P supervisor."
Barko Ex. 141, Ramey Decl. ¶ 7, ECF No. 265-34.  Ramey reported the incident, which was
investigated by KBR.  *Id.* ¶ 8. The Court acknowledges that these differing stories—Ramey's
perception of a bribe or kickback versus Poe's explanation of making change—could create a
genuine dispute of material fact *if* Mr. Barko had claimed that Poe (on behalf of KBR) was
receiving kickbacks on the specific contracts at issue resulting in the submission of material false
claims to the government.  Mr. Barko's complaint, however, nowhere even mentions Poe, and his
opposition to KBR's motion for summary judgment does not link this event in the field office to
the submission of inflated costs to the government.

        None of Mr. Barko's declarations persuade this Court that he has raised a genuine dispute
of material fact regarding kickbacks or bribes between KBR and D&P.  The evidence submitted
in support of such claims is inadmissible, consists of mere allegations, or fails to actually show the
existence of bribes or kickbacks.

        Having found that Mr. Barko has failed to offer evidence of kickbacks or bribes, the Court
is left with various bidding, procurement, or performance issues related to each contract.  The
Court will first turn to the second largest aspect of Mr. Barko's claims—anticompetitive
subcontract bidding (which is largely tied up with the allegations of kickbacks)—and then will
address the issues of performance defects as a basis for FCA violations, Mr. Barko's claims
relating to double billing on the laundry subcontracts, and Mr. Barko's claims relating to the man
camp construction contract.  The Court finds that summary judgment in favor of KBR is
appropriate in each situation.

        **B.**      **Anticompetitive Bidding and Procurement**

        The Court now addresses the issues that constitute a large portion of Mr. Barko's claims—
anticompetitive bidding and procurement.  The parties strongly dispute whether the subcontracts

at issue were competitively bid.  Barko claims that the man camp construction contract was improperly awarded to D&P and that PPI was improperly excluded from consideration; that KBR failed to solicit enough subcontractors for the laundry subcontracts (knowing that another subcontractor had already priced itself out) and prematurely awarded the bid to D&P; that KBR steered the water well drilling subcontract to D&P, rigged the bid, and awarded it to D&P at grossly inflated prices; and that Gerlach falsely claimed to KBR managers that D&P was the only approved source for the labor subcontract, then induced another subcontractor to withdraw and never contacted other bidders, and created the false illusion that D&P's prices were competitive.  Barko also claims that certain changes on the existing subcontracts were not competitively bid.  KBR argues that the subcontracts were in fact competitively bid and fairly won by D&P.  As explained in greater detail below, KBR submitted invoices for payment to government on forms known as public vouchers, and argues that such forms contained no false statements or claims.

The Court finds that, regardless of any dispute of fact relating to the competitiveness of the subcontract bidding process, these allegations cannot form the basis of Barko's FCA claims.  To succeed on an FCA claim, one must show that a claim or statement was false—either because it was factually false, was an express false certification, or was an implied false certification.  FCA liability also attaches when the government is fraudulently induced to enter a contract.  Mr. Barko has failed to show the element of falsity or fraudulent inducement based on anticompetitive bidding.

### 1.   *Factual Falsity*

First, Mr. Barko is not alleging that any of the claims submitted to the government were factually false because of statements regarding the subcontract bidding process.  For example, Mr.

Barko does not argue that KBR submitted claims for costs not actually incurred.[3]  He does not argue that the public vouchers contained factually false statements at all.  Thus, Mr. Barko has failed to establish factual falsity of the claims submitted.

### 2.   Legal Falsity

In addition, the existence of allegedly anticompetitive activity surrounding the subcontract bidding processes does not translate into the existence of legally false claims.  Again, express false certification may occur when a claimant asserts compliance with a statute, regulation, or contractual term, but has not actually complied.  *See Kellogg Brown & Root Servs., Inc.*, 800 F. Supp. 2d at 154.  Implied false certification occurs when "the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's noncompliance with a statutory, regulatory, or contractual requirement," and that "omission renders those representations misleading."  *Escobar*, 136 S. Ct. at 1995.  Neither occurred here.

### a)   Express False Certification

Under the contracting scheme, "KBR extract[ed] from its accounting system all direct and indirect allowable costs incurred on each Task Order, including subcontract costs, and submit[ted] them to the Government on an invoice known as a 'public voucher.'  The public voucher was a standard form and contain[ed] no certifications to the Government as a condition of receiving payment."  Ritondale Decl. ¶ 9.  The Court has examined the relevant public voucher—Standard Form 1034—submitted by KBR as part of the record.  KBR Ex. 114, Purchase Voucher, ECF 136-11.  It contains the following information: 1) the government department and location; 2) the date

---

[3] Note that under the contract at issue here KBR was entitled to be reimbursed for direct and indirect costs incurred performing the assigned work, "not for delivering any particular results."  Ritondale Decl. ¶¶ 6–7.  Mr. Barko has not directly disputed this element of the contract.

the voucher was prepared; 3) the contract number and date; 4) the requisition number and date; 5) the voucher number and the schedule number; 6) payor and payee information; 7) shipping information; and 8) specific order information such as the number and date of order, the date of delivery or service, a description of the articles or services, quantity, cost, and total amount invoiced.  *Id.*  The most substantive section of the voucher asks for a description of the articles or services, the item number of the contract or Federal supply schedule, and "other information deemed necessary." *Id.*

The only certification on the voucher reads as follows: "Pursuant to the authority vested in me, I certify that this voucher is correct and proper for payment."  *Id.*  It does not contain any certifications to the government regarding the bidding process or compliance with any law, regulation, or contract.  Nor does Mr. Barko claim that it does.  The Court finds that a certification that the voucher is "correct and proper" does not mean that KBR certified that the amount invoiced was reasonable because the subcontract was competitively bid, or even that it was in compliance with the terms of the LOGCAP III contract or relevant regulations.  *See United States ex rel. Thomas v. Black & Veatch Special Projects Corp.*, No. 11-2475-CM, 2013 WL 3878168, at *2–3 (D. Kan. July 26, 2013) (finding that the certification on Standard Form 1034 "relate[s] to the propriety of the fiscal data and reports submitted to the government," and rejecting the relators' argument that this statement certifies compliance with the contract terms); *United States ex rel. McLain v. Fluor Enterprises, Inc.*, No. CIV.A. 06-11229, 2013 WL 6002828, at *5 (E.D. La. Nov. 12, 2013) (finding that relators' reliance on the "correct and proper for payment" language failed because they "point[ed] no provision of the agreement or the Federal Acquisition Regulations (FAR) that ties payment authorization to a certification of holistic compliance with either the . . . regulations or the contract itself"); *see also United States v. President & Fellows of Harvard Coll.*,

323 F. Supp. 2d 151, 181 (D. Mass. 2004) (rejecting the argument that FCA liability existed where the defendant certified, in a request for funds, that payments were proper, even though the request was approved on the basis of false reports). Absent evidence that the certification did in fact mean that KBR had not engaged in anticompetitive bidding, or that it was in compliance with the LOGCAP III contract or accompanying regulations, Mr. Barko has failed to demonstrate the existence of an express false certification.

The Court also agrees with KBR that Mr. Barko's argument that the cost of certain subcontracts was unreasonable—*i.e.*, inflated as a result of bid rigging or collusion with D&P—is insufficient to establish the legal falsity of a claim because the public vouchers said nothing about cost reasonableness, they simply stated the cost itself. Other courts have considered this issue and have reached the same conclusion. In *United States ex rel. Watkins v. KBR, Inc.*, the court considered FCA claims related to the same master contract—LOGCAP III. 106 F. Supp. 3d at 951. The relator claimed that the defendants "violated the FCA by submitting invoices in order to receive payment for costs incurred under the LOGCAP III that were not, in fact, allowable under the applicable regulations" because the defendants knew that the costs of a charter flight service contract between KBR and a subcontractor "were actually unreasonable in that they could have saved $75 million dollars by implementing [a different subcontract] and no reasonable person would forego $75 million dollars in savings." *Id.* at 964. The court found that under 48 C.F.R. § 52.232–25, which was included in the LOGCAP III contract and the relevant Task Order, "invoices submitted to the Government must satisfy certain criteria," but that "none of the criteria mentioned in that particular regulation is an affirmative statement that the cost is allowable or reasonable." *Id.* Therefore, because KBR was not required to certify that the cost was reasonable, the relator's

claims that the cost was unreasonable did not state a claim for an FCA violation.  *See id.* at 964–67.

In *United States ex rel. Godfrey v. Kellogg, Brown & Root, Inc.*, the Eastern District of Virginia considered whether to dismiss FCA claims based on the submission of DD 250 forms—material inspection and receiving reports.  No. 1:05CV1418 GBL, 2008 WL 9878351, at *4 (E.D. Va. Mar. 13, 2008), *aff'd sub nom. United States ex rel. Godfrey v. KBR, Inc.*, 360 F. App'x 407 (4th Cir. 2010).  The court found that the relator was "unable . . . to indicate which terms, if any, of the contract, require express certification, or what exact information the contractor is required to certify."  *Id.*  Quoting another case which dismissed FCA claims against KBR because "[t]here [was] no indication that KBR was required to certify as a condition of receiving payment anything other than that the [Form 1034] voucher was correct and proper," and "certification forms and the form 1155 and DD 250 do not . . . demonstrate a lie by the government contractor," the court found that the submission of the Form DD 250 did not constitute a false certification.  *Id.*

In sum, Mr. Barko has failed to present evidence regarding certifications on the public vouchers, *i.e.*, KBR's claims for payment, that would allow a reasonable jury to find the existence of express false certifications.

*b)      Implied False Certification*

Mr. Barko has also failed to demonstrate evidence of implied false certifications.  Mr. Barko correctly notes that liability may exist when one shows that a "contractor withheld information about its noncompliance with material contractual requirements."  *SAIC II*, 626 F.3d at 1269.  The contours of Mr. Barko's implied false certification argument are unclear; he does not identify which material contractual requirements KBR was not complying with, and then subsequently when it failed to disclose its noncompliance to the government.  *Cf. United States ex*

*rel. Keaveney v. SRA Int'l, Inc.*, No. CV 13-855 (EGS), 2016 WL 6988787, at *7 n.4 (D.D.C. Nov. 29, 2016) ("While an implied certification theory of FCA liability rests on allegations that a 'contractor withheld information about its noncompliance with material contractual requirements' . . . Relators here have not identified any relevant contractual requirements pertinent to Defendants.").  Mr. Barko seems to imply that KBR withheld the following types of information from the government: 1) that Gerlach or others were accepting bribes or kickbacks from D&P; 2) that KBR was otherwise engaging in anticompetitive bidding; and 3) the results of the COBC investigations.   He states that "[t]he Government was not fully informed about any of the allegations of bribery or kickbacks and other bid-rigging/manipulations that were raised" and that "KBR did not disclose the existence of the COBC investigations, let alone the underlying facts, to the Government," and therefore Mr. Barko is "entitled to an inference that KBR's 'investigation showed wrongdoing but KBR nonetheless made no report to the government.'"  Pl.'s Opp'n at 24–25.

Again, although compliance with anti-kickback laws or contractual provisions may be material to a government's decision to pay, and therefore, withholding information about noncompliance with such laws or provisions may give rise to liability under a theory of implied false certification, *see Barrett*, 251 F. Supp. 2d at 32–34, evidence of noncompliance does not exist here.  The Court has already found that Mr. Barko has failed to present evidence of kickbacks received by Gerlach or KBR from D&P.  In addition, the Court repeats that it will not infer that the COBC investigations revealed wrongdoing from KBR's claim of privilege over the reports.  It also finds that the Court of Appeals' statement that one could infer "that the [COBC] investigation[s] showed wrongdoing but KBR nonetheless made no report to the government," *KBR II*, 796 F.3d at 146, does not require such an inference.  The Court of Appeals found that this

inference *could* be drawn, in direct contrast to the inference previously advocated by KBR that the COBC reports did not show wrongdoing, not that this inference *must* be drawn. *See id.* Again, the only direct evidence that Mr. Barko presents is that relating to Mr. Poe, but Mr. Barko fails to link this event to the submission of false claims. Absent other evidence of kickbacks or bribes, the Court will not infer that the investigations revealed wrongdoing and that KBR failed to report such wrongdoing to the government.

Finally, it appears that Mr. Barko is arguing that that KBR was otherwise engaging in anticompetitive bidding. Other than the FAR clause prohibiting kickbacks, 48 C.F.R. 52.203-7, Mr. Barko does not identify applicable regulations or contract provisions that KBR violated, which it then failed to disclose to the government. *Cf. Hockett*, 498 F. Supp. 2d at 68 ("Relator has not identified a regulation or law in this case that specifically conditions payment on compliance with a law, regulation, or other requirement that IPH violated."). Because this Court has already found that Mr. Barko lacks direct evidence that kickbacks occurred,, Mr. Barko may not rely on a theory of implied false certification to succeed on his FCA claims.

### 3.   Fraudulent Inducement

Finally, Mr. Barko raises the theory of fraudulent inducement to argue that FCA violations occurred. The Court finds, however, that Mr. Barko has failed to show that the government was fraudulently induced to enter any contract with KBR. Fraudulent inducement exists where a contract was procured by fraud or when a party to a contract makes promises at the time of contracting that it intends to break. *See Bettis*, 393 F.3d at 1326; *Schwedt*, 59 F.3d at 199; *Head*, 798 F. Supp. 2d at 196.

Here, however, KBR's actions do not fall into either of the aforementioned categories. KBR entered into the LOGCAP III contract with the government. It then entered into various

subcontracts with D&P.  Mr. Barko does not allege, or provide evidence showing, that KBR somehow fraudulently induced the government to enter into the LOGCAP III contract with it.  Nor does he allege, or provide evidence showing, that KBR made some promise while entering the LOGCAP III contract that it never intended to fulfill.  Furthermore, although the government issued Task Orders to KBR for certain services, Mr. Barko again does not allege, or provide evidence showing, that KBR either fraudulently induced the government to issue any Task Orders, or made promises in relation to the Task Orders that it never intended to fulfill.  *Cf. Watkins*, 106 F. Supp. 3d at 957 (finding that a fraudulent inducement case was "easily distinguishable from this case because there is no allegation here that the LOGCAP III or any of its Task Orders were procured by fraud such that invoices for payment under them are tainted.").

Rather, Mr. Barko focuses on the subcontracting environment between KBR and D&P, arguing that they were rigging the subcontracting bidding process to steer contracts to D&P.  For example, Mr. Barko claims that D&P should have been disqualified from the man camp construction contract, but instead a suitable competitor (PPI) was improperly excluded from consideration; that Gerlach did not solicit enough bids for the laundry subcontract and improperly awarded it to D&P over Rezayat; that KBR improperly steered the well drilling subcontract to D&P by rigging the bids to favor D&P at grossly inflated prices; and that Gerlach engaged in various anti-competitive activities designed to ensure D&P would receive the labor subcontract.

The Court has already found that Mr. Barko has not presented evidence that Gerlach or others at KBR were receiving bribes or kickbacks in exchange for awarding subcontract to D&P. More importantly, even if Mr. Barko had produced such evidence, he still would not succeed on his theory of fraudulent inducement because none of the alleged rigging occurred with respect to the LOGCAP III contract or with the issuance of Task Orders.  He has not for example, alleged

that KBR and D&P improperly colluded in such a way that they induced the government to award the LOGCAP III contract to KBR, or to pay a certain amount for the LOGCAP III contract, or to issue certain Task Orders.  In contrast, fraudulent inducement existed in *Hess* due to classic bid rigging—an agreement amongst bidders regarding their proposals and the ultimate awardee of the contract.  *Hess*, 317 U.S. at 540 n.1, 543.

This case is also distinguishable from *Murray & Sorenson v. United States*, the other case cited by Mr. Barko in support of his theory of fraudulent inducement.  In *Murray & Sorenson*, Hanson, a purchasing agent of two contractors building a naval base for the United States under cost-plus-fixed-fee contract, solicited competitive bids for materials and then submitted a report with recommendations to a government officer. *Murray & Sorenson v. United States*, 207 F.2d 119, 121 (1st Cir. 1953).  Once a naval officer approved a bid, the contractor issued an order to the successful bidder, after which the Navy Department paid the contractor, who then paid the supplier (the bidder).  *Id.*  Hanson had a relationship with the secretary and treasurer of one of the bidders (a manufacturer), George W. Sorenson.  *Id.*  Hanson received money and gifts from Sorenson in exchange for contracting favors.  Hanson advised Sorenson that its bid for faucets was low, and that a higher bid would be fair, after which Sorenson raised the price.  *Id.* at 121–22.  The district court did not find that the defendants had deliberately presented false, fictitious, or fraudulent claims, nor did it find that documents containing fraudulent or fictitious statements or entries existed.  *Id.* at 122.  It did find, however, that "Sorenson knew that the faucets were charged by the contractors to the United States under the cost-plus-a-fixed-fee contracts, and . . . that Hanson, Sorenson and the corporation had conspired with one another to defraud the United States."  *Id.*  The payments from Sorenson to Hanson were made in furtherance of the conspiracy. *Id.*

The First Circuit upheld the district court's finding of a violation of the False Claims Statute. It found that the evidence supported the conclusion that Hanson, Sorenson, and the corporation acting through Sorenson "had at least a tacit understanding" resulting in the government paying a higher amount for the faucets than it would have absent such an understanding. *Id.* at 123. The Court found that although this case was "not a case of collusive bidding by ostensible competitors like [*Hess*], the tendency and character of the understanding between Hanson and the defendants is just as mischievous to the public, for it, like a secret agreement between bidders, has the necessary effect of increasing the price which the government eventually has to pay." *Id.* It also found that this case had "an element of falsehood comparable to that in *Hess*," namely, "the secret tip given by Hanson to Sorenson that the latter could raise his bid on behalf of the corporate defendant for faucets to a price higher than would otherwise have been submitted." *Id.* In sum, "in *Hess* there was an implied false representation that the bids were competitive, and in this case there was an implied false representation that the bids were at a figure which the corporate defendant would have submitted in competition instead of at a somewhat higher figure suggested by the contractors' purchasing agent to Sorenson." *Id.* at 124.

In *Murray & Sorenson*, evidence existed that the contractor and subcontractor agreed to inflate the cost of the subcontract in exchange for gifts. Here, again, Mr. Barko has not presented evidence of agreements between D&P and Gerlach or anyone at KBR to inflate the costs of the subcontracts in exchange for kickbacks. Moreover, in *Murray & Sorenson* the government relied on the prime contractor, who found an appropriate subcontractor, which was approved by the government who then paid the prime contractor. The contractor and the subcontractor fraudulently induced the government to enter the contract at issue with inflated costs. Here, however, Mr. Barko has presented no evidence showing that the government was induced to enter the LOGCAP

III contract or to issue any specific Task Orders due to actions of KBR, D&P, or others.  Instead, it seems that Mr. Barko is claiming that after the government and KBR entered into the LOGCAP III contract or the Task Orders, KBR later engaged in anticompetitive conduct to steer subcontracts to D&P.  This is not fraudulent inducement.  Any claims submitted by KBR to the government are not tainted by fraud associated with the procurement of its contracts with the government, and are not therefore cognizable under the FCA based on a theory of fraudulent inducement.

In sum, there is simply no evidence that anything KBR and/or D&P did caused the government to award the LOGCAP III contract to KBR or issue Task Orders, or that it made a promise it intended to break.  *Cf. United States ex rel. Westrick v. Second Chance Body Armor Inc.*, 128 F. Supp. 3d 1, 19 (D.D.C. 2015) (finding that government's fraudulent inducement theory could not survive and granting partial summary judgment where the government accused the defendant of submitting manipulated data because the government failed to show that it relied on the data when making contract modifications, *i.e.*, that the manipulated data caused it to make the modifications);  *United States ex rel. Graves v. ITT Educ. Servs., Inc.*, 284 F. Supp. 2d 487, 503 (S.D. Tex. 2003), *aff'd*, 111 F. App'x 296 (5th Cir. 2004) (originally dismissing relators' fraud in the inducement claim because relators failed to allege facts showing that the defendant had no intention of complying with certain provisions when it entered the contracts at issue, and finding that nonperformance—*i.e.*, repeated unfulfilled promises—does not state a claim for fraudulent inducement).  Mr. Barko therefore cannot rely on a theory of fraudulent inducement as a basis for his claims regarding anticompetitive bidding and activity.

Thus, Mr. Barko has largely failed to present evidence creating a genuine dispute of material fact regarding the falsity of claims—specifically related to anticompetitive bidding and procurement—submitted to the government on public vouchers.  He has also failed to present

evidence creating a genuine dispute of material fact regarding fraudulent inducement because he has not shown that the government was induced to enter into the LOGCAP III contract with KBR or to issue any Task Orders.  Accordingly, the Court will grant summary judgment in favor of KBR on Counts I, II, III, VI, IX, X, XIV, and XV all of which relate, at least in part, to allegations of anticompetitive bidding or procurement.

### C.     Performance Defects

The Court now briefly turns to Mr. Barko's allegations regarding various performance related issues and finds that these cannot form the basis of his FCA claims.  Mr. Barko describes numerous defects in the construction of the man camp—such as defective welding and the erection of only one steel foundational structure long after the project was set to be completed—and various issues relating to the drilling of wells—such as inability to commence drilling in a timely fashion and the production of poor quality water.  These allegations cannot form the basis of an FCA claim. As this Court has already explained, the FCA does not reach all complaints involving contractual performance.  The allegations regarding poor performance sound in breach of contract, and, as noted by the Fourth Circuit, "[i]f every dispute involving contractual performance were to be transformed into a *qui tam* FCA suit, the prospect of litigation in government contracting would literally have no end."  *Wilson*, 525 F.3d at 373; *see also Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 789–90 (4th Cir. 1999) ("[T]his count amounts to no more than an allegation of poor management, which, as the district court noted, is not cognizable under the False Claims Act.").  Although the government may choose to assert such a claim, Mr. Barko cannot do so under the guise of the False Claims Act.  *Cf. Wilson*, 525 F.3d at 377 ("[A]lthough Relators posit that KBR did not properly perform under Task Order 43, the United States government—the actual party to the contract—has not expressed dissatisfaction with KBR's performance in the form of a breach of contract action.").

Accordingly, the Court will grant summary judgment in favor of KBR on Counts VII, VIII, and XV, all of which relate, at least in part, to allegations of deficient performance or nonperformance.

### D.     Double Billing and Failure to Backcharge

Finally, Mr. Barko claims that double billing on D&P contracts was "rampant," specifically on the laundry subcontracts.  D&P was awarded the laundry subcontracts and was responsible for—and therefore was paid to—construct laundry facilities, provide labor at the facilities, and provide supplies at the facilities.  Mr. Barko argues that KBR doubled billed the government for the laundry facilities when it purchased the facilities on behalf of the government, even though the original subcontract vested title to such facilities in the government.  He also argues that KBR double billed for labor at the laundry facilities when it failed to backcharge D&P for labor that it (KBR) provided when D&P failed to fulfill its contractual terms of providing labor.  Finally, Mr. Barko claims that KBR similarly double billed the government for laundry supplies when it failed to backcharge D&P for supplies it (KBR) provided.

### 1.     Double Billing for Laundry Facilities

Mr. Barko first claims that KBR double billed for the laundry facilities, stating that KBR engaged in a renegotiation of the laundry subcontracts to obtain title to the laundry facilities for the government from D&P, even though title was already vested with the government (not with D&P).  Pl.'s Opp'n at 17–18.  KBR argues that no double billing for the laundry facilities occurred because it was understood that D&P would retain title to the facilities, and that there is no evidence that KBR knowingly double billed for the facilities.  Defs.' Reply at 18–19.

Knowledge is an essential element of an FCA violation.  *See* 31 U.S.C. § 3279(a)(1)(A)–(B); 31 U.S.C. § 3729(b)(1)(A).  Mr. Barko has failed to sustain his burden of showing that KBR

knew that title to the facilities vested with the United States government from the outset, and therefore took title on behalf of the government during the renegotiation and knowingly submitted a false claim by double-billing the government. Mr. Barko relies solely on the definition of "owner" and other provisions in the laundry subcontract, *see* Barko Ex. 145, Laundry Subcontract, ECF No. 265-35, as well as FAR Clause 52.245-2, which discusses government property. The laundry subcontract, in its definitions section, defines "owner" as the United States government. Laundry Subcontract at 3 (Section 1.2). It also states that the subcontractor will not claim any lien against the sublet work or the property on which the work is performed, and warrants that the title to all materials, supplies, and equipment installed by the subcontractor is free from any claims, liens, security interests, or charges. *Id.* at 11 (Section 3.3). Finally, it states that "[t]he Sublet Work in progress and all of the Owner- and General Contractor-furnished items and all of Subcontractor-furnished labor, materials, plant equipment, supplies, and other things intended for the Sublet Work shall be the property of General Contractor." *Id.* at 13 (Section 6.1.1). FAR Clause 52.245-2 states that "[t]he Government shall retain title to all Government-furnished property" and that "[t]itle to each item of facilities and special test equipment acquired by the Contractor for the Government under this contract shall pass to and vest in the Government when its use in performing this contract commences or when the Government has paid for it." Barko Ex. 158, FAR Clause 52.245-2, ECF No. 265-36.

KBR disagrees with Mr. Barko's interpretation of the subcontract, noting that "owner" is not used in the clauses regarding liens or title, cited above. Defs.' Mot. Sum. J. at 18. It argues that the subcontract does not contains terms regarding title to facilities constructed by D&P, the subcontractor, and the specific terms of the contract "do not include the compensation terms they would need to include in order to invoke the 'ownership' clause." *Id.* at 19. KBR also introduces

39

evidence of KBR and the government's understanding of the subcontract, arguing that the government made "clear that 'KBR is not in the business of procuring buildings for the army," and that "[c]onstruction of facilities in the pursuit of services provided under LOGCAP should be done with facilities that are temporary in nature." Defs.' Mot. Sum. J. at 17. KBR claims that Gerlach was directed by KBR to renegotiate the contract to acquire title in order "to meet what KBR understood *the military's* expectations for how LOGCAP III service contracts should be structured at this point in the war." *Id.* Finally, KBR states that it "and the Government shared the understanding that, under the defense appropriation statutes in place at the time these subcontracts were awarded, the funds made available to KBR to pay its subcontractors during the relevant time period were not considered 'military construction' funds and were not intended to be used to contract for the construction of permanent or semipermanent buildings or facilities that were to be owned by the Government." *Id.*

The Court finds that the contract here is ambiguous. It is true that the laundry subcontract defines "owner" as the government, but it is also true that "owner" is not used in either of the sections identified by Mr. Barko—*i.e.*, those regarding liens and title to labor, materials, equipment and supplies. In fact, the latter section states that such items are the property of the "General Contractor." *See* Laundry Subcontract at 13 (Section 6.1.1). The subcontract directs the subcontractor to provide, emplace and maintain a laundry facility, *see* Laundry Subcontract at 3 (Section 2.1), but it does clearly state who will hold title to the facility.

FAR Clause 52.245-2 also does not clearly answer the question. First, it states that "[t]he Government shall retain title to all Government-furnished property," FAR Clause 52.245-2(c)(1), but the facilities here were not furnished by the government, They were furnished by D&P. Next, it states that "[a]ll Government-furnished property and all property acquired by the Contractor,

title to which vests in the Government under this paragraph (collectively referred to as Government property), are subject to the provisions of this clause." FAR Clause 52.245-2(c)(2). Again, the government did not furnish the facilities, D&P did. In addition, the parties dispute whether property was acquired by the Contractor, KBR. Mr. Barko argues that facilities belonged to the government from the outset, but KBR argues that it did not acquire the facilities on behalf of the government until the renegotiation. This part of the FAR Clause does nothing to resolve the dispute. Finally, it states that "[t]itle to each item of facilities . . . acquired by the Contractor for the Government under this contract shall pass to and vest in the Government when its use in performing the contract commences or when the Government has paid for it, whichever is earlier, whether or not title previously vested in the Government." FAR Clause 52.245-2(c)(3). Again, this Clause is of little help because the parties dispute if and when KBR acquired title to the laundry facilities for the government. Due to this ambiguity, KBR relies in large part on its discussions with the government, and their understanding of ownership and title.

The Court finds that because the contract did not clearly vest title to the laundry facilities in the United States government, and Mr. Barko relies on the terms of the contract (and the incorporated FAR clause) to prove that KBR knew that government held title to the facilities at the time KBR renegotiated to obtain title and then submitted a false claim to the government for the laundry facilities, Mr. Barko has failed to proffer evidence satisfying the essential element of scienter. Mr. Barko has not shown that KBR either actually knew that the contract vested title with the government, or that it acted with deliberate ignorance of or with a reckless disregard for such a fact. *See* 31 U.S.C. § 3729(b)(1)(A); *United States v. Sci. Applications Int'l Corp.*, 626 F.3d 1257, 1274–75 (D.C. Cir. 2010) ("Although Congress defined 'knowingly' to include some forms of constructive knowledge, its definition of that term imposes liability for mistakenly false

claims only when the defendant deliberately avoided learning the truth or engaged in aggravated gross negligence."). Therefore, the Court will grant summary judgment on Counts IV and V, which relate to the alleged double purchase of the laundry facilities.

### 2. Double Billing for Laundry Labor

In addition, Mr. Barko claims that KBR double billed for laundry labor because it (KBR) never backcharged D&P for labor that it (KBR) supplied. D&P utilized a second tier subcontractor, TEPE, to provide labor at the laundry facilities. The parties do not dispute that a TEPE walkout of some degree occurred after a TEPE employee was executed by Iraqi insurgents on or around July 27, 2004. What happened next, however, is the subject of disagreement. Mr. Barko claims that TEPE employees walked off all three sites and, when D&P was unable to provide replacement labor, KBR stepped in and operated the laundries on all three sites. He argues that KBR—via Gerlach—then failed to backcharge D&P for the cost of this labor, which resulted in double billing to the government. To establish that the TEPE employees walked off all three sites, Mr. Barko relies on a KBR Award Fee Board Presentation which states that the TEPE employee execution resulting in TEPE pulling out of laundry services at B1, B2, and B3, *see* Barko Ex. 27, ECF No. 265-5, and an internal KBR email stating the same, *see* Barko Ex. 149, ECF No. 265-35. To show that KBR then provided replacement labor, Mr. Barko submits an April 20, 2005 report from KBR's B-sites area manager Tommie Hicks stating that "there have been a number of problems at the laundry with subcontractors in the past 7 months" and that "KBR is supplying all the needed supplies to operate and perform all daily laundry tasks." *See* Barko Ex. 152, ECF No. 265-35.

To establish that Gerlach was asked to backcharge for replacement labor, Mr. Barko relies on a September 24, 2004 email from KBR's B site deputy project manager, David Stallard to

Gerlach, stating that he "want[ed] to submit an invoice to back charge D&P for Expat performance in the laundries at all three sites."  Barko Ex. 150, ECF No. 265-35.  At this point the parties appear to agree that KBR backcharged for replacement labor at the B1 site, *see* Barko Ex. 148, Subcontract GU84-VC-SB10005 Backcharge Executive Summary, ECF No. 265-35, although Mr. Barko takes issue with the fact that the backcharge was executed a year late.  But, to show that KBR failed to backcharge at the B2 and B3 sites, Mr. Barko submits his own declaration and the declaration of Suzanne Raku, KBR's morale welfare and recreation regional manager.  Mr. Barko declares that "[t]here is no record of KBR backcharging D&P for the cost of providing the laundry services for a period of seven months at B2 and B3."  *See* Barko Decl. ¶ 17.  While Ms. Raku's declaration states that "D&P never had the labor force they were required to have on site," it does *not* state that KBR failed to backcharge at the B2 and B3 sites.  *See* Raku Decl.

KBR tells a different story.  KBR states that TEPE employees walked off the B1 site, resulting in KBR providing replacement labor at B1 from August 3, 2004 through October 2, 2004.  KBR backcharged D&P for this labor on October 5, 2005, which, as noted above, Mr. Barko does not dispute.  At this point, KBR's version of the events becomes somewhat unclear.  In its Statement of Facts, KBR does not address the use of replacement labor at B2 or B3, or therefore whether it backcharged for such labor.  In its reply brief, however, KBR states that a backcharge was taken at B3, and submits backcharge documentation for the B3 site.  *See* KBR Ex. 151, B3 Site Backcharge Documents, ECF No. 268-14.  It then states that the subcontract files do not show that replacement labor was even used at B2, citing documents that show the backcharges for B1 and B3 only.

Therefore, the evidence shows that backcharges were in fact made for the B1 and B3 sites.  The remaining issue thus boils down to 1) whether replacement labor was used at B2, and 2)

whether KBR failed to backcharge for such labor.  The Court finds that Mr. Barko has failed to

sustain his burden of showing that replacement labor was used at B2.  The evidence that he relies

on does not establish such a fact.  First, the Hicks report is titled "Subcontractor report for B1 AL

ASAD Laundry."  *See* Barko Ex. 152.  It does not name or discuss the B2 site specifically.  *See id.*

In addition, the Stallard email discusses the desire to backcharge at all three sites, but does not

state that replacement labor was used at B2.  *See* Barko Ex. 150.  Although theoretically the report

and the email could eventually lead to evidence showing that replacement labor was used, it does

not constitute admissible evidence that replacement labor was in fact used at B2.  Because the

undisputed evidence shows that backcharges were taken at B1 and B3, and because Mr. Barko has

failed to present sufficient evidence showing that replacement labor was used at B2, the Court will

grant summary judgment to KBR on Counts XII and XIII, which relates to double billing for

laundry services.[4]

### 3.      *Double Billing for Laundry Supplies*

Finally, Mr. Barko alleges that KBR double billed for laundry supplies, claiming that his

own audit showed that KBR repeatedly "[payed] for laundry supplies and laundry facility

maintenance when thoseare costs were covered by either the original subcontract or the change

order 1 to the laundry subcontracts," resulting in $400,000 worth of overcharges that were never

backcharged.  Barko SOF ¶ 76.  In support, he submits the laundry subcontract, which states that

the subcontractor shall "[p]rovide all . . . labor, material,  . . . supplies,  . . . and all other  things

necessary to provide laundry services," *see* Barko Ex. 145, Laundry Subcontract Section 2.0, ECF

---

[4] The Court notes that in Count XII, Mr. Barko claims that KBR and D&P double billed for labor to perform laundry services using the Master Labor agreement and the laundry subcontracts.  *See* Am. Compl. ¶¶ 532–37.  In his opposition brief and statement of facts, however, the only double billing for laundry services clearly identified by Mr. Barko are those that allegedly occurred in connection with the TEPE walkout.  Therefore, the Court finds that summary judgment in favor of KBR is appropriate on Count XII as well.

No. 265-35, and the subcontract change order, which also states that the subcontractor shall provide all materials necessary to provide laundry services, *see* Barko Ex. 146, Laundry Subcontract Change Order, ECF No. 265-35.  To support his claim that KBR paid $400,000 for supplies and maintenance which was never backcharged, Mr. Barko submits his own declaration which states the following:

> After receiving numerous complaints from the laundry supervisors at all B-sites about shortage of laundry supplies, I determined to research and document the facts.  During the last month prior to my leaving Iraq, I reviewed all Purchase Orders (PO) related to the B-sites laundry contract that were processed and maintained in Document Control.  My review included POs for supplies that had been ordered, received (or cancelled), and paid for by KBR.  I compiled a spreadsheet indicating the status and disposition of each PO as of the time I left the country.  As of June, 2005, over $400,000 of supplies had been paid for by KBR.  These supplies were to have been provided by D&P under the terms of their subcontract, and had already been paid for in the cost of laundry services as proposed by D&P.  I presented my findings about D&P's overcharges of over $400,000 to Rami Oweis and Ghattas Oweis in a meeting a few days before I left country.  They refused to discuss the charges with me and stormed out of the meeting.

Barko Decl. ¶ 17.  Mr. Barko also submits as an exhibit the spreadsheet described above.  *See* Barko Ex. 60, Barko Laundry Spreadsheet, ECF No. 265-14.

In response, KBR submits evidence that it took title to the laundry facilities and equipment in October 2004 (October 14, 2004 at B1, October 19, 2004 at B3, and October 21, 2004 at B1).  *See* KBR Ex. 147, Material Received Records, ECF No. 268-101.  At this point it assumed responsibility for supplies and maintenance at the facilities.  *See* KBR Ex. 145, Ritondale Depo. 241:9–14, ECF No. 268-8 ("When we took title to all the facilities, from that point forward we were responsible for maintenance."); KBR Ex. 148, Material Requisition VCW 4637, ECF No. 268-11 (describing laundry supplies and noting that they were intended for use at the B1 laundry facility, which was "no longer subcontracted out").  Thus, once KBR took title in October 2004, the cost of supplies were KBR's responsibility and it was not under an obligation to backcharge D&P for the supplies.  Because Mr. Barko's spreadsheet does not show any charges for supplies

made before the purchase of the laundry facilities in October 2004,[5] he has failed to present evidence showing that KBR failed to backcharge for such supplies and therefore double billed the government.  The Court will grant summary judgment to KBR on Count XIII, which related to double billing for laundry supplies.[6]

### E.      Site B6 Man Camp Construction Contract Claims

Although most of KBR's claims for payment were submitted via the public voucher process described above, KBR also submitted a Certified Claim for the work completed for the man camp construction after the subcontract was terminated for convenience.  KBR and D&P negotiated what D&P should be paid for the work they had completed, during which KBR inspected the work, and agreed on a figure.  KBR submitted a claim for approximately $3.3 million. Mr. Barko argues that the Certified Claim contained false assertions that the claim was "made in good faith" and that "the supporting data are accurate and complete."  Barko SOF ¶ 145.  He argues that KBR falsely stated that the subcontract was competitively bid, that a section related to performance was false by omission, that KBR concealed material facts from the government about the true value of the claim, and that KBR falsely claimed 50% of work was completed, when only 3% of work was actually completed.  *Id.* ¶¶ 146–65.  KBR notes that when it submitted the Certified Claim, it disclosed the construction deficiencies, and the government approved the claim in full, and argues that Mr. Barko is merely submitting his subjective belief of what KBR should

---

[5] Mr. Barko's spreadsheet shows that the (non-cancelled) POs were made between July 24, 2004 and February 12, 2005.  *See* Barko Laundry Spreadsheet.  Two POs predate October 2004: VCW 1831 on July 24, 2004, and VCW 2523 on September 23, 2004.  However, as noted by KBR, VCW 1831 was for "home laundry" supplies, not facility supplies, and VCW 2523 was not converted into a purchase order until November 18, 2004.  *See* KBR Ex. 149, Material Requisition VCW 1831, ECF No. 268-12 (noting that the laundry bags ordered were for home laundry); KBR Ex. 150, KBR Requisition VCW 2523 and Purchase Order, ECF No. 268-13 (listing the PO Date as November 18, 2004).  Mr. Barko has not presented evidence to the contrary.

[6] In Count XI of his Amended Complaint, Mr. Barko claims that KBR and D&P "repeatedly billed for labor under the master labor agreement when there were already contracts in place that included labor" through work releases and change orders.  As noted by KBR, Mr. Barko's opposition brief does not sufficiently address or explain such instances of double billing. The Court will therefore grant summary judgment on Count XI.

have disclosed to the government, rather than identifying any obligation to disclose the purportedly missing information.  Defs.' Mot for Sum. J. at 22; Defs.' Reply at 21– 22.

The Court will not reach any decision regarding the factual dispute amongst the parties over the Certified Claim, but will nonetheless grant summary judgment to KBR.  The Certified Claim is not mentioned anywhere in Mr. Barko's complaint, nor is it identified as the basis for any one of his fifteen listed counts against KBR.  Counts VIII–X of Mr. Barko's Amended Complaint relate to the construction of the B6 man camp.  Count VIII alleges that D&P's construction of the camp was substandard and hazardous and that damages to the United States include the cost to construct the dormitory, $4,800,000.  *See* Am. Compl. ¶¶ 508–12.  This count sounds in breach of contract.  The Court has already found that breach of contract claims for deficient performance are not cognizable under the False Claims Act and has granted summary judgment to KBR on such claims.

In addition, Count IX claims that "KBR willfully and recklessly attempted to enforce performance of [the] subcontract" and then caused the submission of false claims by adding more than $2 million to the contract via change orders after D&P's failure to perform was identified.  *See* Am. Compl.  ¶¶ 513–19.  In his opposition brief, Mr. Barko argues that KBR awarded D&P a mobilization fee of $305,000 without explanation "and a no-bid $1,091,500 subcontract for providing housing units when the entire house shortage was due to D&P's failed and defaulted construction effort."  Pl.'s Opp'n at 9.  He also states that the construction delay resulted in further costs and "KBR billed the government an additional $740,349.95 for the cost of replacement housing when D&P failed to construct the B6 man camp dormitories"  Barko SOF ¶ 119.  Count X alleges that KBR engaged in anticompetitive bidding, manipulating the bidding process to award the subcontract to D&P, and claims that the contract was therefore void *ab initio*.  *See* Am. Compl.

¶¶ 520–27.   Again, however, Mr. Barko has failed to demonstrate the existence of a false certification—express or implied—in these claims or fraudulent inducement to enter into the man camp subcontract.   The Court will therefore grant summary judgment to KBR on Counts IX and X.

In sum, Mr. Barko submits in his opposition brief that the Certified Claim was false for many reasons, but a false claim not named in a complaint cannot form the basis of his lawsuit.   Mr. Barko has further failed to present evidence demonstrating false claims related to the B6 man camp construction contract for the reasons stated above.

## V.      MR. BARKO'S RULE 56(D) ARGUMENT

Mr. Barko argues that summary judgment should be denied pursuant to Rule 56(d).   Rule 56(d) provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition, the court may . . . allow time to . . . take discovery."   Fed. R. Civ. Proc. 56(d).   Accordingly, courts should not grant summary judgment until "all parties have 'had a full opportunity to conduct discovery.'"   *U.S. ex rel. Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 25 (D.C. Cir. 2014).   To succeed on a Rule 56(d) motion, the nonmoving party must 1) detail the particular facts he wishes to discover and explain why such facts are necessary, 2) explain why he could not produce such facts in his opposition to summary judgment, and 3) show that the information is discoverable.   *Id.* at 26.   Courts should also consider whether the party opposing summary judgment has diligently pursued the discovery sought.   *Id.*

### A.      Procedural History

This case has been pending for twelve years.   During this time it has been to the Court of Appeals twice to resolve discovery disputes, and two stays of discovery have been implemented. Before reaching the parties' arguments, therefore, the Court finds it necessary to summarize the relevant discovery-related history.   The following information is taken from the docket, as well as

from each party's declarations.   The periods during which discovery was stayed pending the outcome of appeal are bolded.

- 06/27/2005: The original Complaint was filed under seal.

- 06/27/2005–06/13/2007: The United States Government began conducting an investigation of the allegations in the Complaint and requested several extensions of the investigative period before notifying the court of its decision whether to intervene.

- 06/13/2007: The Amended Complaint was filed under seal.

- 06/13/2007–03/02/2009: The United States Government continued its investigation of the allegations in the Complaint and requested several extensions of the investigative period before notifying the court of its decision whether to intervene.

- 01/12/2009: The Amended Complaint was unsealed.

- 03/02/2009: The United States declined to intervene in this case.

- 03/19/2009: Summons were issued to KBR and D&P.

- 06/19/2009: KBR filed a motion to dismiss the Amended Complaint.

- 09/11/2009: D&P filed a motion to dismiss the Amended Complaint.

- 06/17/2010: Judge Sullivan found that jurisdictional discovery was appropriate and ordered jurisdictional discovery be completed by 7/30/2010.

- 12/30/2010: The jurisdictional discovery deadline was extended to 04/1/2011.

- 06/24/2011: Mr. Barko's motion for additional jurisdictional discovery was denied.

- 09/15/2011: This case was reassigned from Judge Sullivan to Judge Gwin, with motions to dismiss pending.

- 07/08/2013: Judge Gwin denied the motions to dismiss.

- 08/12/2013: Judge Gwin entered a scheduling order, setting the deadline for discovery needed to support or defend dispositive motions for 2/3/2014.  The final discovery deadline was set for 5/11/2014.

- 12/13/2013: Mr. Barko served Interrogatory 1 on KBR.  Interrogatory 1 asked KBR to "Identify every person other than legal counsel that you believe possesses knowledge or information regarding the factual allegations and/or legal claims described in the First Amended Complaint filed in this action and the Answer

thereto of any Defendant, and describe in detail your understanding of the facts about which they have knowledge."

- 01/21/2014: KBR answered Interrogatory 1, identifying 205 potential witnesses, 168 of whom were KBR employees. According to Mr. Barko, KBR failed to state the facts known to these witnesses or to provide sufficient contact information. According to KBR, the interrogatory asked for privileged information and was so overly broad and unduly burdensome that KBR treated it as a request for Rule 26(a)(1) disclosures, identifying the names and titles of each witness, as well as the particular subcontracts about which they had knowledge.

- 02/03/2014: Mr. Barko moved to compel documents relating to the COBC investigations.

- 02/10/2014: KBR filed its original motion for summary judgment.

- 03/06/2014: Judge Gwin granted Mr. Barko's motion to compel and found that privilege did not apply to the COBC reports.

- 03/12/2014: Judge Gwin extended the preliminary discovery deadline to 3/17/2014.

- 03/12/2014: KBR appealed Judge Gwin's finding regarding privilege of the COBC reports.

- 04/10/2014: The parties filed a joint motion to suspend deadlines and stay proceedings pending the outcome of KBR's first appeal.

- **04/11/2014: Judge Gwin granted the joint motion and discovery was stayed pending KBR's first appeal. Otherwise, all discovery was scheduled to be completed by 5/11/2014.**

- **06/27/2014: The Court of Appeals reversed Judge Gwin's privilege decision, finding that the COBC reports were protected by the attorney-client privilege. The 4/11/2014 stay of discovery expired on its own terms.**

- 09/15/2014: Judge Gwin ordered that the parties file position papers to address 1) whether any attorney-client privilege had been waived; and 2) what discovery had arguably not been produced.

- 10/06/2014: Both parties filed position papers responding to Judge Gwin's 09/15/2014 Order. Mr. Barko raised the issue of contact information for the witness list provided in response to Interrogatory 1 for the first time.

- 10/20/2014: Both parties filed reply briefs to the other side's position papers.

- 11/20/2014: Judge Gwin found that KBR waived privilege over the COBC reports and ordered discovery to be completed by 3/30/2015.  He did not specifically address the contact information issue.

- 12/17/2014: Judge Gwin found that the COBC reports were discoverable fact work product.

- 12/19/2014: KBR appealed Judge Gwin's 11/20/2014 and 12/17/2014 decisions regarding the COBC reports.

- 12/22/2014: Mr. Barko demanded the contact information of all 168 witnesses listed by KBR as employees.  The parties subsequently agreed that KBR would provide a list of current versus former employees, and then Mr. Barko would select from that list those whose contact information he wanted.

- 12/31/2014:  KBR moved to stay all discovery pending the outcome of its second appeal.  Mr. Barko opposed this motion.

- 01/10/2015: Judge Gwin denied KBR's motion to stay all proceedings and ordered that Mr. Barko could proceed with renewed 30(b)(6) depositions, ordering that they be completed by 1/30/2015.  The court stayed Mr. Barko's notice to depose Chris Heinrich in his personal capacity.

- 03/05/2015: KBR provided a list of current versus former employees from the 168 witness list.

- 03/06/2015: Mr. Barko moved to stay discovery and extend deadlines, moved for a protective order to preclude KBR from deposing a former government official, and moved to compel the identifying information and knowledge of the 205 witnesses identified in response to Interrogatory 1.

- 03/09/2015: The discovery deadline was extended from 3/30/2015 to 4/30/2015. Judge Gwin ordered that final dates would be provided after the Court of Appeals ruled on KBR's second appeal.  Judge Gwin did not rule on Mr. Barko's motion to compel and did not stay discovery.

- 03/31/2015: The parties filed a joint motion to suspend all deadlines and stay proceedings pending resolution of KBR's second appeal.

- **04/01/2015: Judge Gwin granted the joint motion to stay and discovery was stayed pending KBR's second appeal.  Judge Gwin ordered that new discovery deadlines would be set after resolution of KBR's second appeal.  Judge Gwin ordered that Mr. Barko's opposition to summary judgment would be due sixty days after the Court of Appeals issued its opinion.**

- **08/11/2015: The Court of Appeals reversed Judge Gwin's 11/20/2014 and 12/17/2014 decisions regarding both waiver and work product.  The 4/1/2015 stay of discovery expired on its own terms.**

- 08/12/2015: Judge Gwin entered a new briefing schedule, but did not set additional deadlines for discovery.  Judge Gwin ordered that Mr. Barko's opposition to KBR's pending motion for summary judgment, filed on 2/10/2014, was due on 10/12/2015, sixty days after the Court of Appeals' decision.

- 08/31/2015: This case was reassigned to Judge Lamberth.

- 09/01/2015: KBR produced the contact information for the 168 witnesses identified in response to Interrogatory 1.  It did not describe the facts known to each witness.

- 10/12/2015: Mr. Barko filed his opposition to summary judgment, raising a Rule 56(d) argument.

- 10/26/2015: KBR filed its reply in support of summary judgment.

The Court will now turn to the parties' positions.  Mr. Barko argues that "[a]dditional productive discovery has not been completed due to delays caused by KBR's litigation of certain discovery ruling on mandamus and to resolve other discovery disputes over KBR's objections to discovery that resulted in delays."  Pl.'s Opp'n at 25.  He submits the affidavit of his counsel, Michael D. Kohn, in support.  *See* Barko Ex. 162, Kohn Decl., ECF No. 265-36.  KBR responds that the Rule 56(d) motion should be denied because Mr. Barko has sat on his own hands and tactically deferred taking discovery.  Defs.' Reply at 8–9.  KBR submits the declaration of its counsel, Craig D. Margolis, in support.  *See* KBR Ex. 139, Margolis Decl., ECF No. 268-2.

## B.    Mr. Barko's Arguments

Mr. Barko states that the following discovery is necessary: 1) interviews of the 168 witnesses identified by KBR; 2) depositions of six KBR employees; and 3) the disclosure of underlying facts known by the 168 witnesses, including those regarding the COBC investigations (*i.e.*, investigations of fraud or kickbacks).  First, regarding the 168 witnesses, Mr. Barko states that when he filed his opposition to summary judgment, he was in the process of contacting the

witnesses.  As of that date, two witnesses had signed declarations submitted in support of Barko's opposition, and five had indicated a willingness to be interviewed and possibly sign declarations. One witness was preparing to sign a declaration attesting to witnessing cash payments from D&P to a KBR manager, but the witness soon backed out of this commitment.

Next, regarding the six KBR employee depositions, Mr. Barko states that he had deferred completing the depositions until after the Court of Appeals' decisions regarding privilege "in order to conserve resources and not duplicate efforts." and "until final resolution of the production of underlying facts are known to KBR but as yet not been disclosed."  Kohn Decl. at 3.

Finally, with respect to the underlying facts of the COBC investigations, Mr. Barko argues that relevant facts and information are within KBR's possession, but KBR has not disclosed them and that "KBR has suppressed disclosure of relevant facts in discovery that apparently contradict the positions taken by KBR in its motion for summary judgment."  *Id.* at 7.  He argues that KBR is refusing to disclose the facts, instead pointing Mr. Barko to "thousands of pages of documents" already produced.  *Id.* at 9.

C.    **KBR's Arguments**

In response to Mr. Barko's argument that KBR failed to supply contact information for the 168 witnesses, therefore making them essentially unavailable, KBR claims that it "repeatedly offered to provide Relator with the information he now claims to have needed, had he provided KBR with a reasonably sized list of individuals for whom he needed it . . . [and] KBR similarly offered to assist in coordinating and scheduling depositions for any person . . . requested." Margolis Decl. ¶ 12.  KBR then details the interactions it had with Mr. Barko's counsel regarding the witness list.  First, KBR states that Mr. Barko did not complain about the lack of contact information—the crux of his complaint now—until October 6, 2014, nine months after KBR disclosed the witness names, and this complaint was made to the court without any attempt to meet

and confer. *Id.* ¶ 13. On December 22, 2014 (almost one year after KBR provided the witness list), Barko demanded that KBR provide contact information for everyone on that list. *Id.* ¶ 15. KBR responded that that was unreasonable and unnecessary, and agreed to provide contact information for a smaller subset. *Id.* The parties then agreed that KBR would provide a list of current versus former employees, and then Barko would select from that list those whose contact information he wanted. *Id.* KBR provided the list on March 5, 2015, but instead of responding with his own list, Barko moved to compel the contact information of all 168 witnesses. *Id.* ¶ 16. Judge Gwin issued an order that did not specifically address the motion to compel. *See* March 9, 2015 Order, ECF No. 243.

On March 23, 2015 KBR indicated again that it was willing to provide contact information for a smaller subset of witnesses from the list. *Id.* ¶ 17. A week later, the parties jointly moved for a stay of discovery pending KBR's second appeal. *Id.* During the stay, KBR compiled the contact information. *Id.* On August 26, 2015, after the second Court of Appeals decision came down, Mr. Barko renewed his request for the contact information of everyone on the list. *Id.* On September 1, 2015, KBR provided the contact information. *Id.*

Next, with respect to the KBR employee depositions that Mr. Barko seeks to now take, KBR argues that Mr. Barko made the tactical decision to sit on his hands and wait for the Court of Appeals' decisions (which were decided in KBR's favor). KBR states that Barko is now arguing that he deferred taking these depositions to conserve resources and not duplicate efforts. *Id.* ¶ 6. However, when counsel conferred regarding KBR's motion to stay pending KBR's second appeal, which was filed on December 31, 2014 and was opposed by Mr. Barko, counsel for Mr. Barko stated that "[t]o the extent additional discovery may be required based on the resolution of the pending mandamus appeal it can easily be corrected by adjusting the current discovery schedule

as opposed to halting Plaintiff-Relator's ongoing discovery efforts altogether." *Id.* The Court denied KBR's motion to stay, thereby leaving in place the April 30, 2015 deadline. *Id.*[7] KBR argues that counsel for Mr. Barko "does not explain why he could not take the depositions he now claims he wants . . . after opposing KBR's motion for a stay of discovery." *Id.*[8] After the Court of Appeals decided KBR's second appeal, and the second stay of discovery expired, counsel conferred again and counsel for Mr. Barko did not raise the prospect of deposing any KBR witnesses. *Id.* ¶ 8.

Finally, in response to Mr. Barko's arguments regarding the disclosure of the facts known to the 168 witnesses, KBR argues that it has not withheld or suppressed any non-privileged documents or information. It states that KBR responded to Barko's requests with all responsive, non-privileged information available. It also states that KBR has *only* resisted discovery of the contents of the privileged COBC reports—a privilege that has been upheld by the Court of Appeals—and that it "has never sought to prevent Relator from learning any non-privileged facts through means of regular discovery tactics, such as reviewing source documents or conducting factual depositions, irrespective of whether those same facts also appear in a COBC report." *Id.* ¶ 19. It argues that Barko is complaining of suppression when he has simply not taken the time to identify the facts sought somewhere other than in KBR's privileged files.

Exhibit H to the Margolis Declaration—a letter sent to Mr. Barko's counsel on September 1, 2015 accompanying the contact information for the 168 witnesses—further explains KBR's position. In Interrogatory 1, Mr. Barko asked KBR to include the facts known by the individuals identified as having potentially discoverable information. KBR responded that this was virtually

---

[7] The parties later filed a joint motion to stay discovery on March 31, 2015, which was granted on April 1, 2015.

[8] That is, Mr. Barko does not explain why could not take the depositions between January 10, 2015, when the court denied KBR's motion to stay, and March 31, 2015, when the parties filed their joint motion to stay.

impossible without waiving privilege.  Only the witnesses themselves could say what they "know"; KBR could only disclose what the witnesses had told KBR's counsel.  It states that the two Court of Appeals' decisions had definitively established that privilege applies to such statements.  Mr. Barko's narrowing of the request to exclude any information expressly revealed in documents produced did not help.  Leaving aside the burden of such a request, KBR argues that if it were to exclude "facts 'expressly' revealed in the documents produced in discovery, KBR's summary judgment filings, or facts disclosed in depositions, the only remaining source of information would appear to be KBR's attorney-client communications."  Ex. H at 2.  In addition, KBR argues "[t]hat [Barko] seek[s] this protected information is patently obvious from [his] demand that KBR disclose 'the underlying facts known to counsel as to the identity of persons who possess information tending to indicate that Mr. Gerlach had an improper relationship with D&P, steered any contract to D&P, or had obtained things of value directly or indirectly from D&P.'"  *Id.*  KBR then notes that the Court of Appeals stated that "the privilege 'does not protect disclosure of the underlying facts *by those who communicated with the attorney*.'  *In re Kellogg Brown & Root, Inc.*, 756 F.3d 754, 764 (D.C. Cir. 2014) (*KBR 1*) (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 395 (1981) (emphasis added);" it did not sanction obtaining such facts from the attorneys themselves.  *Id.*

KBR concludes by stating that "[t]he time-honored method sanctioned by the rules for discovering what potential witnesses 'know' is to take depositions and gather such information directly from the witnesses.  Rather than take depositions, Barko has relentlessly pursued KBR's COBC files."  *Id.*

### D.     Fall 2014 Position Paper Arguments

Earlier in this litigation, the parties submitted position papers responding to the Court's September 15, 2014 Order to address in part what discovery had arguably not been produced.

Some of the issues addressed in these papers are relevant to the dispute here and helpful for the Court to examine.  Specifically, the parties presented arguments regarding the production of the facts known to the 168 witnesses concerning misconduct and fraud reported through the COBC policy.

Mr. Barko argues that such facts are not privileged and "[i]f a KBR employee disclosed wrongdoing or fraud that is relevant to the allegations in this case, those facts must be disclosed in response to Plaintiff-Relator's discovery requests."  Pl.'s Position Paper at 18, ECF No. 180. According to Mr. Barko, when KBR responded to the interrogatory it and its counsel "knew which persons had raised concerns about matters relevant to the issues raised by Plaintiff-Relator in this case, and KBR is under a duty to disclose all underlying facts within KBR's knowledge.  Simply because communications were made by employees to COBC investigators does not permit KBR to withhold the non-privileged underlying facts."  *Id.* at 22.  He argues that it is improper for KBR to simply refer him to other documents produced for the information he seeks.

KBR responds first that the information sought is privileged and that "this is just another way of demanding that KBR disclose exactly the communications that the Court of Appeals has now held privileged.  Relator is simply not entitled to know who KBR interviewed or what they said during a privileged communication."  Defs.' Response to Position Paper at 14, ECF No. 187. In addition, KBR argues that Interrogatory 1 itself is an improper "blockbuster" interrogatory, "commonly held objectionable on grounds of overbreadth and undue burden because it essentially requires the answering party to 'provide the equivalent of a narrative or otherwise detailed account of [its] entire case in chief.'"  *Id.* at 15 (internal citation omitted).  KBR states Mr. Barko is essentially asking KBR to provide a narrative of Mr. Barko's own case.  Therefore, KBR construed

Interrogatory 1 as a request for a Rule 26(a)(1) disclosure,[9] and provided the names, titles, and particular subcontracts about which the witnesses were thought to have relevant knowledge.

### E.      Analysis and Conclusion

For the following reasons, the Court will deny Mr. Barko's Rule 56(d) motion, will not order additional discovery, and will grant summary judgment to KBR.

### 1.      Mr. Barko is Not Entitled to Discovery Sought

The Court first turns to the last category of information sought—an identification of the facts about which the 168 witnesses have knowledge—and finds that Mr. Barko is not entitled to this discovery.  The interrogatory was served on KBR, not the witnesses listed.  Asking KBR to identify the facts known to each witness—specifically the facts reported through the COBC policy regarding fraud or kickbacks—is akin to asking KBR to disclose privileged information.  Over two and a half years ago, the Court of Appeals found that "KBR initiated an internal investigation to gather facts and ensure compliance with the law after being informed of potential misconduct. And as in *Upjohn*, KBR's investigation was conducted under the auspices of KBR's in-house legal department, acting in its legal capacity.  The same considerations that led the Court in *Upjohn* to uphold the corporation's privilege claims apply here."  *KBR I*, 756 F.3d at 757.  It therefore found that the attorney client privilege applied to the COBC investigations.  *Id.* at 760.  Mr. Barko is now asking KBR to identify, in response to an interrogatory, this privileged information.  He is not entitled to such information and the Court will not order KBR to provide it.

Furthermore, the Court agrees with KBR that the interrogatory is overbroad and unduly burdensome.  It asks KBR to identify every person that may possess knowledge or information

---

[9] Rule 26(a)(1) orders parties to provide "the name and, if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment."  Fed. R. Civ. Proc. 26(a)(1)(A)(i).

regarding the factual allegations or legal claims in Mr. Barko's complaint—which are incredibly numerous, to say the least—and then describe, in detail, the facts about which they have knowledge.  There are no apparent limitations on the information sought.  Mr. Barko is essentially asking KBR to investigate and describe his case for him.  This is not the proper purpose of interrogatories.  *See, e.g.*, *Cannata v. Catholic Diocese of Austin St. John Neumann Catholic Church*, No. A-10-CA-375 LY, 2011 WL 221692, at *1 (W.D. Tex. Jan. 21, 2011) ("[I]nterrogatories are not intended to take the place of depositions, where follow up questions are easily asked, and details of the facts of a case are better discovered.").  A party cannot "be forced to prepare its opponent's case."  8B WRIGHT, MILLER & MARCUS, FED. PRAC. & PROC. § 2174 (3d ed. 2013).  Therefore, the Court finds that Interrogatory 1 is also improperly overbroad and unduly burdensome.  *Cf. Hilt v. SFC Inc.*, 170 F.R.D. 182, 186–87 (D. Kan. 1997) (finding interrogatories overbroad and unduly burdensome on the grounds that they "would require plaintiff to provide the equivalent of a narrative or otherwise detailed account of her entire case in chief, together with identification of virtually all supporting evidence for each fact"); *cf. also Megdal Assocs., LLC v. La-Z-Boy, Inc.*, No. 14-81476-CIV, 2016 WL 4503337, at *6 (S.D. Fla. Feb. 1, 2016) (adopting the reasoning of *Hilt* and finding that "the interrogatory at issue here, which seeks the factual and legal bases for all allegations in Plaintiff's Complaint, . . . is an improper use of that discovery tool [because] [i]t is not tailored to any specific claim or allegation in the Amended Complaint [and it] sweeps in not only material facts, but incidental details, secondary accounts, trivial tidbits—even facts supporting allegations that Defendant has admitted").

It appears to the Court that Mr. Barko, instead of endeavoring to discover these facts elsewhere, relied on the hope that the Court of Appeals would agree with Judge Gwin's findings that the COBC reports were not privileged, or that KBR had waived that privilege.  The Court of

Appeals did not do so.  And, while KBR's appeals were pending, it was not KBR's job to build Mr. Barko's case by providing such information.  Mr. Barko should have sought to discover these facts without relying on the ultimately misplaced expectation that he would have access to them via the privileged COBC reports, or via an equally privileged explanation from KBR regarding the contents of the same reports.  Therefore, the Court finds that Mr. Barko is not entitled to the following discovery sought: the apparently unlimited knowledge of the 168 witnesses, particularly when that knowledge is the contents of the privileged COBC reports.

### 2. Mr. Barko Failed to Show That He Could Not Produce the Information He Seeks to Now Discover in Opposition to Summary Judgment

In addition, the Court finds that Mr. Barko has failed to show that he could not produce two pieces of information that he now seeks, prior to filing his opposition to summary judgment: 1) the contact information of the 168 witnesses, and 2) depositions of six KBR employees.  He did not diligently pursue this discovery.  First, with respect to the contact information, the Court acknowledges the two stays of discovery, but is not persuaded that these prevented Mr. Barko from obtaining the information sought.  Mr. Barko received the list of names, titles, and subcontracts on January 21, 2014.  Discovery was stayed between April 11, 2014 and June 27, 2014 (the date of the first Court of Appeals' decision), but Mr. Barko could have, yet failed to, asked for the contact information any time before April or after June of 2014 (that is, until it raised the issue with the Court in October of 2014).  Despite any stays of discovery, Mr. Barko ultimately had roughly twenty months from the date that KBR originally filed for summary judgment (after it had provided the list of witness names) to the date that his opposition was due.  Mr. Barko knew that he had to gather evidence in preparation for this opposition.  Where so much of Mr. Barko's claims rest on information he allegedly discovered while examining and auditing KBR's files, and where Mr. Barko was a KBR employee presumably in contact with other KBR employees during his

employment, the Court is not convinced that Mr. Barko adequately used this time to track down and question witnesses.

In addition, after Mr. Barko did specifically ask KBR for the contact information in December of 2014, the evidence shows that KBR objected to providing contact information for every single witness on the grounds of undue burden.  It also shows that Mr. Barko therefore agreed to provide a revised and shortened list to KBR describing a smaller number of employees whom he wished to contact, but did not do so, instead moving to compel the contact information of all 168 witnesses on March 6, 2015.  Judge Gwin issued an order on March 9, 2015 but did not specifically rule on the motion to compel.  Three weeks passed before discovery was again stayed on April 1, 2015 pending the outcome of KBR's second appeal, during which Mr. Barko apparently did not submit a narrowed list to KBR.  After the Court of Appeals issued its decision on August 11, 2015, Mr. Barko renewed his request for the contact information of all 168 witnesses, and KBR provided it on September 1, 2015, less than a week later.

Mr. Barko then had several weeks contact these witnesses before his opposition was due. In his opposition, filed on October 12, 2015, he stated that counsel was in the process of contacting such persons.  The Court is not satisfied that the plaintiff showed any diligence whatsoever in this process of contacting these witnesses by waiting until this point to start attempting to contact them, given that he had the names of the witnesses (along with their titles and a description of the subcontracts they worked on) since January 21, 2014 (*i.e.*, 21 months prior to the ultimate deadline to file an opposition brief), and turned down an opportunity to get the contact information nearly a year earlier by narrowing his request, but failing to do so.

Furthermore, although the Court acknowledges that interviewing this number of witnesses in a short time could be burdensome and that Mr. Barko's counsel has attested that at least five

witnesses could not be interviewed before the opposition was due, eighteen months have now passed since Mr. Barko filed his opposition.  At no point has Mr. Barko attempted to supplement his opposition or submit exhibits to the Court showing that he has conducted interviews of any additional witnesses and that he now has concrete evidence to defeat summary judgment.  In sum, Mr. Barko had the names of the 168 witnesses for an extended period of time, regardless of any stays of discovery, failed to narrow the list in any way and apparently failed to find alternative means of contacting such persons knowing that they may have had discoverable evidence, did not contact every person on the list in the six weeks between receiving the contact information and submitting his opposition brief, and has not presented evidence showing that now, eighteen months later, he has obtained enough evidence to oppose summary judgment.

As for the depositions that Mr. Barko seeks to now take, if Mr. Barko wanted to wait for the outcome of the Court of Appeals' decision, he could and should have moved to stay discovery, instead of opposing KBR's motion to stay.  Exhibit A to the Margolis Declaration (December 31, 2014 emails between Mr. Kohn and Mr. Margolis) confirms that counsel for Mr. Barko opposed staying discovery pending KBR's second appeal and that he indeed took a contradictory position to the one now advocated—that he deferred depositions to conserve resources and not duplicate efforts—instead stating that discovery should not be completely halted and that if additional discovery was necessary after the Court of Appeals decision, then the discovery schedule could be adjusted.  It again appears that Mr. Barko was relying on the misplaced hope that he would gain access to the COBC reports.

Furthermore, it also does not appear that Mr. Barko attempted to depose the employees after the Court of Appeals conclusively determined that the reports were privileged and not subject to waiver on August 11, 2015, two months before his opposition to summary judgment was due.

The Court does not find it unreasonable to expect that a party could complete six depositions in two months, particularly when the case has been pending for so long and when that party knows it has an opposition brief due.

Mr. Barko had ample opportunities to obtain the information that he now uses as a basis for opposing summary judgment.  This case has been pending for many years, and although stays have been entered, discovery has *not* been stayed from the moment that KBR answered Interrogatory 1 until Mr. Barko filed his opposition, and there appears to have been no impediments to his ability to take the discovery sought outside the stay periods.  That situation would present very different issues.  Here, when the stays were lifted, or before they were implemented, Mr. Barko waited to request the contact information and waited to seek depositions. He had twenty months from the time that KBR filed for summary judgment and should not have been surprised that he had to gather sufficient evidence to oppose the motion.  The Court finds that Mr. Barko had his chance to discover the information he now seeks and produce the resulting facts in his opposition to summary judgment, and therefore that his Rule 56(d) argument fails.  *See Berkeley v. Home Ins. Co.*, 68 F.3d 1409, 1414–15 (D.C. Cir. 1995); *see also Thomas v. Paulson*, 507 F. Supp. 2d 59, 80–81 (D.D.C. 2007) (finding it would not be appropriate to reopen discovery where the plaintiff "had ample opportunity to [identify a witness during discovery and take his deposition], but failed to do so") (internal quotation marks omitted)).

Therefore, for the reasons explained above, the Court rejects Mr. Barko's Rule 56(d) argument because the discovery sought is privileged and/or overly broad and unduly burdensome, or because he has not shown that he could not discover and produce the facts that he now seeks. The Court will grant summary judgment to KBR without allowing additional time for discovery.

## VI.    KBR'S MOTIONS FOR LEAVE TO FILE SUPPLEMENTAL MEMORANDA

KBR has filed two motions for leave to file supplemental memoranda, ECF Nos. 264, 272, both of which are opposed by Mr. Barko.  First, KBR seeks to file a supplemental memorandum addressing additional discovery conducted since the filing of its motion, and factual developments that have taken place including a DCMA review and approval of the laundry subcontracts at issue. *See* Defs.' Mot. for Leave to File Supp. Mem. ECF No. 264.   In addition, KBR seeks to file a supplemental memorandum addressing the Supreme Court's recent decision in *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 2001 (2016), cited above.  *See* Defs.' Mot. for Leave to File Supp. Mem., ECF No. 272.

Surreplies are generally disfavored, but leave to file a surreply is "'routinely' granted 'when a party is unable to contest matters presented to the court for the first time in the last scheduled pleading.'"   *Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d 75, 85 (D.D.C. 2014).   In determining whether to grant leave, courts "should consider 'whether the movant's reply in fact raises arguments or issues for the first time, whether the nonmovant's proposed surreply would be helpful to the resolution of the pending motion, and whether the movant would be unduly prejudiced were leave to be granted.'"  *Id.*  The Court in this case also previously entered an Order stating that "Counsel may only file one summary judgment motion.  Counsel must seek leave of this Court if he or she wishes to file any additional or supplemental motions.  The Court will grant a motion for subsequent motions only in very rare circumstances."  Court's Aug. 12, 2013 Order at 2–3, ECF No. 126.

The Court will deny leave to file the supplemental memoranda.  They are not necessary to the Court's determination of the issues on summary judgment, and would not alter the Court's decision.  The Court finds that "very rare circumstances" have not been presented.

## VII.    CONCLUSION

Mr. Barko has presented an incredible amount of information to this Court regarding, among many other things, KBR's subcontracting practices and other activities in Iraq.  The Court does not doubt that numerous issues of waste, fraud, and mismanagement may have existed.  However, not every instance of waste, fraud, mismanagement, or breach of contract translates into a False Claims Act violation.  The Court finds that KBR is entitled to judgment as a matter of law.  Mr. Barko has failed to present admissible evidence that KBR received kickbacks in return for contracting favors to D&P.  He makes innumerable allegations of anticompetitive bidding activities, but fails to demonstrate their connection to factually or legally false claims and fails to show that the government was the victim of fraudulent inducement.  His allegations regarding performance defects or nonperformance sound in breach of contract, not False Claims Act violations.  He claims that KBR double billed on the laundry subcontracts, but he has failed to provide evidence showing that KBR knowingly double billed for the purchase of the laundry facilities or that it was obligated to, and failed to backcharge for laundry labor and supplies.  Finally, Mr. Barko cannot succeed on his claims relating to the B6 man camp construction subcontract for many of the same reasons listed above and because his Amended Complaint does not state a claim with regard to the Certified Claim submitted by KBR.

In addition, the Court concludes that it is not appropriate to deny summary judgment on the basis of the need for additional discovery under Rule 56(d).  Mr. Barko is either not entitled to the discovery sought or he has not shown why he could not produce the facts sought in opposition to summary judgment.

For those reasons, the Court will grant summary judgment to KBR and dismiss this action. The Court will also deny KBR's motions for leave to file supplemental memoranda.


Date:  March 14, 2017

Royce C. Lamberth
United States District Judge